**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

XCHANGE TELECOM CORP.,

                 Plaintiff,

       v.

SPRINT SPECTRUM L.P.,

                 Defendants,

No. 14-CV-54
(GLS/CFH)

_____

**APPEARANCES:**

HERZOG LAW FIRM P.C.
Attorneys for Plaintiff
7 Southwoods Boulevard
Albany, New York 12211

XCHANGE TELECOM CORP.
Attorney for Plaintiff
3611 14th Avenue, Suite 215
Brooklyn, New York 11218

ARMSTRONG TEASDALE LLP
Attorneys for Defendants
6400 South Fiddlers Green Circle
Denver, Colorado 80111

SHEEHAN, GREEN, GOLDERMAN &
   JACQUES, LLP
Attorneys for Defendants
54 State Street, Suite 1001
Albany, New York 12207

**OF COUNSEL:**

KEITH J. ROWLAND, ESQ.

MORDECHAI GROSS, ESQ.

CHARLES W. STEESE, ESQ.

LAWRENCE H. SCHAEFER, ESQ.
THOMAS D. LATIN, ESQ.

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER

    Plaintiff XChange Telecom Corp. (hereinafter "XChange") commenced this action

against defendants Sprint Spectrum, L.P., Nextel of New York, Inc., Nextel Partners of

Upstate New York, Inc. and Sprint Communications Company L.P. (hereinafter "Sprint"),

asserting various causes of actions pursuant to the Federal Communications Act of 1934,

47 U.S.C. §§ 151-621 and the New York Public Service Law to recover carrier access

charges, as well as related common law contract claims. Compl. (Dkt. No. 1). Presently

before the Court are motions to compel filed by both parties. Dkt. Nos. 40, 42. Both

motions are opposed. Dkt. Nos. 44, 45, 52, 54. Both parties also seeks sanctions against

the other and Sprint further requests XChange to disclose its damages computation. Dkt.

Nos. 40, 42. For the reasons stated below (1) XChange's motion to compel is granted; (2)

Sprint's motion to compel, as modified and outlined below, is granted; (3) both parties'

motions for sanctions are denied; and (4) Sprint's request for a damages computation

disclosure is granted.


## I. Background

On January 17, 2014 the instant action was filed. Compl. (Dkt. No. 1). In that

complaint, XChange contends that it properly billed Sprint and that Sprint refused to pay

those bills. Id. Accordingly, "[t]he primary question presented by this lawsuit is whether

XChange's interstate and intrastate switched access tariffs apply to the calling in question."

Sprint MTC Mem. of Law (Dkt. No. 42-9) at 3. Sprint contends that XChange is incorrect

because charges do not apply to (1) local wireless (i.e. intraMTA) calls or (1) calls originated

by or terminated to a telephone number not owned by an end user customer (i.e.

involvement in traffic pumping."). Id.

A general overview of the relationships between the parties and industry terms are as

follows:

Sprint is a nationwide long-distance carrier known in telecommunications lingo as an "interexchange carrier (IXC)." [XChange] . . . is a "local exchange carrier (LEC)". LECs usually own the "real estate" in telecommunications: the facilities that connect to users' telephones within the LEC. One of the things LECs do is provide switched access services to IXCs, which allow IXCs to transmit long-distance phone calls to customers in the LEC's area, even though the IXC does not own or lease the facilities that connect to the customers' telephones. When a call begins in the LEC and travels out of the LEC's area, the LEC charges an origination access fee to the IXC; when a call begins elsewhere and ends in the LEC's area, the LEC charges the IXC a termination access fee.

The Federal Communications Commission (FCC) establishes rules for the rates that LECs can charge IXCs for these services. These rates are based on tariffs filed with the FCC for interstate services and with the . . . [state p]ublic [u]tilities [c]ommission . . . for intrastate services. These fees for switched access services can be thought of as "rent": a fee paid by the IXC (here, Sprint) to the LEC (here, [XChange]) for the temporary use of the LEC's property – the facilities used to connect to customers' telephones – for purposes of connecting the IXC's customer to a customer within the LEC.

Where a telephone call originates and terminates within the LEC's area, no fees to an IXC are generated because the LEC handles the call from start to finish. It is only where the call originates from outside the LEC and terminates within the LEC (or vice versa) that the LEC is allowed to charge a switched access fee to the IXC. Enter the concept of "traffic pumping."

Traffic pumping occurs when an LEC artificially increases its long-distance telephone call volume by partnering with a service that purports to offer free (or nearly free) calling services. Usually, the free calling service is located outside the LEC, but it obtains a telephone number within the LEC. Then, when calls are placed to the calling service, they are routed through the LEC, often terminating in a place other than the LEC. Thus, sometimes the call neither originates in the LEC nor terminates there, but it "pumps" the LEC's long distance traffic, allowing the LEC to charge IXCs switched access fees. Traffic pumping schemes often involve an agreement between the LEC and the free calling service to share the switched access fees generated paid by the IXC. . .

Sprint accuses [XChange] of traffic pumping.

Sprint Commc'ns Co. L.P. v. Native Am. Telecom, LLC, No. 10-CV-04110-KES, 2015 WL 201243, at *1-2 (D.S.D. Jan. 14, 2015).

On March 28, 2014, Sprint filed a motion to dismiss some of XChange's causes of action. Dkt. No. 8. A Memorandum-Decision and Order dated September 16, 2014 granted Sprint's motion in its entirety, dismissing counts one, six and seven in whole and count three in part. MDO (Dkt. No. 30). Familiarity with the facts, which are outlined in that MDO, is assumed.

## II. Discussion

The Federal Rules of Civil Procedure allow for broad discovery demands so long as the information requested is relevant and not privileged or otherwise limited by a court order. FED. R. CIV. P. 26(b)(1). Demands are "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978).

> No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.

Hickman v. Taylor, 329 U.S. 495, 508 (1947).

Discovery is limited or denied if the court determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

4

> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C). "The Federal Rules distinguish between discoverability and admissibility of evidence . . . Therefore, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial. These considerations are not inherent bars to discovery, however." Sancom, Inc. v. Qwest Communications Corp., No. CIV 07-4147-KES, 2009 WL 136679, at *3 (D.S.D. Jan. 20, 2009). If a party fails to properly respond to a discovery demand, the party seeking the discovery is entitled to move for an order compelling disclosure. FED. R. CIV. P. 37(a).

