UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| XCHANGE TELECOM CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -*against*- | ) |
| | ) |
| SPRINT SPECTRUM L.P.; NEXTEL OF NEW | )   Case No. 1:14-CV-0054(GLS/CFH) |
| YORK, INC.; NEXTEL PARTNERS OF | ) |
| UPSTATE NEW YORK, INC.; and SPRINT | ) |
| COMMUNICATIONS COMPANY L.P., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF XCHANGE TELECOM CORP. MEMORANDUM
## IN SUPPORT OF MOTION FOR PARTIAL STAY OF
## PROCEEDINGS ON ISSUE OF INTRA-MTA CALLING

Keith J. Roland
Bar Role No. 601256
Herzog Law Firm P.C.
7 Southwoods Boulevard
Albany, New York 12211
Tel: (518) 465-7581 Extension 185
Fax: (518) 462-2743
e-mail: kroland@herzoglaw.com

Mordy Gross, Esq.
Bar Role No. 517828
XChange Telecom Corp.
3611 14th Avenue, Suite 215
Brooklyn, New York 11218
e-mail: mgross@xchangetele.com

Attorneys for XChange Telecom Corp.

Dated: Albany, New York
       August 14, 2015

## BACKGROUND

This case was initiated by the Plaintiff XChange Telecom Corp. ("XChange") to collect lawful interstate and intrastate terminating access charges from various Sprint companies, for traffic which those companies sent to XChange for XChange to terminate to XChange's end user customers. (Complaint, Docket Item #1, ¶2) Some of the Sprint companies provide wireless services; Sprint Communications Company L.P. ("Sprint Landline") is a "landline carrier" which provides traditional (non-cellular) local and toll services.

XChange is a competitive local exchange carrier ("CLEC"), authorized by the Federal Communications Commission ("FCC") and the New York Public Service Commission ("PSC") to provide local exchange services in the state of New York. (Complaint, ¶¶1, 13) Among the services which XChange provides to other carriers is to terminate calls which originate on those other carriers' networks and are delivered to XChange for XChange to deliver to XChange's own customers. Under federal and state law, XChange is entitled to receive carrier access charges when it terminates a toll call, and local termination charges (known as reciprocal compensation) when it terminates a local call. If the toll call is interstate, XChange assesses the access charge rates set forth in XChange's FCC tariff; if the toll call is intrastate, XChange assesses the carrier access charges set forth in its intrastate tariff on file with the PSC. For local calls terminated by XChange, XChange receives the charges agreed to in interconnection agreements between carriers, or in the absence of an interconnection agreement, the charges set forth in XChange's PSC local terminations tariff. (Complaint, ¶¶13-16)

The calls at issue here were delivered by Sprint Landline to XChange via the Verizon tandem (which interconnects various telephone companies to one another) (Zwick Affidavit,

October 15, 2014, ¶4).[1] Sprint alleges some of the calls delivered by Sprint Landline actually originated with Sprint wireless companies, and were then transferred to Sprint Landline for delivery to XChange. In this role, Sprint Landline is not the originating carrier, but rather an "intermediate" carrier. (Zwick Aff't, ¶6)

The definition of a "local" or "toll" call varies, depending upon whether the call originated from a wireless carrier or a landline carrier. In general, a local call in the landline context is completed within a limited geographical area, such as a city and its surrounding suburbs. In the case of New York City, a landline local call would include any call originated and completed within the City of New York. (Complaint, ¶8)

In contrast, the FCC has ruled wireless originated calls are local calls based upon much larger geographical areas, known as Metropolitan Trading Areas (MTAs). The MTA covering the downstate New York area, where XChange operates, includes all of New York City; all of Long Island; parts of northern New Jersey; parts of Connecticut; and upstate New York as far north as the Canadian border and as far west as Syracuse. Any wireless call which originates and terminates within this MTA, i.e., an "intra-MTA" call, is treated as local for terminating compensation if delivered by the wireless carrier directly to the terminating local exchange carrier. (Complaint, ¶3)

Sprint has essentially set forth three reasons why calls delivered by Sprint Landline to XChange (via the Verizon tandem) are not subject to access charges. The first defense is that since XChange did not have a valid FCC tariff on file for interstate access charges prior to December 1, 2012, Sprint is not liable for any interstate access charges prior to that date. This issue was resolved in Sprint's favor in a decision issued by Judge Sharpe on September 16, 2014.

---

[1] This affidavit was submitted as part of XChange's Motion to Compel Disclosure, dated October 16, 2014 (Docket Item # 40), and is incorporated in support of the instant motion.

The second defense is that because XChange is allegedly engaged in a program of "call stimulation", access charges are not applicable to certain calls terminated by XChange to customers with large volumes of incoming traffic, pejoratively labeled by Sprint as "calling companies", under the terms of XChange's interstate and intrastate access tariffs.[2]

Under various FCC rulings, whether or not access charges apply to interstate calls terminated to "calling companies" depends upon the wording of a carrier's interstate access tariff. In cases cited by Sprint, the FCC has ruled that the tariffs of certain local exchange carriers, while applying to the termination of most interstate calls, do not apply to the termination of interstate calls to calling companies. The New York PSC has never issued a similar ruling, and has never stated that intrastate access tariffs do not apply to calls to calling companies. But despite Sprint's effort to convince the Court that interstate calls terminated by carriers such as XChange to calling companies are part of some unlawful scheme, FCC rules specifically authorize carriers such as XChange to assess access charges on these calls, so long as the rate charged to terminate those calls does not exceed the rate charged by the dominant local exchange carrier in the state (in this case, Verizon). This issue is discussed at length in XChange's November 3, 2014, Memorandum in Opposition to Sprint Motion to Compel (Docket Item # 45,

---

[2] As an example of the type of call Sprint claims is "call stimulation" (also known as "call pumping"), is when the parties participated in a conference call with the Court on the morning of July 24, 2015. That call used an AT&T conference calling bridge. AT&T has encouraged members of the public, businesses, and governmental agencies to use its conference bridging service, and presumably makes money on the service. Neither this Court, AT&T, nor the parties participating in the conference call (except for Sprint) would deem use of that AT&T conference bridge, or AT&T's charging access charges when calls are delivered to its conference bridge, to be improper.