Initially it is noted by the Court that both parties spend a majority of their memorandums of law, both in supporting and opposing the respective motions, making substantive arguments about who proffers the correct theory of the case. No party "possess the unilateral ability to dictate the scope of discovery based on their own view of the parties' respective theories of the case." Sentis Group, Inc. v. Shell Oil Co., 763 F3d 919, 925 (8th Cir. 2014). Instead, the Federal Rules specify that any information not exempted by privilege or court order may be discoverable to the extent that it "may [be] use[d] to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A). Thus,

> it matters not for the purpose of discovery which side's theory of the case might ultimately be proven correct. What matters is that each side is entitled to pursue intelligible theories of the case and [neither party can] . . . by their sole insistence, declare evidence undiscoverable or irrelevant merely because it does not fit into their own theory of the case.

5

<u>Sentis Group</u>, 763 F.3d at 926; <u>see</u> <u>also</u> <u>Oppenheimer Fund</u>, 437 U.S. at 351 (explaining that "discovery is not limited to issues raised by the pleadings, [as it] . . . . is designed to help define and clarify issues," neither is it "limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits."). To the extent that "claims or defenses . . . have been stricken, or to events that occurred before an applicable limitations period, unless that information sought is otherwise relevant to issues in the case," discovery should be denied. <u>Oppenheimer Fund</u>, 437 U.S. at 352. However, it is not presently appropriate given the pending motion, or within the jurisdiction of the undersigned, to determine whether the substantive issues raised during the briefing should lead to the decision that various claims or defenses need to be striken and that, by extension, the discovery demands are inappropriate. Instead such arguments regarding the viability of the remaining claims and defenses should be properly presented, in a dispositive motion, before the District Judge.

**1. XChange's Motion to Compel**

As relevant to the present motion, in XChange's first set of interrogatories it sought for Sprint to:

> 1. Identify each call record on these discs for which Sprint asserts XChange is not entitled to payment at the rates billed by XChange. For each call record identified, set forth:
>
>    a. The specific call by originating and terminating number;
>
>    b. The date and time the call was initiated;
>
>    c. The specific reason (factual or legal) Sprint asserts the amount billed is incorrect or that XChange is not entitled to compensation on that call;

6

d. If a disputed call from a Sprint end user was terminated by XChange, identify the specific Sprint entity which originated the call (as distinct from any Sprint entity acting as an intermediate carrier on such call); the telephone number of the originating caller; and the location where such call originated;

e. If a disputed call originated from XChange, and was terminated by a Sprint entity directly to a Sprint end user, identify the Sprint entity terminating the call; the telephone number of the called party; and the location of such called party when the call was terminated.

Dkt. No. 40-2 at 23. Sprint objected to the interrogatory, citing its response would be "unduly burdensome and oppressive, in requiring Sprint to provide details on a line-by-line basis on millions of individual call detail records ("CDRs")[1]." Dkt. No. 40-2 at 28. Instead of "providing a table with millions of individual lines, Sprint . . . provide[d] business rules that XChange can utilize and apply to the millions of CDRs. With these business rules, the burden of deriving or ascertaining the answer will be substantially the same for . . . XChange. Thus, Sprint relied upon Fed. R. Civ. P. 33(d)." Dkt. No. 40-2 at 29. Sprint also states that a CDR analysis is best suited for an expert witness, which is something Sprint intends to pursue. Id.

Basically, XChange is asking Sprint to generate a spreadsheet, on a call by call basis,

---

[1] As part of its initial disclosures, XChange provided Sprint with three discs call detail records (CDRs) from the Verizon tandem switch. Sprint Resp. (Dkt. No. 44) at 5. "Billing system data is sourced from . . . CDRs," which contain "many fields of information pertaining to a telephone call . . . includ[ing] the originating telephone number, the terminating telephone number, the time of day, the duration of the telephone call and the identity of the switch from which the telephone call came." Acxiom Corp. v. Axiom, Inc., 27 F. Supp. 2d 478, 483 (D. Del. 1998). One expert referred to the CDR as a "Holy Grail because it contains information that is critical for the telecommunications companies to understand their customers better . . . [by] discern[ing] a pattern of telephone useage . . . " Id. (internal quotation marks omitted).

identifying each reason why Sprint refuses to pay for each individual call.  Sprint Resp. (Dkt. No. 44) at 1.  Sprint has identified four overarching reasons for why the calls as a whole were not compensable, indicating that some calls should not be paid for a variety of reasons and some for only one.  Id. at 1-2.  If Sprint is required to present a reason for non-compensability for each call, this interrogatory will require Sprint to generate four spreadsheets – one for each category of reasons Sprint disputes the charges – and identify which of the millions of identified calls fits into each category.  Id. at 2.

Sprint's CDR expert propounds that he is qualified as an expert because he works for a company which does "CDR analytics [which o]n average . . . loads and analyzes between five and ten billion CDRs every day."  Canfield Decl. (Dkt. No. 44-2) ¶¶ 2-3. A CDR is generated when a call is routed through a tandem switch, each switch captures data about each individual call and memorializes that data in the CDR.  Id. ¶ 8.  "CDRs are not human readable, but a series of dot-delimited records that can be read and understood with specialized software."  Id.  A CDR study analyzes the data contained within the CDR and "[t]he cost and complexity of such a study depends upon the time frames over which the study is being performed, the output desired, and other factors."  Id.  While Sprint analyzes its own CDRs on a regular basis and has software capable for doing that analysis, it does not receive or analyze CDRs from Verizon on a routine basis, thus, Sprint would need to generate new software to transform the Verizon CDR into a readable format from which a CDR analysis could be completed.  Id. ¶¶ 18-19.  Canfield estimates that, if the Verizon CDRs are used to complete the analysis, it will cost approximately $25,000 to build a program which can read the CDR prior to an analysis being able to be conducted.  Id. ¶ 23.

Canfield contends that CDRs, regardless of whether derived from Sprint's or Verizon's

records, contain the same information, which carriers may then enhance in various ways to make them more usable to their systems and software, but in its most basic form, the CDRs from Sprint contain the same raw data as the CDRs from Verizon.  Canfield Dec. ¶¶ 20-21. XChange's retained expert disagrees with Canfield's assessment that the Sprint and Verizon CDRs are essentially the same and thus made be used as the basis for the CDR analysis interchangeably.  Malfara Aff. (Dkt. No. 52-1) ¶¶12-18; see also Acxiom Corp., 27 . Supp. 2d at 483 (explaining that there can be "up to 256 different fields [of information in] . . . the CDR.").  Further, Malfara disagrees with Canfield's cost estimate regarding the amount of money it would take to create software to read the Verizon CDRs.  Malfara Aff. ¶ 19. Specifically, Malfara observes that software to read the millions of minutes of calls which compose the Verizon CRDs should not be difficult to create for a company like that which Canfield works for, which loads and analyzes billions of CRDs each day.  Id.  In fact, Malfara states that "[o]n several occasions, it has been necessary for [him] to load and analyze millions of CDRs for [his] clients . . . Even when such analysis calls for designing new database table formats to accommodate new CDR formats or fields . . . the time required to do so . . . is modest [and thus he] . . . find[s] . . . Canfield's cost projection . . . exceedingly high."  Id.