4

at pp. 11-12). XChange's termination rates match those of Verizon, and accordingly are authorized by the FCC's own rules. (Affidavit of Alfred West, November 3, 2014, at ¶4.[3]

See In the Matter of Connect America Fund, WC Docket 10-90, et al. (FCC 11-161, "Report and Order and Further Notice of Proposed Rulemaking", released November 18, 2011. ("Connect America Fund Order"). The FCC rule authorizing the assessment of access charges on calls to calling companies is set forth at 47 CFR §61.26(g)(1)(b).

## The Instant Issue

Sprint's third defense is the one addressed by this motion.

Specifically, the legal issue is whether the FCC's intraMTA rule applies to two categories of calls:

(a)     calls originated by Sprint wireless companies, transferred by the Sprint wireless company to Sprint Landline, and then delivered by Sprint Landline to XChange for termination (via the Verizon tandem); and

(b)     calls originated by an XChange customer, delivered to Sprint Landline (via the Verizon tandem), and then delivered by Sprint Landline to a Sprint wireless company.

XChange agrees that intraMTA traffic originated or terminated by a cellular company, and directly routed between that company and XChange (via the Verizon tandem), without use of an intermediate landline carrier, is an intraMTA call and not subject to access charges. The parties disagree, however, whether the FCC rule applies when an intermediate carrier, such as Sprint Landline, is inserted into the call path in either direction.

---

[3] This Affidavit was submitted as part of XChange's November 3, 2014, Opposition to Sprint's Motion to Compel (Docket Item #45), and is incorporated in support of the instant motion.

Sprint asserts the FCC's orders are clear that the interposition of an intermediate carrier does not counter the FCC's intra-MTA rule.[4] Hundreds of other telecommunications carriers say otherwise. The issue, which is far from certain, has been central to scores of lawsuits pending around the country.

**Legal Argument**

Application of the FCC's intra-MTA rule is a matter of great significance and financial impact to the entire telecommunications industry in the United States. Interpretation of that rule is, in fact, pending before two separate forums in which large numbers of telecommunications carriers, on both sides of the issue, are involved.

Recently, Sprint, Verizon, and other interexchange carriers (IXCs), have brought scores of lawsuits around the country seeking refunds of access charges previously paid, which the IXCs claim should not have been paid because of the intra-MTA rule. The actions in federal courts have been consolidated in multidistrict litigation now pending before the United States District Court for the Northern District of Texas (the "MDL court"). See In re: IntraMTA Switched Access Charges Litigation, MDL Case No. 2587(ND Tex). The specific issue in that MDL case, as in the case pending in this Court, is whether insertion of an intermediate carrier between a cellular company and a terminating or originating local exchange carrier, affects application of the FCC's intra-MTA rule. Hundreds of local exchange carriers are defendants in the various consolidated suits, and the legal issues will be briefed by law firms with some of the greatest telecommunications experience and expertise in the country. (Roland Affidavit, ¶5). An

---

[4] See, for example, Letter from Charles W. Steese, counsel for Sprint, to Honorable Christian F. Hummel, in opposition to plaintiff's request for a scheduling conference, July 17, 2015, at page 2.

MDL court determination on this legal issue will undoubtedly be binding on all pending and future cases in which this issue is raised, including before this Court.

In the MDL action, the defendant local exchange carriers have filed a Joint Rule 12(b)(6) Motion to Dismiss, which sets forth a comprehensive (and in XChange's view, compelling) legal analysis as to why the FCC's intra-MTA rule does not apply when an intermediate IXC inserts itself into the call flow. A copy of that motion, and the legal analysis contained therein, is attached as Exhibit A to this Memorandum.

It is possible however, the MDL court may choose not to resolve the intraMTA issue itself. That is because a parallel proceeding on the very same legal issue is now pending before the FCC. See Petition for Declaratory Ruling to Clarify the Applicability of the Intra-MTA Rule to LEC-IXC Traffic, WC Docket 14-228, filed November 10, 2014 (Federal Communications Commission). On December 10, 2014, the FCC acknowledged filing of that Petition, and sought comment from affected carriers. (Roland Affidavit, ¶6). See Public Notice DA 14-1808, December 10, 2014, "Wireline Competition Bureau seeks comment on Petition for Declaratory Ruling Regarding Applicability of the Intra-MTA Rule to LEC-IXC Traffic", CC Docket 01-92, WC Docket Nos. 10-90, 14-228 (Exhibit B to this Memorandum). The FCC reported the relief sought in that Petition was as follows:

> Petitioner's request that the Commission issue a declaratory ruling to confirm that the intra-MTA rule – under which intra-MTA calls exchanged between local exchange carriers (LECs) and commercial mobile radio service (CMRS) carriers are subject to reciprocal compensation – does not apply to LEC charges billed to an interexchange carrier (IXC) when the IXC terminates traffic to or receives traffic from a LEC via tariffed switched access services."

As indicated above, the MDL court may refer the intra-MTA legal issue to the FCC. In the Motion to Dismiss before the MDL Court (Exhibit A to this Memorandum), the defendants asked the court, as an alternative to dismissal of the case, that if the court finds the FCC orders

are unclear on this issue, the court should refer the legal issue to the FCC under the doctrine of primary jurisdiction. (MDL Motion to Dismiss, Exhibit A, pp. 48-53).

In light of the fact the intra-MTA issue in this case will be determined, either in the MDL Court or by the FCC, it would be appropriate for this Court to stay resolution of that aspect of this case pending the determination of the underlying legal issue in one of those forums. Otherwise, a situation could arise where a legal determination by this Court is at odds with the determination of the MDL court or the FCC.