Canfield also estimates that the CDR analysis which is contemplated, using either set of CDRs, would cost approximately $100,000.  Canfield Decl. ¶ 25.  XChange's expert disagrees with this assessment as well.  Instead, "the cost which would be incurred by Sprint or its contractor to process the useage data in [a useable] . . . manner . . . would be approximately $6,000-$6,500."  Redden Aff. (Dkt. No. 52-3) ¶11.

Federal Rule of Civil Procedure 33 governs interrogatories to parties.  Interrogatories

9

"may relate to any matter that may be inquired into under Rule 26(b)."  Fed. R. Civ. P.

33(a)(2).  Interrogatories may be objected to by the responding party.  Id. 33(b)(4).  Further,

> [i]f the answer to an interrogatory may be determined by examining,
> auditing, compiling, abstracting, or summarizing a party's business
> records . . . and if the burden of deriving or ascertaining the answer
> will be substantially the same for either party, the responding party
> may answer by:
>
> 1.  specifying the records that must be reviewed, in sufficient
>     detail to enable the interrogating party to locate and identify
>     them as readily as the responding party could; and
>
> 2.  giving the interrogating party a reasonable opportunity to
>     examine and audit the records and to make copies,
>     compilations, abstracts, or summaries.

FED. R. CIV. P. 33(d).  "Rule 33 production is suited to those discovery requests requiring a

compilation or analysis, accomplished as easily by one party as another, or where neither

side has clear superiority of knowledge or familiarity with the documents.  Accordingly, Rule

33 is well-suited to reply to inquiries of an intensely objective nature."  United Oil Co., Inc. v.

Parts Ass., Inc., 227 F.R.D. 404, 419 (D. MD 2005).  Rule 33 is not appropriate where

"interrogatories pose questions of fact or mixed questions of law and fact with require the

exercise of particular knowledge and judgment on the part of the responding party."  United

Oil Co., 227 F.R.D. at 419; see also In re Savitt/Adler Litig., 176 F.R.D. 44, 49 (N.D.N.Y.

1997) (explaining that where interrogatories ask for facts, "Rule 33(b) require[s] that th[e

interrogatories] be answered separately and fully and the resort to Rule 33(d) in response to

these interrogatories was inappropriate.") (internal quotation marks and citations omitted).

Further, Rule 33 requires reference to business records only, for which third party records

do not apply.  See In re M & L Bus. Mach. Co., Inc., 184 R.R. 366, 369 (D. Colo. 1995)

(denying application of Rule 33(d) where the referenced records included "third-party expert

10

reports . . . not the . . . business records . . . .").

XChange's interrogatory is looking for a factual answer, requiring a separate and specific explanation regarding each call which Sprint objects to paying for. This inquiry is relevant, thus discoverable pursuant to Federal Rule 26(b) and 33(a)(2). Sprint first contends that it should not be forced to performing the CDR analysis and answer the interrogatory because doing so would cause an undue burden. The CDR analysis would initially decipher the underlying call information about where each call initiated and terminated and through which access switches it passed. Both sides have intimated that the above information from the CDR analysis is a necessary burden which must be undertaken during the course of the litigation. Factual questions surrounding the origins and termination of the calls are essential to meeting the burden of proof for any of the claims, counterclaims or defenses of both parties. Just because the information which goes into the CDR analysis, and which will be generated from that analysis, is voluminous is not, in and of itself, dispositive of demonstrating an undue burden. Conversely, for the reasons previously mentioned, it is a necessary burden for both parties. Accordingly, Sprint's argument is insufficient to relieve it from responding to XChange's interrogatory.

Even though the undersigned acknowledges that both sides require the basic information generated from the CDR analysis about the origination, duration and termination of the calls, Sprint's contentions that XChange should shoulder the financial burden of the CDR analysis and reliance on Rule 33(d) fails for a variety of reasons.

First, XChange's interrogatory seeks more than just objective information. The interrogatory asks Sprint to go a step further to provide relevant, specific, factual explanations and clarifications with regard to why it finds XChange's billing practices

objectionable.  It elicits specific answers for why Sprint refuses to pay for the calls which it has billed, for which a general referral to business records is insufficient.  The underlying information from the CDR analysis about the call history is required to formulate the specifics behind Sprint's refusal to pay, which is the genesis of the lawsuit.  Further, while Sprint contends that the CDRs are business records, and while the Sprint CDRs which have not been provided as a part of the initial disclosures may be business records, the Verizon CDRs which were provided by a third, unrelated party, are not.  Therefore, they fall outside of the gambit of Rule 33(d) coverage.

While completing the CDR analysis will be burdensome, it is necessary for both parties. While the undersigned does not agree with Sprint's proffers that XChange should bear the full financial burden of the analysis pursuant to Rule 33(d), the Court is also not persuaded that in the interests of fairness Sprint should be required to shoulder the entire financial burden either, as the bulk of the information generated from the CDR analysis will be helpful to both parties.  The undersigned cannot stress enough that XChange's interrogatory is proper and shall be answered because it asked Sprint to provide additional, specific, factual information on top of the results of the CDR analysis – one of the enumerated reasons why Rule 33(d) was inapplicable.  However in deciding how the underlying CDR analysis should best be accomplished, a middle ground seems most appropriate.

The undersigned agrees that using the Verizon CDRs provided to Sprint by XChange is the most appropriate set of records with which to undertake the CDR analysis.  If Sprint disagrees and wishes to do an additional CDR analysis with their own records, they may do so at their own expense.  Further, as cost is a factor which is now relevant to both parties,

the undersigned directs that parties agree upon a contractor to develop the appropriate software to read the Verizon CDRs and ultimately perform the CDR analysis and verification and that the cost of that be born equally by both parties. If the parties cannot reach a consensus with which contractor to use, they will provide the Court with four contractor quotes, two from each party, and the Court will decide who shall perform the analysis.

Accordingly, XChange's motion to compel, as consistent with this Order, is granted.