Allowing resolution of the intraMTA issue in the MDL court or the FCC, rather than by this Court, will assure the appropriate presentation is made to the MDL court and/or the FCC by both sides. XChange is a small, competitive carrier, and does not have the resources or legal expertise equivalent to those of the major players in the telecommunications industry which are briefing the intra-MTA issue before the MDL court and the FCC. (Roland Affidavit, ¶10).

XChange does not propose staying discovery of the amount at issue in this case (in both claims and counterclaims) related to the intraMTA issue. That discovery is already underway and intertwined with discovery on the other two issues. While the discovery can identify the intraMTA portion of the damage claims, an order awarding relief to either side should await resolution of the intraMTA legal issue.

While Sprint opposes a stay in this proceeding, it has taken a contrary position elsewhere, and has forcefully argued that other forums should stay proceedings on the intraMTA issue.

Particularly relevant is a Sprint motion dated March 27, 2015, filed with the New York State Public Service Commission in a complaint now pending on, among other things, the intraMTA issue, seeking to stay that PSC proceeding pending a determination of the intraMTA issue by the MDL Court. See PSC Case 14-C-0568, Complaint of Ontario Telephone Company

Inc. and Trumansburg Telephone Company, Inc. against Sprint Communications Company, L.P.
Concerning Refusal to Pay Intrastate Access Charges. (PSC Proceeding). The Sprint Motion to
Dismiss or Stay in that proceeding is attached as Exhibit C to this Memorandum.[5]

In that motion, Sprint forcefully argued to the PSC that it should not decide the intra-
MTA legal issue (or any other issue in that case) because of the pendency of that very same issue
before the MDL court.

In its motion to the PSC, Sprint argued that "if the Commission [PSC] were to decide
factual or legal issues in this matter related to the intra-MTA dispute, it would effectively deprive
the MDL court of one of the main reasons that the federal cases were consolidated: the need for
nationwide uniformity regarding the FCC's intra-MTA rule". Sprint PSC Motion to Dismiss or
Stay, Exhibit C to this Memorandum, at p. 13.

Further urging the PSC to defer any action on the complaint before it, Sprint declared,
"Once the MDL panel issues its ruling, it would easily render this dispute either moot or one that
would not make financial sense for any of the parties to litigate. Dismissing the case until after
the MDL Court's ruling would allow the parties to conserve resources – the MDL Court's ruling
will be dispositive as to the lion's share of the charges." (Sprint PSC Motion, p. 14)[6]

In a similar vein, on March 20, 2015, Sprint initiated a plenary lawsuit against two New
York State local exchange carriers in the US District Court for the Southern District of New
York, citing the FCC's intra-MTA rule, and, as it has done here, demanding refunds on access

---

[5] Sprint supplied a copy of its PSC motion as an attachment to its letter of July 17, 2015, to this
Court opposing XChange's request for the partial stay in this proceeding.

[6] Sprint argues it urged the PSC to stay the case before it because the intraMTA issue governed
the bulk of the claims in that case. That is not a valid distinction. First, we do not yet know in
this case how much of the claims and counterclaims are based on the intraMTA issue. But more
importantly, the goal is to avoid potentially inconsistent rulings and preserve the Court's and
parties' resources. That will occur regardless of the percentage of total claim here related to the
intraMTA issue.

charges previously paid by Sprint. That case has been transferred to the MDL Court in Texas, without apparent objection from Sprint.[7]

In its letter to this Court of July 17, 2015, Sprint urges the Court to deny XChange's motion on several grounds. None of them are valid.

First, Sprint suggests that a decision from the MDL court should be issued "by the end of the summer". That is highly over-optimistic. The MDL court may grant the motion to refer the issue to the FCC. And, should the court decide to address the legal issue itself, there will undoubtedly be an appeal because of the huge financial impact the court's decision will have, one way or the other, on every participant in the national telecommunications market.

Next, Sprint argues XChange has not put forth any justification for XChange's position that the intra-MTA rule is not applicable because of the insertion of an intermediate carrier in the call flow. However, as shown in the legal analysis contained in the Motion to Dismiss in the MDL court (Exhibit A to this Memorandum), it is far more likely the MDL court and/or the FCC will uphold the local exchange carrier (and XChange's) position, rather than Sprint's position.

Finally, Sprint argues there is a distinction between the PSC proceeding and this lawsuit, because Sprint's motion to stay submitted to the PSC was filed after the MDL was created, and filed by a party already a party in the MDL case. That is a distinction without a difference. It does not matter when the MDL panel was created, or whether XChange is a party to the MDL litigation. The simple fact is the crucial legal issue, to be applicable to the entire telecommunications industry in this country, will be decided either in the MDL litigation or by the FCC. Resolution of that issue by this Court is neither necessary nor appropriate.

---

[7] Sprint Communications Company LP v. Ontario Telephone Company, Inc., 25-CV-2126 (JMF), Case 3:15-CV-01179-D, in the MDL court.

**This Court Has the Power to Issue a Partial Stay**

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. Pierre v. Prospect Mortgage LLC, 2013 WL 5876151 at *2 (NDNY, 2013), citing Louise Vuitton Malletier S.A. v. Ly USA, Inc., 676 F.3d 83 at 96 (2d Cir. 2012). "By possessing sweeping managerial authority over its own docket, a district court would be acting within its discretion when invoking a stay in such cases as an MDL or mass tort." Pierre, at *2, citing In re Zyprexa Products Liability Litigation, 594 F.3d 113 at 127, fn 61 (2d Cir. 2010).

This Court has also observed that "it is rather common for courts to stay cases pending a motion for MDL." Pierre, at *2.