### 2. Sprint's Motion to Compel

As relevant to the present motion, Sprint served a request for production of documents and interrogatory responses to XChange on July 25, 2014. Steese Decl. (Dkt. No. 42-1) ¶ 2. XChange's responses were due on August 28, 2014. Id. During a meeting the parties had on June 25, 2014, Sprint identified categories of discovery relevant to its claims and defenses which XChange would not provide as it disagreed with the basis of Sprint's claims. Id. ¶ 3. XChange requested, and Sprint thereafter sent, copies of orders and decisions which had been entered by previous courts compelling similar and identical discovery demands. Id.; see also Dkt. Nos. 42-4, 42-5. On August 28, 2014, Sprint also sent XChange an email asking that , pursuant to Fed. R. Civ. P. 26(a)(1), XChange supplement its initial disclosures on damages. Dkt. No. 42-6. XChange did not timely object or respond to the interrogatories or requests for production. Steese Decl. ¶ 6.

On September 9, 2014, Sprint again emailed XChange seeking responses to its discovery demands. Steese Decl. ¶ 6; see also Dkt. No. 42-7. Shortly thereafter, Sprint requested, and was granted, a discovery conference with the Court. Dkt. Nos. 31-35. An on-the-record conference was held on September 24, 2014 whereupon the undersigned set

13

a briefing schedule for the instant motions.  Dkt. No. 36.

Sprint contends that XChange has still not provided objections to its discovery demands and only partially responded to requests 9, 23, 24, and 34.  Steese Decl. ¶ 8.  The parties held another meeting on October 8, 2014 where XChange remained steadfast in its position that Sprint was not entitled to the discovery requested.  Id. ¶ 9.

Sprint currently moves for the production of all previously requested demands with the exception of document requests 7, 25, 27, and 35.  Sprint Reply I (Dkt. No. 54) at 13.  Accordingly, any such reference or argument regarding the discoverability of these demands is moot.

## A. XChange's Failure to Respond to the Discovery Demands

If a party fails to state, with specificity, his or her objection to an interrogatory within a timely manner, namely thirty days, that "objection is waived unless the court, for good cause, excuses the failure."  FED. R. CIV. P. 33(b).  If a party fails to answer interrogatories, a party may move to compel disclosure and request appropriate sanctions.  Id. 33(b)(5) & 34(b).

Sprint contends that XChange failed to timely respond to the discovery demands it presented, despite multiple interventions attempting to prompt such responses.  Sprint MTC Memo. of Law (Dkt. No. 42-9) at 3-5; Sprint MTC Reply (Dkt. No. 54) at 1-2.  XChange fails to specifically address these contentions, instead relying on verbal statements disagreeing with Sprint's entitlement to various information and proffering that all Sprint's "discovery requests . . . were blunderbuss, overly broad, and unduly burdensome."  XChange Resp. (Dkt. No. 45) at 23.  Relying on "[s]uch pat, generic, non-specific objections, intoning the

same boilerplate language, [is] inconsistent with both the letter and the spirit of the Federal Rules . . . An objection to a [discovery] request must clearly set forth the specifics of the objection and how that objection relates to the [discovery] being demanded." <u>Obiajulu v. City of Rochester, Dept. of Law</u>, 166 F.R.D. 293, 295 (W.D.N.Y. 1996).

The frustration between the parties, now shared by the Court, stems from a failure to focus on the issue being presented and instead take each opportunity provided to advance the merits of each sides' respective claims.  It does appear that XChange first decided to make its objections to Sprint's discovery demands in the course of its responding papers, though many of those objections were difficult to decipher given the amount of space dedicated to discussing the substantive law of the case.  However, this was a failure of both parties and it should not be ignored that, given the voluminous submissions before the Court, objections have been made and should be given some consideration.  This is not to suggest that making such untimely objections after the fact, or relying on verbal, non-specific statements that are not memorialized anywhere, constitute good cause to excuse XChange's failures.  XChange is cautioned that, as the case progresses, any future failures to abide by the Federal Rules will potentially subject it to sanctions.


### B. Interrogatories and Document Requests

Sprint made the following discovery demands with respect to two main categories, intraMTA calls and traffic pumping/calling companies ("Ccs").


### i. Requests for Production of Documents

1.  Produce all documents referenced or identified in response to any of the interrogatories or requests for admission, and any document you referred to or reviewed in responding to any of those interrogatories or requests for admission.

As there were no stated objections to this standard inquiry, and it is reasonably related to produce any relevant information which would fill in the gaps from the demands subsequently solicited, Sprint's motion as to this request is granted.

2.  Produce all correspondence, emails or other documentation exchanged between you and any CC.

3.  Produce all service agreements, contracts, memoranda of understanding or other agreements with each CC. If such service agreements, contracts, memoranda of understanding or other agreements were executed before January 1, 2007, but effective at any time on or after January 1, 2007, such documents should be produced.

4.  Produce all documents relating to contract negotiations with each CC, including without limitation drafts and notes.

XChange generally contends that these discovery requests are overreaching, burdensome and malicious. However, as is discussed frequently throughout this opinion, any evidence illustrating the business relationship between XChange and the CCs is germane to Sprint's allegations of traffic pumping.

While XChange attempts to carve out the negotiations process, contending that the final contract is all that is relevant to establishing what the business relationship is between the parties, those arguments are unpersuasive. The documents surrounding negotiations will lead to relevant, though potentially not admissible, evidence regarding the parties wants, concerns, and true intentions.

As there are many lines of inquiry which will present relevant evidence demonstrating how XChange interacted with CCs and whether that relationship was similar or different to Sprint, the previous requests are relevant and Sprint's motion regarding such is granted.

16

5.   Produce all correspondence or other documentation exchanged between you and any consultant relating to (a) CCs or (b) access revenue sharing including without limitation, work papers or related materials relating to switched access or local exchange tariffs, or rate development.

6.   Produce all documents that evidence, reflect, identify or relate to the volume of traffic that has been routed to you and/or sent to each CC.

8.   Produce all documents that evidence, reflect, identify, or discuss the assignment of telephone numbers to CCs.

While XChange generally alleges that these requests are overbroad, burdensome and unreasonable, it only specifically articulates, with respect to RFP 8, that a large number of documents could be involved in production. However, such concerns are overshadowed by the fact that demands relating to documents and consultation conversations regarding CCs, "access revenue sharing, switched access tariffs, local exchange tariffs, or rate development . . . have discovery relevancy." Readlyn Telephone Co. v. Qwest Comm. Corp., No. 10-CV-2040 (JEG/RAW), 2013 WL 1334547, at *1 (N.D.Iowa Mar. 29, 2013); see also Dkt. No. 42-5 at 23 (discussing that "documents about revenue sharing, . . . "traffic pumping" schemes, copies of newsletters . . . , documents exchanged with certain consultants . . ., documents relating to the assignment of telephone numbers, and documents relating to call routing," were all relevant and subject to production). Accordingly, Sprint's motion is granted.