This Court cited five criteria to apply in deciding whether a stay is appropriate, and went on to note that "Conservation of judicial resources is a 'fundamental goal of multidistrict litigation practice,' and stays are appropriate when they serve judicial economy." Pierre, at *4, citing Royal Park Investors SA/NV v. Bank of America Corp., 2013 WL 1509854.  It also cited with approval In re Wayne Farms LLC Fair Labor Standard Act Litigation, 528 F.Supp.2d 1355 to the effect centralization in MDL proceedings "will eliminate duplicative discovery, prevent inconsistent rulings, and conserve the resources of the parties, counsel, and the judiciary."

Pierre granted a stay pending determination of a motion, made to the joint panel on multidistrict litigation, pursuant to 28 USC §1407, to consolidate numerous related cases before an MDL court.  The rationale for granting a stay while a motion to consolidate was pending is the same as for granting a stay once an MDL court is already established to consider related

cases. In both instances, the question is whether a stay would promote conservation of resources and the avoidance of inconsistent rulings. That is most certainly the case here.

The first criterion cited in Pierre is whether there would be a prejudice to plaintiffs if pending litigation were delayed because of a referral to an MDL court. Here, there is no prejudice, because it is plaintiffs who are suggesting the Court refrain from deciding one legal issue pending resolution by the MDL court. In fact, plaintiffs (and Sprint as well) will benefit from the stay, because the parties will not be required to expend significant legal and financial resources to brief an extremely complicated legal issue which is already being done by participants in the telecommunications marketplace with great expertise in this area.

The second criterion is whether there will be a burden on the defendants. That will not be the case here. Sprint itself has acknowledged, in its letter to the Court of July 17, 2015, opposing a stay, that the intraMTA legal issue to be applied by this court will be that determined in the MDL court. That is the same acknowledgment it made to the PSC, stating that the ruling of the MDL court "will be dispositive" [on the intraMTA issue]. (Sprint Motion to PSC to Dismiss, Exhibit C, at p. 14).

Granting the stay until resolution of the intraMTA issue alone will not in any way prejudice the Sprint defendants. Discovery here will proceed to determine the dollar value of claims (on both sides) which depend on the resolution of the intraMTA issue. Once that legal issue is resolved in the MDL court or the FCC, the ruling can be applied to the value of the claims in this case.

The third criterion is the interest of the courts. On that alone, the court should issue a stay.

As discussed above, the primary purpose of MDL litigation is to prevent inconsistent rulings and conserve the resources of the parties, counsel, and the judiciary. Wayne Farms LLC, 528 F.Supp.2d 1355, supra. Briefing the intraMTA legal issue to this court will require expenditure of significant legal and financial resources by the parties, a prospect which might not bother the multibillion dollar Sprint, but certainly will be a significant burden on XChange. Moreover, as this court can see from the legal memorandum submitted to the MDL court (Exhibit A to this Memorandum), resolving the legal dispute will require a great deal of time and expenditure of judicial resources by this court, which would likely involve reviewing hundreds of pages of FCC rulings and orders, and numerous court decisions (including those cited by both sides in the MDL litigation). It is precisely to avoid imposing that burden on large numbers of individual district courts that MDL litigation was created.

The fourth factor is the interests of persons not parties to the litigation. That also weighs in favor of a stay. This litigation is a private dispute between XChange and Sprint, and no other party or person has a stake in the outcome. In contrast, should this Court issue a legal ruling on the intraMTA issue, it could affect hundreds of telecommunications carriers throughout the US – carriers who have not had an opportunity to brief the legal issue to this Court.

The fifth factor is the public interest. For all of the reasons cited above, and in particular the need to prevent inconsistent court rulings, and conserve the resources of the parties, counsel, and the judiciary, a stay should be granted.

It is not completely clear why Sprint wants this Court to decide the intraMTA legal issue while the rest of the telecommunications industry is litigating that very point before the MDL panel and the FCC. Royal Park Investments, supra, 941 F.Supp.2d 367 (SDNY 2013) is instructive on this point. Therein, the court rejected an effort by the plaintiff in that case to have

the forum court decide the common legal issue, stating it had not seen any authority "for the proposition that plaintiff's desire to have the law of one forum apply to its case outweighs the efficiency and economy concerns that led the JPML to form an MDL proceeding in another forum." The court continued "in addition, this court, like the court in United Western Bank, declines to speculate as to why plaintiff prefers to obtain that ruling here and further declines to assume that plaintiff will be prejudiced if it does not do so." Royal Park Investments, 941 F.Supp.2d 367 at 372, citing Federal Deposit Insurance Corp. v. Countrywide Financial Corp. (United Western Bank), 2011 WL 4372915 at *3.

The same logic applies to rejecting Sprint's desire to have this Court, rather than the MDL court, decide the intraMTA issue.

It is also possible that this legal issue could be resolved by the FCC, either in the proceeding already commenced at the FCC (Docket WC 14-228, Ex. B to this Memorandum), or in a referral from the MDL court. In either case, the FCC's ruling would either determine the legal issue or receive substantial deference from this Court under the doctrine of primary jurisdiction.

Primary jurisdiction "is a richly developed, prudential doctrine with the chief mission of 'promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties ... [and] to ensure that they do not work at cross purposes'". Ellis v. Tribune Television Company, 443 F.3d 71 at 81 (2d Cir. 2006).