Payments and revenues, especially in comparison to the volume of traffic, resulting in what has been billed and received is relevant to Sprint's arguments about traffic pumping. Widevoice Comm., Inc. v. Qwest Comm. Co., LLC, No. 12-CV-467 (Dkt. No. 42-5 at 105-117) at 10 ("[T]he court finds that documents relating to the volume of traffic that has been routed to or through [a CC or its affiliate] for deliver to or from, or relating to revenues [a CC

or its affiliate] has billed and/or received from any LEC . . . and any [CC] . . . are relevant . . . ."). While the scope of this information is broad, it is not overly broad. In order to have a clear picture of what was actually paid, when, and if there is any remaining debt or unpaid balances pending, Sprint requires more than just invoices and account statements. See Qwest Comm., LLC v Tekstar Comm., Inc., (Dkt. No. 42-5 at 55-62) at 6 (allowing discovery to procure "documents or other information that may support or contravene [a] . . . 'notion' [that a LEC] . . . netted or offset its payments to [a CC] to account for the services [the LEC] . . . was allegedly providing to [the CC]."). Accordingly, the breadth of financial information requested is necessary for generating potentially relevant information showing the alleged extent of the traffic pumping in which XChange is supposedly engaged.

Acknowledging XChange's contentions, this response may encompass several documents, but that does not make it burdensome because the content of the documents may reveal relevant information to the when, what and why behind the assignment and possession of telephone numbers which is directly related to the alleged traffic pumping claims. See Dkt. No. 42-5 at 23 (discussing that "documents about revenue sharing, . . . "traffic pumping" schemes, copies of newsletters . . . , documents eXChanged with certain consultants . . ., documents relating to the assignment of telephone numbers, and documents relating to call routing," were all relevant and subject to production). Accordingly, Sprint's motion is granted.

9. Produce each version of your interstate access tariff, intrastate access tariffs, New York PSC No. 4 (including similar tariffs from other states, if any), and local eXChange tariffs that has been on file and/or in effect in any jurisdiction at any time since 2007.

There appear to be no specific objections to this request. Thus, Sprint's motion is

18

granted.

10. Produce all documents relating to websites, advertisements, or other marketing by CCs, including without limitation, all prior versions and drafts regardless of when created, used or effective.

XChange objected to this request stating it was irrelevant because the information related to the CCs and not XChange. However, the Federal Rules allow for discovery of documents that are also within the parties' possession. If XChange does not have any responsive documents, they should indicate as much. Otherwise, Sprint's motion is granted and XChange shall comply with the discovery demand.

11. Produce all documents that relate to invoices sent to or received from, checks and check stubs sent to or received from, or accounting records related to CCs.

12. Produce all documents (including without limitation, cancelled checks, check stubs, copies of checks, general register, journal entries) evidencing, identifying, or relating to any payments you have received from any CC.

13. Produce all documents (including without limitation, cancelled checks, check stubs, copies of checks, general register, journal entries) evidencing, identifying, or relating to any payments you have made to any CC.

14. Produce all balance sheets, financial statements, monthly income statements, monthly cash flow statements, and the general ledgers.

XChange contends that these are offensive requests which are overbroad, burdensome and unreasonable. Moreover, XChange contends that these are business records which are actually unnecessary to produce to determine whether the CCs are receiving free service. Instead, XChange purports that all that is required is review of the contracts between itself and the CCs.

However, these requests seek billing information, invoices and accounting information which is relevant to ascertain the true nature of the billing relationship between XChange and the CCs with which it did business. Further, the overall financial statements, including

19

the balance sheets and general ledger, are relevant because it will illustrate to what extent, if any, XChange has profited and Sprint has suffered by the alleged traffic pumping and how XChange treats its traditional customers in relation to the CCs. Such information is relevant to Sprint's claims to establish or refute whether billing and collections practices were appropriately adhered to. See Qwest Comm., LLC v Tekstar Comm., Inc., (Dkt. No. 42-5 at 55-62) at 4 (explaining that "discovery of information concerning the relationships, if any, between [a CC] and other [CC]'s or local telephone companies may lead to admissible evidence . . . Such information may demonstrate a practice, pattern, or scheme exercised by [a CC] for its business that may be consistent or inconsistent with its practice, pattern, or scheme in regard to its business relationship with [the LEC] (regardless of whether such a practice is considered lawful or unlawful)."); see also Dkt. No. 42-8 at 10-11. Accordingly, Sprint's motion is granted and XChange is required to produce these discovery requests.

15. Produce all order forms showing any CC subscribed to any service with you.

16. Produce all entries in any billing or computer system showing that any CC subscribed to any service with you.

17. Produce all documents where you described the services that any CC was obtaining from you.

XChange contends that these requests are ambiguous and that the information can be found in the applicable CC contracts, account statements, and billing invoices. Therefore, more encompassing discovery need not occur. However, the demands represent a relevant inquiry reasonably related to gathering admissible evidence demonstrating the business relationship between the various entities which is intended to further Sprint's claims. Sancom, Inc. v. Quest Comm. Corp., No. 07-CV-4147(KES), 2009 WL 136679, at *4 (Jan. 20, 2009). Accordingly, Sprint's motion is granted.

20

18. Produce all documents submitted to the Federal Communications Commission, state regulatory commissions such as, but not limited to, the New York PSC, and/or the Universal Service Administrative Company, that relate to access stimulation dockets.

19. Produce all documents that reflect or otherwise describe access line counts, the number of end user customers, and universal service reporting including without limitation your Form 499s (annual and quarterly), Form 477s, and Form 502s, and also including without limitation, any other reporting containing or reflecting this information in documents submitted to the Federal Communications Commission, Universal Service Administrative Company, NANPA, Neustar, or state regulatory commissions such as, but not limited to, the New York PSC.

XChange objects to this request claiming it is voluminous thus burdensome. However, Sprint has further clarified the request, narrowing it to the "several, specific regulatory reports in which a [LEC] such as XChange must report its total access line count, number of end users, and USF reporting: Forms 477, 499 and 502 are the primary documents. These reports are filed with regulatory bodies, but are not publicly available . . . [a]ny regulatory report in which XChange identified total lines or end users is relevant regardless that the reports contain only totals." Sprint MTC Reply (Dkt. No. 54) at 19-20. These documents may lead to relevant discovery regarding why certain CCs are being reported and the methodology behind such, which again goes to perceived or actual business relationships. Accordingly, Sprint's motion, as further clarified, is granted.

20. Produce all Board of Directors (or the equivalent managers or members) meeting minutes relating to Blog Talk Radio, Your relationship(s) with CCs or intraMTA calling.