Whether or not a court should defer to an agency's ruling depends on the authority Congress delegated to the agency. Referral to an agency is appropriate when a claim:

> "is originally cognizable in the courts, and comes into play whenever the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case, the judicial process is suspended pending referral of such issues to the administrative body for its views." New

York State Thruway Authority v. Level 3 Communications, 734 F.Supp.2d 257 (NDNY 2010) at 262, citing Mathirampuzha v. Potter, 548 F.3d 70 at 83-84 (2d Cir. 2008)

"The driving precepts of the primary jurisdiction doctrine are consistency and uniformity in the regulation of an area entrusted to a particular federal agency." Ellis v. Tribune Television Company, 443 F.3d 71 at 82. An agency's specialized expertise may come into play as to:

> "whether a case raises 'issues of fact not within the conventional experience of judges,' but within the purview of an agency's responsibility; whether the 'limited functions of review by the judiciary are more rationally exercised, by preliminary resort' to an agency 'better equipped than courts' to resolve an issue in the first instance; or, in a word, whether preliminary reference of issues to the agency will promote the proper working relationship between the court and agency that the primary jurisdiction doctrine seeks to facilitate." Ellis v. Tribune Television Company, 443 F.3d 70 at 82, cited in New York State Thruway Authority v. Level 3 Communications, 734 F.Supp.2d 257 at 262.

New York State Thruway Authority held that not all cases involving telecommunications issues should be referred to the FCC, and that where issues involved those "within the conventional experience of judges," the court was not required to refer a case to the FCC. That, however, is not applicable to interpretation of the FCC intraMTA rule.

Rules setting forth the compensation which carriers should pay to each other on various types of calls were established by the FCC under authority of the Federal Communications Act and the Telecommunications Act of 1996. In establishing those rules, the FCC promulgated its intraMTA rule – the very rule whose interpretation is the subject of great controversy. Here, it is the FCC which knows best what its own rule requires, and how that rule should be applied in light of the huge economic impact it will have on various sectors of the nationwide telecommunications network. Those are issues not primarily within competence of judges.[8]

---

[8] An example of a referral by this Court to the FCC, under the doctrine of primary jurisdiction, is Flanigan's Furniture v. New York Telephone Company, 1987 WL 20302 (NDNY 1987), in which this Court stayed proceedings and referred to the FCC the application of the FCC's rule that private line circuits which carried more than 10% interstate traffic were to be deemed jurisdictionally interstate and subject to FCC tariffs instead of state tariffs.

In this motion, XChange takes the same position that Sprint took before the New York State PSC in arguing that the intraMTA legal issue should be decided by the MDL court, and not the PSC. The same logic applies to this Court deferring a ruling on interpretation of the FCC's intraMTA rule to resolution of that very same issue by the MDL court or the FCC.[9]

## CONCLUSION

For the reason set forth herein, this Court should grant XChange's Motion for a Partial Stay.

Respectfully submitted,

Keith J. Roland (Bar Role No. 601256)
Herzog Law Firm P.C.
7 Southwoods Boulevard
Albany, New York 12211
Tel: (518) 465-7581 Extension 185
Fax: (518) 462-2743
e-mail: kroland@herzoglaw.com

Mordy Gross, Esq. (Bar Role No. 517828)
XChange Telecom Corp.
3611 14th Avenue, Suite 215
Brooklyn, New York 11218
e-mail: mgross@xchangetele.com

Attorneys for XChange Telecom Corp.

Dated: Albany, New York
August 14, 2015

---

[9] XChange is not asking this Court for a referral to the FCC, because the intraMTA issue is already there. What is requested is simply a stay until the FCC (or the MDL court) decides the issue.

# CASES WITH LIMITED CITATIONS
# REFERRED TO IN MEMORANDUM OF LAW

1987 WL 20302
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

FLANIGAN'S FURNITURE, INC., Fan Distributing
Co., Inc., Flanigan–Naked Furniture, Inc., Real
Wood Furniture Company, Inc., Flanigan's
Furniture of Western New York, Inc., and Flanigan's
Furniture of Central New York, Inc., Plaintiffs,

v.

NEW YORK TELEPHONE COMPANY,
American Telephone and Telegraph Company,
AT & T Communications, Inc., and AT & T
Communications of New York, Inc., Defendants.

No. 86–CV–796.   |   Nov. 25, 1987.

**Attorneys and Law Firms**

Roland, Fogel, Koblenz & Carr, Albany, N.Y. (Keith J.
Roland, of counsel), for plaintiffs.

McNamee, Lochner, Titus & Williams, Albany, N.Y. (David
Wukitsch, of counsel), for AT & T.

Bickel & Brewer, New York City, Casey, Yanas, Mitchell &
Amerling, Albany, N.Y., (Walter C. Reid, Gary Alexander
Stahl, of counsel), for New York Telephone.

**ORDER**

McAVOY, District Judge.

**\*1** At oral argument on November 9, 1987, this court
dismissed plaintiffs' complaint based on the doctrine of
primary jurisdiction. By order dated November 10, 1987,
the decision was modified and placed on reserve status to
permit the court to consider the parties' positions on the
following issues: (1) in the event of dismissal, will plaintiffs
suffer prejudice due to the statute of limitations; and (2)
should the court dismiss the complaint or retain jurisdiction
pending determination by the FCC. All parties filed briefs
with the court on November 13, 1987.

Under the doctrine of primary jurisdiction, the complaint
may be dismissed when all relief sought may be obtained
before the administrative agency or in a reinstituted
proceeding. *Engelhardt v. Consolidated Rail*, 756 F.2d 1368,
1369 (2d Cir.1985) (per curiam). If a party will be prejudiced
by dismissal, a stay of court action pending administrative
proceedings is more appropriate. *United States v. Michigan
National Corp.*, 419 U.S. 1, 5, 95 S.Ct. 10, 12 (1974) (per
curiam); *see Engelhardt*, 756 F.2d at 1369.

Plaintiffs claim dismissal based on the doctrine of primary
jurisdiction will prejudice them in three ways: (1) the statute
of limitations will preclude recovery of a significant portion
of plaintiffs' damages; (2) plaintiffs' claims based on federal
common law and state statutes and common law will not be
heard; and (3) plaintiffs will be unable to recover attorney's
fees and costs under Section 206 of the Communications Act.
Because plaintiffs' first argument persuades the court that a
stay, rather than dismissal, is appropriate in this case, the
court will not address plaintiffs' second and third arguments.