Sprint's allegations of untoward business relationships in conjunction with traffic pumping make this inquiry relevant for advancing such claims. Any "information relating to ownership interest, partnership, membership, profit participation, compensation arrangements, or other financial holdings . . ., including how ownership [and partnerships]

21

have changed over time, [are] relevant [to the present claim.]" Widevoice Comm., Inc. v. Qwest Comm. Co., LLC, No. 12-CV-467 at 11; see also Connect Insured Tele., Inc. v. Qwest Long Dist., Inc., No. 10-CV-1897 (Dkt. No. 42-5 at 63-68) at 3 (allowing discovery into the "nature of any relationship . . . including but not limited to a description of any contractual relationship, any affiliation between the entities, any common ownership between the entities, and/or any historical interrelationship between the entities."). Therefore, Sprint's motion is granted.

21. Produce all documents relating to any discussion or decision whether to issue bills (including but not limited to back bills) to any CC at any point in time.

XChange contends that this request is nebulous, ill-defined, and irrelevant because the pertinent inquiry surrounds only whether the bills were issued. However, the decision of who to back bill and conversations surrounding why to back bill are also directly relevant to illustrating the business relationship between the entities and thus is relevant to alleged traffic pumping claims. Accordingly, despite XChange's claims of vagueness, the undersigned finds that the request is clear and appropriate; thus, Sprint's motion is granted.

22. For each Customer with whom you have shared access revenues, produce all of the following documents relating to that Customer: contracts, agreements, invoices and correspondence relating to such revenue sharing.

XChange contends that these are overbroad, burdensome, and unreasonable requests. However, Sprint's allegations of untoward business relationships in conjunction with traffic pumping make this inquiry relevant for advancing such claims. Any information relating to ownership interest, partnership, or membership are relevant to the present claim. See Widevoice Comm., Inc, No. 12-CV-467 at 11; see also Connect Insured Tele., Inc., No. 10-CV-1897 at 3 (allowing discovery into the "nature of any relationship . . . including but not

limited to a description of any contractual relationship, any affiliation between the entities, any common ownership between the entities, and/or any historical interrelationship between the entities.").  Further, payments and revenues, resulting in what has been agreed to be billed and what is received is relevant to Sprint's arguments about traffic pumping.  While the scope of this information is broad, it is not overly broad.

23.  Produce your certificate of public convenience and necessity from the state regulatory commissions such as, but not limited to, the New York PSC, including any amendments or corrections.

24.  Produce all versions of your service area map that have been on file with state regulatory commissions such as, but not limited to, the New York PSC.

There appear to be no specific objections to these requests.  Thus, Sprint's motion is granted.

26.  Produce your policy manual, order forms, or other documents relating to how you interface with customers or potential customers.

XChange objects based on the burdensome nature of this potentially voluminous request.  Sprint has subsequently narrowed its request to solely policy manuals and order forms.  As XChange has already voiced that the production of order forms is not objectionable and the policy manuals are relevant to the development of business relationships at the heart of Sprint's claims, Sprint's motion is granted.

28.  Produce all CABS billing records, Call Detail Records (CDR), or similar information that relates to the billings submitted to Sprint.

There appear to be no specific objections to this request.  Additionally, the undersigned believes that this production has already occurred.  To the extent it has not, or must be supplement, XChange is directed to do so as this information is directly relevant to establishing Sprint's claims and damages.  Thus, Sprint's motion is granted.

29. Produce your articles of incorporation and bylaws, and those of any parent, affiliate or subsidiary, or any other entity in which you have an ownership interest.

XChange contends that this request is seeking irrelevant corporate information. However, Sprint's allegations of untoward business relationships in conjunction with traffic pumping make this inquiry relevant for advancing such claims. Any information relating to ownership interest, partnership, membership, profit participation, compensation arrangements, or other financial holdings, including how ownership and partnerships have changed over time, are relevant to the present claim. See Connect Insured Tele., Inc, No. 10-CV-1897 at 3 (allowing discovery into the "nature of any relationship . . . including but not limited to a description of any contractual relationship, any affiliation between the entities, any common ownership between the entities, and/or any historical interrelationship between the entities."). Therefore, Sprint's motion is granted.

30. Produce all documents relating to CC certificates of authorization or other documentation authorizing them to do business in or provide telecommunications services in the state of New York.

31. Produce all correspondence or other documentation eXChanged between you and any other person relating to your interactions with CCs (generically or specifically), access revenue sharing, traffic pumping, or access stimulation.

XChange contends that these are overbroad, burdensome, and unreasonable requests. Sprint's allegations of untoward business relationships in conjunction with traffic pumping make this inquiry relevant for advancing such claims. Any information relating to ownership interest, partnership, or membership are relevant to the present claim. See Connect Insured Tele., Inc, No. 10-CV-1897 at 3 (allowing discovery into the "nature of any relationship . . . including but not limited to a description of any contractual relationship, any affiliation between the entities, any common ownership between the entities, and/or any

historical interrelationship between the entities.").  Further, payments and revenues, resulting in what has been agreed to be billed and what is received is relevant to Sprint's arguments about traffic pumping.  While the scope of this information is broad, it is not overly broad.  Thus, Sprint's motion is granted.

32.   Produce all bill inserts sent to any customers and the list of CCs to whom the inserts were sent.

XChange objects based on the irrelevant and burdensome nature of this potentially voluminous request.  Acknowledging that, Sprint has voluntarily offered to withdraw its request for bill inserts.

33.   Produce all documents related to Your ability, entitlement (or lack thereof) to bill switched access charges on intraMTA calls.

While there appears to be no specific objection to this request, Sprint has demonstrated how the intraMTA data is relevant to their claims and establishing their damages. Accordingly, Sprint's motion is granted and XChange is directed to respond to these interrogatories.

34.   Produce your document retention policy.

36.   To the extent not already produced in response to the foregoing requests for production, please produce all documents that you identify in your initial disclosures.

There appear to be no specific objections to these requests.  Thus, Sprint's motion is granted.


**ii. Requests for Interrogatories**

1.   To the extent Sprint delivers calls to You over a Feature Group D facility (whether via a tandem provider or otherwise), describe Your practice to determine whether they are CMRS calls originated and terminated in the same intraMTA.

2. To the extent that you originate calls and hand them to Sprint for delivery (whether via a tandem provider or otherwise), describe Your practice to determine whether they are (a) CMRS calls, and/or (b) likely to be originated and terminated in the same intraMTA.

3. To the extent you originate an intraMTA call and hand the call to Sprint (whether via a tandem provider or otherwise), describe the practice you employ to bill Sprint or some other carrier usage sensitive charges on the call.

4. To the extent you terminate an intraMTA call and receive the call from Sprint via a Feature Group D facility (whether via a tandem provider or otherwise), describe the practice you employ to bill Sprint or some other carrier usage sensitive charges on the call.