47 U.S.C. Section 415(c) establishes a two-year statute of
limitations for recovery of overcharges against a carrier. [1]
For purposes of this motion, the court will assume that
Section 415(c) is applicable. Plaintiffs filed this action
on July 8, 1986. Plaintiffs argue that if the complaint is
dismissed and filed anew with the Federal Communications
Commission ("FCC"), the two-year statute of limitations will
be measured from the date of filing with the FCC. As a
result, plaintiffs claim, the period for which it can recover
damages will be circumscribed. Defendants argue that the
statute of limitations was tolled when this action was filed.
By virtue of tolling, defendants claim plaintiffs will be in the
same position before the FCC as before this court. Although
Section 415 does not contain a tolling provision which would
apply in this case, defendants argue tolling is consistent
with the statutory scheme. While defendants arguments are
persuasive, defendants have submitted no authority, nor has
our research uncovered any cases, which would indicate that
the FCC would toll the statute of limitations from the time the
action was filed in this court. Because there is no guarantee
that the FCC will adopt defendants' construction of the statute
of limitations, this court is not convinced that plaintiffs will
not suffer prejudice in the event of dismissal. As a result,
a stay rather than dismissal, is appropriate. Accordingly,
the proceedings in this court will be stayed until the FCC

Flanigan's Furniture, Inc. v. New York Telephone Co., Not Reported in F.Supp. (1987)

considers all issues raised by the complaint over which it is entitled to assume jurisdiction.

SO ORDERED

**All Citations**

Not Reported in F.Supp., 1987 WL 20302

Footnotes

1    47 U.S.C. Section 415(c) provides, in part:
     "For recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within two years from the time the cause of action accrues, and not after...."

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5876151
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sadiki PIERRE and Christopher Dabiere, Plaintiffs,
v.
PROSPECT MORTGAGE, LLC, Defendant.

Civ. No. 1:13–CV–453 (NAM/
RFT).    |    Oct. 31, 2013.

**Attorneys and Law Firms**

Nichols, Kaster Law Firm, Andrew G. Chase, Esq., of
Counsel, Minneapolis, MN, for Plaintiffs.

Getman, Sweeney Law Firm, Matthew T. Dunn, Esq.,
Michael J.D. Sweeney, Esq., of Counsel, New Paltz, NY, for
Plaintiffs.

Seyfarth Shaw LLP, Howard M. Wexler, Esq., of Counsel,
New York, NY, for Defendant.

Seyfarth Shaw LLP, Barry J. Miller, Esq., of Counsel, Boston,
MA, for Defendant.

## *MEMORANDUM–DECISION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** Currently before this Court is Prospect Mortgage LLC's
(hereinafter "Prospect Mortgage") Motion to Stay Pending
Decision on Transfer of this case to the Judicial Panel
on Multidistrict Litigation (hereinafter "JPML") for the
coordination and consolidation of the pretrial proceedings
filed pursuant to 28 U.S.C. § 1407. [1] Dkt. No. 13, Def.'s Mot.
to Stay, dated Sept. 18, 2013. Plaintiffs oppose the Motion.
Dkt. No. 19, Pl.'s Amend. Opp'n, dated Oct. 4, 2013. [2]
Prospect Mortgage filed a Reply to Plaintiff's Opposition.
Dkt. No. 21, Def.'s Reply, dated Oct. 11, 2013. For the
following reasons, Prospect Mortgage's Motion is **granted.**

## I. BACKGROUND

On April 23, 2013, Plaintiffs filed this action pursuant to the
Fair Labor Standard Act (FLSA), 29 U.S.C. § 201 *et seq.,* and
the New York Labor Law, Article 19, § 650 *et seq.,* alleging
that Prospect Mortgage violated these statutory provisions
by classifying these loan officers as exempt employees
and failing to pay them overtime. Dkt. Nos. 1 Compl., 5,
Am. Compl. Originally, Plaintiffs were opt-in plaintiffs in a
collective action in the Eastern District of California, *Sliger
et al. v. Prospect Mortgage, LLC et al.,* Case No. 2:11–
CV–465 (E.D.Cal.) (hereinafter "*Sliger* Action"). The *Sliger*
Action was conditionally certified as a collective action and
minimal discovery ensued. Although the parties expended
considerable energy and resources in an attempt to settle the
*Sliger* Action, approximately two years later, the collective
action was decertified. Under the decertification, the *Sliger*
opt-in plaintiffs were granted permission to pursue their
individual claims in other district court fora. Dkt. Nos. 13–1,
Def.'s Mem. of Law at p. 2, 19, Pls.' Mem. of Law at pp. 2–3.

As a consequence of the decertification of the *Sliger* Action,
243 of the opt-in plaintiffs filed individual claims against
Prospect Mortgage in thirty-seven (37) different district
courts. Pls.' Mem. of Law at p. 3. On August 16, 2013,
Prospect Mortgage filed a motion with the JPML, pursuant
to 28 U.S.C. § 1407, requesting that all of these pending
cases, including this case, be transferred to a single forum
for coordinated or consolidated pretrial proceedings. Dkt. No.
10, Def.'s Notice, dated Aug. 28, 2013. It is anticipated that
the MDL Motion will be heard by the JPML on December 5,
2013. [3] Def.'s Mem. of Law at pp. 2–3.