5. Describe the trunk groups or other facilities that are available over which each individual defendant can deliver calls to you (whether via a tandem provider or otherwise).

6. Describe the trunk groups or other facilities that are available over which you can hand a call originated on your network to each individual defendant (whether via a tandem provider or otherwise).

XChange lodges general objections regarding the relationship between itself and other CCs, but does not offer any specific objections with regard to these prior six interrogatory requests. XChange relies on its previous production of CDRs as being responsive to this category of interrogatory requests; however, such records do not explain actions or practices. Further, Sprint has demonstrated how the intraMTA data is relevant to their claims and establishing their damages. Accordingly, Sprint's motion is granted and XChange is directed to respond to these interrogatories.

7. Identify each and every CC with whom you have communicated, interacted, or contracted, or to whom you have provided communications services, collocation services, or payments, whether directly or indirectly. For each CC, identify the (a) name of the CC, (b) address of the CC, (c) your primary contact with the CC, and (d) the time periods (if any) that you have provided services to the CC.

XChange took great issue with identifying what Sprint meant by a CC, contending that the interrogatory was vague and ambiguous. Sprint has defined a CC in both of its

discovery requests and these identical definitions are clear and straight forward. Any of XChange's concerns should be further allayed by Sprint's declaration that it is not seeking XChange to do additional research to determine if a customer might fit that definition, but rather only seeks a list of companies that are already known to XChange as CCs. This information is generally known to XChange and should not be burdensome to provide, thus Sprint's motion is granted. Given the existence of a protective order, there should be no concerns about customer privacy. If there are, the parties are directed to meet and confer to contemplate a modification or additional language which would make both parties comfortable.

8.     Identify and describe the contract(s), agreement(s), understanding(s) or arrangement(s) You have with each individual CC for the originating or delivery of calls. If any aspect of any contract(s), agreement(s), understanding(s) or arrangement(s) with any CC is not in written form, describe the substance of each such contract, agreement, understanding, or arrangement.

Any evidence illustrating the business relationship between XChange and the CCs is germane to Sprint's allegations of traffic pumping.

While XChange alleges that this request is burdensome, it fails to articulate how. Acknowledging XChange's contentions, this response may encompass several documents, but that does not make it burdensome because the content of the documents may reveal relevant information to the when, what and why behind the assignment and possession of telephone numbers which is directly related to the alleged traffic pumping claims. See Dkt. No. 42-5 at 23 (discussing that "documents about revenue sharing, . . . "traffic pumping" schemes, copies of newsletters . . . , documents eXChanged with certain consultants . . ., documents relating to the assignment of telephone numbers, and documents relating to call routing," were all relevant and subject to production).

Again, being there are many lines of inquiry which will present relevant evidence demonstrating how XChange interacted with CCs and whether that relationship was similar or different to Sprint, the previous requests are relevant and Sprint's motion regarding such is granted.

9. Identify and describe each payment you have made to or received from each CC whom you identify in response to Interrogatory No. 7, and the basis or calculation of such payment.

10. For each month beginning January 2007, identify, in minutes of use, the volume of traffic that has been routed (a) to you and (b) separately from you related to each individual CC.

11. For each month beginning January 2007, identify the revenues (separately by interstate and intrastate) that you have received from interexchange carriers on the traffic delivered to or from each individual CC.

XChange contends that these are overbroad, burdensome, and unreasonable requests. Payments and revenues, especially in comparison to the volume of traffic, resulting in what has been billed and received is relevant to Sprint's arguments about traffic pumping. See Widevoice Comm., Inc. v. Qwest Comm. Co., LLC, No. 12-CV-467 (Dkt. No. 42-5 at 105-117) at 10 ("[T]he court finds that documents relating to the volume of traffic that has been routed to or through [a CC or its affiliate] for deliver to or from, or relating to revenues [a CC or its affiliate] has billed and/or received from any LEC . . . and any [CC] . . . are relevant . . . ."). While the scope of this information is broad, it is not overly broad. In order to have a clear picture of what was actually paid, when, and if there is any remaining debt or unpaid balances pending, Sprint requires more than just invoices and account statements. See Qwest Comm., LLC v Tekstar Comm., Inc., (Dkt. No. 42-5 at 55-62) at 6 (allowing discovery to procure "documents or other information that may support or contravene [a] . . . 'notion' [that a LEC] . . . netted or offset its payments to [a CC] to account for the services [the LEC]

. . . was allegedly providing to [the CC].").  Accordingly, the breadth of financial information requested is necessary for generating potentially relevant information showing the alleged extent of the traffic pumping in which XChange is supposedly engaged.

To the extent XChange is unclear about what specifically Sprint is requesting, Sprint further clarified that request to mean "monthly reports that already exist, not XChange's CDRs."  Sprint MTC Reply (Dkt. No. 54 at 18).  Thus, Sprint's motion, as clarified, is granted.

12. For each CC for which you have provided services, goods or products, identify and describe:

   a. The type and quantity of telecommunications service(s) that each CC utilized by written description as well as with specific reference to the provisions of the local eXchange tariff, price list, catalogue, switched access tariff(s) or other offering document from which the CC utilized the service; and,

   b. The location of the conference bridges, platform, computer, intelligent voice response system, soft switch, gateway, router, server, or other piece(s) of equipment owned or used by the CC.

   Note: To the extent the answers to Interrogatory Nos. 12(a) and (b) changed over the requested time period, answer the interrogatory by each applicable time period.

XChange contends that such requests are irrelevant to the present case or provided through the course of other discovery.  However, description of the services which are actually provided, as opposed to just offered, are relevant to Sprint's present claim.  Sancom, Inc. v. Quest Comm. Corp., No. 07-CV-4147(KES), 2009 WL 136679, at *4 (Jan. 20, 2009).  As described above, this will help to outline the contours of the business relationships between XChange and any CC it serviced which is relevant to Sprint's claim.  Accordingly, Sprint's motion is granted.

13. For each CC identified in response to Interrogatory No. 7, identify the telephone

number(s) or block(s) thereof that you assigned to the CC, and if they changed over the requested time period, the time period that the respective telephone numbers were assigned to the CC.

14. Identify any customer(s) of your local eXChange services (to the extent you would consider CCs to be included in that defined term, then excluding CCs) with whom you have shared revenues, not including any normal distributions to owners, partners, members or shareholders in their capacities as such.