At this juncture of the litigation, neither a Rule 26(f) nor a
Rule 16 conference has been convened in order to issue a
scheduling order and commence discovery. *See* FED. R. CIV.
P. 16 & 26(f). In addition to this pending Motion for a Stay,
Plaintiffs have filed a Motion to Strike Defendant's Jury Trial
Demand. Dkt. No. 17, Pl.'s Mot. to Strike, dated Oct. 1, 2013.
Otherwise, no other motion or proceeding are at play. While
little has occurred regarding this case, other related cases have
steadily advanced. Apparently, scheduling orders were issued
in at least twenty-three (23) cases, and "virtually identical
discovery" which includes interrogatories and requests for
production have been served in each. *See* Dkt. Nos. 13–2,

Howard M. Wexler Decl., dated Sept. 18, 2013, at ¶ 8, 21–1, Howard M. Wexler, Reply Decl., dated Oct. 11, 2013, at ¶¶ 3–5. Additionally, similar to here, "Plaintiffs' counsel has also filed motions to strike Defendant's jury trial demand in several other cases." Wexler Decl. at ¶ 9.[4]

## II. LEGAL STANDARD

**\*2** The principle purpose of MDL is to avoid piecemeal **litigation** and coordinate pretrial proceedings. Multi–District **Litig**. Manual § 3.3. 28 U.S.C. § 1407(a) provides, in pertinent part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on **multidistrict litigation** authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

While the decision to transfer a matter to the JPML is pending, a court may contemplate **staying** the current matter before it. "The power to **stay** proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for **litigants**." *Louise Vuitton Malletier S.A. v. Ly USA, Inc.,* 676 F.3d 83, 96 (2d Cir.2012) (quoting *Landis v. North Am. Co.,* 299 U.S. 248, 254 (1936)). By possessing sweeping managerial authority over its own docket, a district court would be acting within its discretion when invoking a **stay** in such cases as an MDL or mass tort. *In re Zyprexa Prods. Liab. Litig.,* 594 F.3d 113, 127 n. 61 (2d Cir.2010) (quoting *Landis v. North Am. Co.*). In fact, it is rather common for courts to **stay** cases pending a motion for MDL.[5] *Royal Park Invs. SA/NV v. Bank of Am. Corp.,* 2013 WL 1509854, at \*3 (S.D.N.Y. Apr. 12, 2013) (citations omitted); *In re OxyContin Antitrust Litig.,* 2012 WL 5184949, at \*6 (S.D.N.Y. Oct. 12, 2012) (considering a **stay** in a MDL case).

In deciding whether a **stay** is appropriate, a court should consider (1) the private interests of the plaintiffs in proceeding expeditiously with the civil **litigation** as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil **litigation**; and (5) the public interest. *Royal Park Inv. SA/NV v. Bank of Am. Corp.,* 2013 WL 1509854, at \*2 (internal quotation marks and citations omitted).

## III. DISCUSSION

Suffice it to say that these parties have submitted their same positions to other courts that had to grapple with whether to grant or deny a **stay** in their respective cases. In this respect, each party has thoroughly expounded upon their respective position, supported by a panoply of citations. Redundancy abounds. Obviously, there is no unanimity among these courts: there are several that denied the motions, others that granted the **stay**, and yet others that fashioned hybrid solutions to the motion.[6] Although the Court appreciates the broad spectrum of views on this subject, a comprehensive review of these multitudinous decisions is not warranted. The Court will weigh solely the factors stated above, without engaging in any specific order.

**\*3** Prospect Mortgage seeks a **stay** on "the grounds that (1) a temporary **stay** would create minimal, if any prejudice to Plaintiffs; (2) allowing the action to continue would create hardship on Prospect Mortgage by exposing it to unnecessary proceedings and potential inconsistent rulings; and (3) a temporary **stay** will promote judicial economy and efficiency by avoiding duplicative efforts by this court and the transferee court." Def.'s Mem. of Law at p. 3.

The apparent genesis for the MDL transfer motion is the scope of nationwide discovery. For this reason, Prospect Mortgage seeks a centralized mechanism to address pretrial proceedings, such as that provided by an MDL, in order to avoid duplicative discovery and inconsistent rulings. It is true that, in some respect, discovery of the 243 nationwide Plaintiffs may be individualized and could be handled by the respective district courts, but the same is not emblematic of the ambit of the discovery to be imposed upon Prospect Mortgage nationwide. Evincing the inequality of

Pierre v. Prospect Mortg., LLC, Slip Copy (2013)

the national discovery burden is the fact Prospect Mortgage has already been besieged by twenty-three sets of identical interrogatories and requests for production in those cases where scheduling orders have been issued and discovery has commenced. Wexler Reply Decl. at ¶¶ 3–5.[7] Should there be a service of discovery demands in each of the pending cases, responding to each of thirty-seven (37) sets of discovery demands is unquestionably burdensome and expensive.[8] And responding to each of these interrogatories and demands for production is undeniably duplicative. An obvious solution would be a consolidated and coordinated process where the majority of the discovery issues would be addressed by one court, the JPML. *See In re Nexium (Esomeprazole) Prods. Liab. Litig.*, 908 F.Supp.2d 1362, 1364 (U.S.Jud.Pan.Mult.Lit.2012) (noting that a transferee judge can structure the pretrial proceedings in such a way that discovery can proceed concurrently with other common issues); *In re Zicam Cold Remedy Marketing and Sales Practices Litig.*, 655 F.Supp.2d 1371, 1372 (U.S.Jud.Pan.Mult.Lit.2009).

Likewise, litigating thirty-seven (37) cases simultaneously would be toilsome and costly. And if the parties were to proceed in this fashion, the specter of inconsistent rulings may be realized. For example, approximately 188 Plaintiffs had signed binding arbitration agreements as a condition of their employment. Pl.'s Mem. of Law at p. 3 n. 3. Waiver of a jury trial is a contested feature of these arbitration agreements. Notwithstanding the waiver, Prospect Mortgage seeks a jury trial in this case as well as in all of the other cases. Plaintiffs here have filed a Motion to Strike, Dkt. No. 17, and apparently similar motions have been filed in other jurisdictions. Wexler Decl. at ¶ 9. Without a centralized court to address this singular issue, the likelihood of inconsistent rulings is veritable, and the prospect of prejudice to Prospect Mortgage is manifested. The Court suspects that similar consequences may ensue with other types of motions.