XChange contends that these are overbroad, burdensome, and unreasonable requests. Further XChange contends that such requests could involve a large number of documents. Sprint's allegations of untoward business relationships in conjunction with traffic pumping make this inquiry relevant for advancing such claims. Further, for the reasons articulated above, identification of CCs or their assigned telephone numbers, is not a vague, ambiguous, or burdensome request from which XChange is exempted. Any information relating to partnership, membership, profit participation, or other compensation arrangements are relevant to the present claim. Therefore, Sprint's motion is granted.

15. Identify and describe every instance where a CC has paid you for the telecommunications services identified in response to Interrogatory No. 12(a).

16. Identify and describe every instance that a CC has paid you money to collocate equipment in your central office or in a building or property that you own, lease or otherwise control.

17. Identify and describe every instance that a CC has paid you money for power to run equipment in your central office.

18. Identify and describe every instance that a CC has paid you money to maintain or repair the equipment collocated in your central office.

To the extent that these discovery demands relate to payment, for the reasons discussed supra in RFP 11, such documents shall be produced. Further, the requests also relate to end user premises requirements which Sprint contends is relevant to determining how to categorize a CC. While XChange argues about the prevailing interpretation of the

30

law, as previously discussed, any such evaluation is premature and inappropriate given the undersigned's jurisdiction and legal standards governing the present motion. While this may be a common industry practice, that still does not diminish the relevance of determining what particular services XChange provided to its CCs and, of those services, what fees were charged and how that relates to XChange's treatment of its traditional customers with regard to Sprint's traffic pumping claims. See Qwest Comm., LLC v Tekstar Comm., Inc., (Dkt. No. 42-5 at 55-62) at 4 (explaining that "discovery of information concerning the relationships, if any, between [a CC] and other [CC]'s or local telephone companies may lead to admissible evidence . . . Such information may demonstrate a practice, pattern, or scheme exercised by [a CC] for its business that may be consistent or inconsistent with its practice, pattern, or scheme in regard to its business relationship with [the LEC] (regardless of whether such a practice is considered lawful or unlawful).") Accordingly, Sprint's motion is granted.

19. Identify any persons (persons include both human beings and/or entities) with whom you have consulted since January 1, 2005 relating to CCs, access revenue sharing, intraMTA calling and the subject about which they were consulted.

XChange contends that these are overbroad, burdensome, and unreasonable requests. Demands relating to documents and consultation conversations regarding CCs, "access revenue sharing, switched access tariffs, local exchange tariffs, or rate development . . . have discovery relevancy." Readlyn Tel. Co. v. Qwest Comm. Corp., No. 10-CV-2040 (JEG/RAW), 2013 WL 1334547, at *1 (N.D.Iowa Mar. 29, 2013). Accordingly, Sprint's motion is granted.

20. Identify every instance that you have placed or permitted placement of equipment belonging to someone other than you, in your central office or in a building or property that you own, lease or otherwise control.

This inquiry relates directly towards the business relationships XChange maintained with its customers, which is relevant and related to the necessary treatment and services rendered to those customers when contemplating the traffic pumping claim and establishing damages. While XChange argues about the prevailing interpretation of the law, as previously discussed, any such evaluation is premature and inappropriate given the undersigned's jurisdiction and legal standards governing the present motion. Accordingly, Sprint's motion is granted.

21. Explain Your ownership interest in, or relationship to, Blog Talk Radio, including whether you have had any contracts with it, whether it is an affiliate, subsidiary, or parent, and any owners and management that you have had in common.

XChange contends that such demands are irrelevant as there is no cross-ownership or relationship and, even if one existed, such a relationship would not be indicative of whether charges apply or free service is given. However, Sprint's allegations of untoward business relationships in conjunction with traffic pumping make this inquiry relevant for advancing such claims. Any information relating to ownership interest, partnership, membership, profit participation, compensation arrangements, or other financial holdings, including how ownership and partnerships have changed over time, are relevant to the present claim. See Connect Insured Tele., Inc, No. 10-CV-1897 at 3 (allowing discovery into the "nature of any relationship . . . including but not limited to a description of any contractual relationship, any affiliation between the entities, any common ownership between the entities, and/or any historical interrelationship between the entities."). Therefore, Sprint's motion is granted.

**C. Damages Computation**

Sprint contends that after reviewing invoices provided to it by XChange, it is still unable

to determine how XChange arrived at the damages figure in the complaint. XChange

asserts that its demands are for the amounts billed to Sprint Landline via its monthly

invoices which were never paid and contends that because it provided Sprint with the

CDRs, from which the monthly invoices are generated, it needs to supplement no further.

> Rule 26 (a)(1)(A)(iii) requires a party to disclose "a computation of
> each category of damages claimed." While the rule does not
> indicate the level of specificity that is required to disclose a
> "computation" properly, courts examining this issue have held that
> Rule 26(a)(1)(A)(iii) "requires more than merely setting forth the
> figure demanded." . . . "Rule 26(a)(1) contemplates an estimate of
> damages and 'some analysis'" . . . "In other words, the disclosures
> must be sufficiently specific that the opposing party has some basis
> to calculate the damages claimed against it."

Max Impact, LLC v. Sherwood Grp., Inc., No. 09-CV-902 (JGK/HBP), 2014 WL 902649, at

*5 (S.D.N.Y. Mar. 7, 2014) (internal citations omitted).

The Federal Rules require parties to provide their damages figure with some level of

specificity besides just a global number. XChange has not done so in this case, and

appears to represent that they do not need to do anything further to be in compliance with

the Federal Rules. This is plainly not the case. Therefore, Sprint's motion is granted and

XChange is directed to file a supplement response demonstrating its computation of each

category of damages.

### D. Sanctions

"A court has broad discretion to tailor appropriate and reasonable sanctions . . . Those

sanctions most commonly include an award of attorneys' fees and costs." S.E.C. v. Smith,

798 F. Supp. 2d 412, 436 (N.D.N.Y. 2011) (internal quotation marks and citations omitted).

The Court declines to award either party attorneys fees, costs or any other sanctions as it

deems they are not warranted.

### III. Conclusion

Wherefore, it is hereby **ORDERED** that:

1. Sprint's Motion to Compel (Dkt. No.42) is **GRANTED** as modified in this Order;

2. XChange's Motion to Compel (Dkt. No. 40) is **GRANTED** in that Sprint is directed to ultimately answer the first interrogatory but that both parties are directed to split the cost of the underlying CDR analysis as directed in this Order;

3. Sprint's request for a more definitive damages computation (Dkt. No. 42) is **GRANTED**;

4. Parties' request for sanctions are **DENIED**; and

5. Parties have **forty-five (45) days** to comply with this order.  Discovery and motion deadlines, as previously extended on February 2, 2015, shall remain unchanged.

**SO ORDERED**

Dated:  February 24, 2015
           Albany, New York

Christian F. Hummel
U.S. Magistrate Judge