*4 Plaintiffs make a compelling argument that they will be prejudiced if a stay is invoked. They assert that the presentation of their case has already been unjustly delayed. More than three years have passed since their initial complaint was filed without any result in sight, and if a stay is granted, it would only prolong the litigation another four to six months. But Plaintiffs' assessment of prejudice is ameliorated on a number of grounds. First, there has been very little activity

in this case. Neither a Rule 26(f) nor Rule 16 conference has been convened, and discovery has not commenced. Conceivably, if there was not a motion for a stay, discovery probably would not commence until about the time the motion for a transfer is scheduled to be heard by the JPML, which is only two months away. Second, the time-frame for the JPML to decide the motion to transfer is unknown. To forecast that it will be protracted is only supposition. Such a decision could be forthcoming immediately after the hearing on December 5, 2013, or anytime thereafter. Third, if the motion to transfer is denied, this Court will respond promptly to set up a Rule 16 conference and issue a scheduling order. Even if a four-month delay ensues, the Court finds the prejudice to be negligible. Plaintiffs may suffer some prejudice but such is outweighed by the potential prejudice that may be visited upon Prospect Mortgage if it is required to respond to thirty-seven (37) separate actions.

This Court agrees with others that have found that indeed judicial resources would be better served by granting a stay pending the JPML's decision. *Royal Park Inv. SA/NV v. Bank of Am. Corp.*, 2013 WL 1509854, at *4–5 (citations omitted). Conservation of judicial resources is a "fundamental goal[ ] of multidistrict litigation practice," and stays are appropriate when they serve judicial economy. *Id.* at p. 6. Moreover, if a transferee decision is granted, the JPML has the authority to supercede previous orders and vacate any scheduling order issued by this Court and set a new one. A brief stay may obviate that occurrence. Accordingly, a temporary stay would promote judicial economy and efficiency by avoiding duplicative efforts by this Court and the transferee court. This Court finds that the interest of judicial economy weigh more in favor of the stay. *In re Wayne Farms LLC Fair Labor Standard Act Litig.*, 528 F.Supp.2d 1355, 1355 (U.S.Jud.Pan.Mult.Lit.2007) (observing that centralization under section 1407 will eliminate duplicative discovery, prevent inconsistent rulings, and conserve the resources of the parties, counsel, and the judiciary).

For all of the reasons stated above, it is hereby ordered that Prospect Mortgage's Motion to Stay Pending Decision on a Motion to Transfer, Dkt. No. 13, is **granted,** and all activity, including any other pending motion,[9] is stayed pending the resolution of Defendant's Motion to Transfer.

**IT IS SO ORDERED.**

Pierre v. Prospect Mortg., LLC, Slip Copy (2013)

**All Citations**

Slip Copy, 2013 WL 5876151

Footnotes

1       Courts within this Circuit have split as to whether a motion to stay is dispositive or non-dispositive. Within the Northern
        District of New York, the judges have consistently treated motions to stay as non-dispositive. In this vein, the Honorable
        Norman A. Mordue, Senior United States District Judge, issued a Text Notice advising the parties that the pending Motion
        to Stay, Dkt. No. 13, is returnable before this Court inasmuch as said Motion is non-dispositive. Text Notice, dated Sept.
        24, 2013; *see also Sullivan v. Cottrell,* 2012 WL 694825 (W.D.N.Y. Feb. 29, 2012) (magistrate judge issuing a direct
        order on a stay).
2       Initially, Plaintiffs filed their Opposition on October 1, 2013, Dkt. No. 18, however, they amended their Opposition on
        October 4, 2013, Dkt. No. 19. Any reference to Plaintiffs' Opposition will be to the amended Response.
3       There is no assurance as to when the JPML will decide the MDL motion, but Prospect Mortgage hazards a guess that
        decision would be forthcoming by early 2014. Dkt. No. 13–1, Def.'s Mem. of Law at p. 3.
4       It appears that Plaintiffs' Counsel, Nicholas, Kaster Law Firm, are the lawyers for all of the opt-in plaintiffs in each of
        these pending actions.
5       Bearing in mind that the opportunity to coordinate and prevent duplicative discovery are vitally important factors,
        labor, employment practices, discrimination litigation, and Fair Labor Standard Act (FLSA) claims are fairly commonly
        transferred to JPML, including the "state-statute counterparts of the FLSA." Multi–District Litigation Manual at §§ 5.14,
        5.25, & 5.26.
6       Plaintiffs claims that "[e]very case that has ruled on one of those motions based on its merits had denied [the motion]."
        Pls.'Mem. of Law at pp. 1–2, Exs. 1 & 2, unpublished opinions. Such claim is not exactly accurate. Some of those shared
        unpublished opinions indicate that the motions were granted in part and denied in part. Additionally, Prospect Mortgage
        provides a list of cases where the motion for the stay was granted. Def.'s Mem. of Law at pp. 9–10.
7       Attorney Howard Wexler, who is defending each of these related lawsuits, explains that each of the twenty-three (23)
        sets of interrogatories served upon Prospect Mortgage seek "all written administrative regulations, orders, rulings, ...
        policies relied upon by Defendant .... [as well as] all persons who have responsibility for ensuring Defendant's compliance
        with [FLSA]." Wexler Reply Decl. at ¶ 4. Additionally, in conjunction with these identical interrogatories, twenty-three
        (23) requests for production seek "all documents identifying or describing Defendants's policies, procedures, or methods
        of compensating loan officers[,] .... policies, procedures, or methods of compensating loan officers [and] all documents
        relating to Defendant's policies, procedures, and/or methods of disciplining loan officers." *Id.* at ¶ 5.
8       The Court assumes that each of the 243 plaintiffs are not serving individual discovery demands. If such assumption
        is incorrect and each of these 243 plaintiffs contemplate filing separate discovery demands, such actions will certainly
        compound Prospect Mortgage's existing burden and costs.
9       Pending is Plaintiffs' Motion to Strike the Jury Demand. Dkt. No. 17.

---

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.