Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: INTRAMTA SWITCHED ACCESS CHARGES LITIGATION | § § § § | Civil Action No. 3:14-MD-2587-D (MDL No. 2587) |
| THIS DOCUMENT RELATES TO ALL CASES | § § § | |

## DEFENDANT LECS' JOINT RULE 12(b)(6) MOTION TO DISMISS

Douglas P. Lobel
David A. Vogel
**COOLEY LLP**
One Freedom Square | Reston Town Center
11951 Freedom Dr.
Reston, Virginia 20190
(703) 456-8000 Telephone
(703) 456-8100 Facsimile
dlobel@cooley.com
dvogel@cooley.com

Michael P. Lynn, P.C.
Christopher J. Akin
**LYNN TILLOTSON PINKER & COX, L.L.P.**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile
mlynn@lynnllp.com
cakin@lynnllp.com

*Counsel for* CenturyLink Affiliates

*Lead and Liaison Counsel for* Defendant LECs

On Behalf Of All Defendant LECs
(*Except As Otherwise Indicated*)

Dated: May 1, 2015

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................ 1

REGULATORY OVERVIEW .............................................................................. 2

I.      TARIFFED ACCESS CHARGES APPLY TO IXCS' USE OF LECS' ACCESS
        SERVICES........................................................................................................ 3

        A.     IXCs Use LECs' Existing Networks To Reach End Users' Phones...................... 4

        B.     To Enable The IXCs' Use Of Their Networks, LECs Provide Services
              Using Standardized Connections ...................................................... 6

II.     CONTRACTUAL "RECIPROCAL COMPENSATION" APPLIES TO LECS'
        USE OF LOCAL FACILITIES TO CONNECT LOCAL CALLS ................... 7

        A.     Landline Calls Between Two LECs ................................................. 8

        B.     Cell Phone Calls Between A Wireless Carrier And A LEC ................. 10

PLAINTIFFS' ALLEGATIONS ........................................................................ 11

I.      PLAINTIFFS ADMIT THAT THEY RECEIVED DEFENDANTS' ACCESS
        SERVICES AND PAID DEFENDANTS' ACCESS CHARGES ................... 12

II.     PLAINTIFFS ARE SEEKING REFUNDS YEARS AFTER USING
        DEFENDANTS' ACCESS SERVICES ................................................... 15

PROCEDURAL DEVELOPMENTS ................................................................. 16

STANDARD OF REVIEW ............................................................................... 17

ARGUMENT..................................................................................................... 18

I.      THE "FILED TARIFF DOCTRINE" BARS PLAINTIFFS' CLAIMS THAT
        WOULD VARY THE CHARGES UNDER DEFENDANTS' FILED TARIFFS .......... 19

II.     THE FCC DID NOT EXEMPT PLAINTIFFS FROM DEFENDANTS' TARIFFS ....... 22

        A.     The FCC's Orders Did Not Preclude LECs From Imposing Access
              Charges On IXCs For Use Of LECs' Access Services To Route
              "IntraMTA" Calls ....................................................................... 23

        B.     Plaintiffs Misread Federal Precedent ........................................... 25

              1.     The INS Case Defeats Plaintiffs' Claims Because IXCs Are Not
                    Exempt From The Access Charge Regime ............................... 26

        2.    Plaintiffs' Other Authorities Also Support Defendants' Position............ 29

        3.    The Fifth Circuit Acknowledges That IXCs Pay Access Charges
            For Using LECs' Access Services To Exchange IntraMTA Calls .......... 32

  C.    Plaintiffs' Theory Is Contrary To Well-Settled Law ............................................. 33

        1.    IXCs Must Pay Access Charges For Using LECs' Access Services,
            Even When The Traffic They Exchange With The LECs Are
            IntraMTA Calls ................................................................................................ 34

        2.    The Same Call Can Be Subject To Both Access Charges And
            Reciprocal Compensation As Between Different Carriers ...................... 35

III.  IF DEFENDANTS' TARIFFS DO NOT APPLY, THEN STATE CONTRACT
     LAW BARS PLAINTIFFS' CLAIMS .............................................................................. 36

  A.    Plaintiffs' Allegations Admit To Implied-In-Fact Contracts................................ 36

  B.    The Voluntary Payment Doctrine Bars Plaintiffs' Demand For Refunds ............ 38

        1.    Plaintiffs' Admissions And Allegations Are Sufficient To Invoke
            The Doctrine Even On A Rule 12 Motion ............................................... 38

        2.    If The Services Are Not Governed By Tariffs, The Filed Tariff
            Doctrine Would Not Be Applicable .......................................................... 40

IV.  PLAINTIFFS HAVE NOT ALLEGED A VIOLATION OF STATE LAW ................... 43

V.  THE FEDERAL, TWO-YEAR STATUTE OF LIMITATIONS APPLIES TO
    ANY STATE-LAW CLAIMS ......................................................................................... 45

  A.    Section 415(b) Applies To Any State-Law Claim That Alleges Violation
      Of Duties Or Rights Provided By Federal Communications Law......................... 45

  B.    Courts Dismiss Untimely State-Law Causes Of Action That Allege Duties
      Under Federal Communications Laws .................................................................... 47

VI.  IN THE ALTERNATIVE—AND ONLY IF IT FINDS THE ORDERS ARE
     UNCLEAR—THE COURT SHOULD "REFER" ISSUES TO THE FCC ..................... 48

  A.    The Court Should Allow The FCC To Resolve Any Ambiguities In The
      Meaning Of Its 1996 And 2011 Orders ................................................................. 49

  B.    The Court Should Also Refer Plaintiffs' Causes Of Action Under
      Section 201(b) Of The Communications Act ........................................................ 51

  C.    Even If It Refers Issues To The FCC, The Court Should Dismiss
      Plaintiffs' State-Law Claims Or Apply A Two-Year Statute of Limitations ....... 53

CONCLUSION ................................................................................................................. 53

## TABLE OF AUTHORITIES

### Federal Cases

*3 Rivers Tel. Coop., Inc. v. US West Commc'ns, Inc.,*
   2003 WL 24249671 (D. Mont. Aug. 22, 2003) ............................................................30, 31, 44

*In the Matter of Access Billing Requirements for Joint Serv. Provision,*
   Order, 1988 WL 488227 (Com. Car. Bur. 1988)........................................................................4

*Access Telecomms. v. Sw. Bell Tel. Co.,*
   137 F.3d 605 (8th Cir. 1998) .....................................................................................................52

*Advamtel, LLC v. AT&T Corp.,*
   105 F. Supp. 2d 507 (E.D. Va. 2000) .......................................................................................52

*Advamtel, LLC v. Sprint Commc'ns Co.,*
   105 F. Supp. 2d 476 (E.D. Va. 2000) .......................................................................................50

*All Am. Tel. Co. v. AT&T Corp.,*
   Memo. Op. & Order, 26 FCC Rcd. 723 (2011) .......................................................................38

*Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.,*
   965 F.2d 1118 (D.C. Cir. 1992) ...............................................................................................51

*Alma Commc'ns Co. v. Mo. Pub. Serv. Comm'n,*
   490 F.3d 619 (8th Cir. 2007) ............................................................................................ *passim*

*Ariz. Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.,*
   284 U.S. 370 (1932).................................................................................................................21

*Arnold v. AT&T, Inc.,*
   2012 WL 1441417 (E.D. Mo. Apr. 26, 2012).................................................................... 39-40

*AT&T Co. v. Cent. Office Tel., Inc.,*
   524 U.S. 214 (1998)......................................................................................................... 19-20, 42

*AT&T Co. v. IMR Capital Corp.,*
   888 F. Supp. 221 (D. Mass. 1995) ...........................................................................................52

*AT&T Commc'ns of the Midwest, Inc. v. Qwest Corp.,*
   2007 WL 978091 (D. Minn. Mar. 28, 2007) ...........................................................................48

*AT&T Commc'ns of the Midwest v. Qwest Corp.,*
   2007 WL 2743491 (D. Neb. Feb. 27, 2007).............................................................................47

*AT&T Commc'ns of the Mountain States, Inc. v. Qwest Corp.,*
   2007 WL 1342657 (D. Utah May 4, 2007)...............................................................................47

*AT&T Commc'ns of the Sw., Inc. v. City of Dall.*,
  8 F. Supp. 2d 582 (N.D. Tex. 1998) ...................................................................53

*AT&T Corp. v. Excel Commc'ns, Inc.*,
  1999 WL 1050064 (D. Del. Oct. 25, 1999) ....................................................3, 4, 5

*AT&T Corp. v. Iowa Utils. Bd.*,
  525 U.S. 366 (1999)...........................................................................................8

*AT&T Corp. v. Swain*,
  1998 WL 907031 (N.D. Tex. Dec. 16, 1998) ........................................................21

*Atlas Tel. Co. v. Okla. Corp. Comm'n*,
  400 F.3d 1256 (10th Cir. 2005) ............................................................... *passim*

*Bell Atl. Tel. Cos. v. FCC*,
  206 F.3d 1 (D.C. Cir. 2000).................................................................................9

*Best Buy Stores, L.P. v. Benderson-Wainberg Assocs.*,
  668 F.3d 1019 (8th Cir. 2012) ...........................................................................39

*Borges v. Local 19 of the Int'l Bhd. of Teamsters*,
  1996 WL 734951 (N.D. Tex. Dec. 10, 1996) .......................................................49

*Brown v. MCI WorldCom Network Servs., Inc.*,
  277 F.3d 1166 (9th Cir. 2002) ...........................................................................20

*Cahnmann v. Sprint Corp.*,
  133 F.3d 484 (7th Cir. 1998) .............................................................................50

*Capital Network Sys., Inc. v. FCC*,
  28 F.3d 201 (D.C. Cir. 1994)..............................................................................51

*Cent. Scott Tel. Co. v. Teleconnect Long Distance*,
  832 F. Supp. 1317 (S.D. Iowa 1993) .............................................................4, 5, 7

*Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va., Inc.*,
  715 F.3d 501 (4th Cir. 2013) .........................................................................6, 8, 9

*Cnty. Motors, Inc. v. Gen. Motors Corp.*,
  2001 WL 34136693 (D.R.I. Jan. 29, 2001) .........................................................44

*Competitive Telecomms. Ass'n v. FCC*,
  117 F.3d 1068 (8th Cir. 1997) .........................................................................7, 8

*In the Matter of Connect Am. Fund,*
    26 FCC Rcd. 17663 (2011) final rules pub., 76 Fed. Reg. 73830
    (Nov. 29, 2011), *aff'd sub nom, In re FCC 11-161,* 753 F.3d 1015
    (10th Cir. 2014) ............................................................................................ *passim*

*Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.,*
    2012 WL 2995063 (N.D. Tex. July 23, 2012) ..................................................6, 21

*Davel Commc'ns, Inc. v. Qwest Corp.,*
    460 F.3d 1075 (9th Cir. 2006) ........................................................ 22, 45, 49-50

*In the Matter of Developing a Unified Intercarrier Comp. Regime,*
    20 FCC Rcd. 4855 (Wireline Comp. Bur. 2005) ..........................................9, 11, 38

*In the Matter of Developing an Unified Intercarrier Comp. Regime,*
    27 FCC Rcd. 1351 (Wireline Comp. Bur. 2012) ..................................................6

*Digital Commc'ns Network, Inc. v. AT&T Wireless Serv.,*
    63 F. Supp. 2d 1194 (C.D. Cal. 1999) ................................................................52

*Dreamscape Design, Inc. v. Affinity Network, Inc.,*
    414 F.3d 665 (7th Cir. 2005) ....................................................................7, 20

*Drew v. MCI WorldCom Mgmt. Co,*
    1999 WL 1087470 (N.D. Tex. Dec. 1, 1999) ......................................................49

*Drive Train Specialists, L.L.C. v. Teleport Commc'ns Grp.,*
    2003 WL 1120062 (E.D. Mich. Feb. 3, 2003) ......................................................48

*Elam v. Kan. City S. Ry. Co.,*
    635 F.3d 796 (5th Cir. 2011) ..........................................................................49

*Evanns v. AT&T Corp.,*
    229 F.3d 837 (9th Cir. 2000) ..........................................................................20

*Firstcom, Inc. v. Qwest Commc'ns,*
    618 F. Supp. 2d 1001 (D. Minn. 2007),
    *aff'd on other grounds,* 555 F.3d 669 (8th Cir. 2009) ................................ 45-46, 48

*Firstcom, Inc. v. Qwest Corp.,*
    555 F.3d 669 (8th Cir. 2009) ................................................................8, 20, 46, 47

*Fitch v. Pub. Util. Comm'n of Tex.,*
    261 F. App'x 788 (5th Cir. 2008) ..................................................................32, 33

*Global NAPS Cal., Inc. v. Pub. Utils. Comm'n of Cal.,*
    624 F.3d 1225 (9th Cir. 2010) ..........................................................................9

*Global NAPS, Inc. v. Verizon New Eng., Inc.*,
 454 F.3d 91 (2d Cir. 2006)..........................................................................3

*Goldwasser v. Ameritech Corp.*,
 222 F.3d 390 (7th Cir. 2000) ......................................................................20

*Great Lakes Commc'n Corp. v. AT&T Corp.*,
 2014 WL 2866474 (N.D. Iowa June 24, 2014),
 *report and recommendation adopted in part*,
 2015 WL 897976 (N.D. Iowa Mar. 3, 2015) ...........................................5

*Hill v BellSouth Telecomms., Inc.*,
 364 F.3d 1308 (11th Cir. 2004) ..........................................................19, 20

*Himmelman v. MCI Commc'ns Corp.*,
 104 F. Supp. 2d 1 (D.D.C. 2000) ...............................................................50

*Hoffman v. Rashid*,
 2009 WL 5084098 (E.D. Pa. Dec. 28, 2009),
 *aff'd*, 388 F. App'x 121 (3d Cir. 2010).....................................................45

*Holmberg v. Armbrecht*,
 327 U.S. 392 (1946)....................................................................................48

*In re Implementation of the Local Competition Provisions
 in the Telecomms. Act of 1996*,
 First Report & Order, 11 FCC Rcd. 15499 (1996) .......................... *passim*

*In the Matter of Access Charge Reform; Reform of Access Charges Imposed
 by Competitive Local Exch. Carriers*,
 16 FCC Rcd. 9923 (2001) ...........................................................................19

*In the Matter of Establishing Just & Reasonable Rates for Local Exch. Carriers;
 Call-Blocking by Carriers*,
 22 FCC Rcd. 11629, (Wireline Comp. Bur. 2007) .......................................6

*Iowa Network Servs., Inc. v. Qwest Corp.*,
 363 F.3d 683 (8th Cir. 2004) .............................................................7, 8, 43

*Iowa Network Servs., Inc. v. Qwest Corp.*,
 385 F. Supp. 2d 850 (S.D. Iowa 2005) ............................................ *passim*

*Iowa Network Servs., Inc. v. Qwest Corp.*,
 466 F.3d 1091 (8th Cir. 2006) ..........................................................26, 27-28

*Johnson v. Sprint Solutions, Inc.*,
 2008 WL 2949253 (W.D.N.C. July 29, 2008),
 *aff'd on other grounds*, 357 F. App'x 561 (4th Cir. 2009) .................39, 40

*Kaplan v. ITT-U.S. Transmission Sys., Inc.,*
   589 F. Supp. 729 (E.D.N.Y. 1984) ................................................................... 51-52

*In re Long Distance Telecomms. Litig.,*
   831 F.2d 627 (6th Cir. 1987) .............................................................................. 52

*Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,*
   497 U.S. 116 (1990) ........................................................................................... 19

*Manhattan Telecom. Corp. v. Global Naps, Inc.,*
   No. 08 Civ. 3829 (JSR), 2010 WL 1326095 (S.D.N.Y. Mar. 31, 2010) ............... 42

*Marcus v. AT&T Corp.,*
   138 F.3d 46 (2d Cir. 1998) .................................................................................. 7

*MCI Telecomms. Corp. v. Dominican Commc'n Corp.,*
   984 F. Supp. 185 (S.D.N.Y. 1997) ..................................................................... 52

*MCI Telecomms. Corp. v. Garden State Inv. Corp,*
   981 F.2d 385 (8th Cir. 1992) .............................................................................. 46

*MCI Telecomms. Corp. v. Teleconcepts, Inc.,*
   71 F.3d 1086 (3d Cir. 1995) ............................................................................... 45

*MFS Int'l, Inc. v. Int'l Telecom Ltd.,*
   50 F. Supp. 2d 517 (E.D. Va. 1999) .......................................................... 46, 47, 48

*Miranda v. Mich.,*
   141 F. Supp. 2d 747 (E.D. Mich. 2001) ............................................................. 20

*N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.,*
   594 F.3d 1149 (9th Cir. 2010) ...................................................................... 52-53

*Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.,*
   46 F.3d 220 (2d Cir. 1995) ................................................................................ 53

*In the Matter of Nw. Bell Tel. Co. Petition for Declaratory Ruling,*
   2 FCC Rcd. 5986 (1987) .............................................................................. 34, 35

*PAETEC Commc'ns, Inc. v. MCI Commc'ns Servs., Inc.,*
   712 F. Supp. 2d 405 (E.D. Pa. 2010) ................................................................. 43

*Pavlak v. Church,*
   727 F.2d 1425 (9th Cir. 1984) ............................................................................ 45

*Pfeil v. Sprint Nextel Corp.,*
   284 F. App'x 640 (11th Cir. 2008) ..................................................................... 20

*In the Matter of Policy & Rules Concerning the*
  *Interstate, Interexchange Marketplace,*
  11 FCC Rcd. 20730 (1996)............................................................................41

*Qwest Commc'ns Co. v. Aventure Commc'ns Tech., LLC,*
  ---F. Supp. 3d---, 2015 WL 711154 (S.D. Iowa Feb. 17, 2015) ...............................21

*Qwest Corp. v. Wash. State Utils. & Transp. Comm'n,*
  484 F. Supp. 2d 1160 (W.D. Wash. 2007).....................................................5

*Reiter v. Cooper,*
  507 U.S. 258 (1993)...........................................................................48-49

*Rosenblatt v. United Way of Greater Houston,*
  607 F.3d 413 (5th Cir. 2010) .................................................................18

*Ruiz-Sánchez v. Goodyear Tire & Rubber Co.,*
  717 F.3d 249 (1st Cir. 2013)..................................................................39

*Rural Iowa Indep. Tel. Ass'n v. Iowa Utils. Bd.,*
  476 F.3d 572, 576 (8th Cir. 2007) ...........................................................29

*S. New Eng. Tel. Co. v. Global NAPS, Inc.,*
  2005 WL 2789323 (D. Conn. Oct. 26, 2005) ............................................. 6-7

*S. New Eng. Tel. Co. v. MCI WorldCom Commc'ns, Inc.,*
  353 F. Supp. 2d 287 (D. Conn. 2005).........................................................5

*Sandwich Isles Commc'ns, Inc. v. Nat'l Exch. Carrier Ass'n,*
  799 F. Supp. 2d 44 (D.D.C. 2011)............................................................50

*Sprint Commc'ns Co. v. Butler-Bremer Mut. Tel. Co.,*
  2014 WL 4980539 (N.D. Iowa Oct. 6, 2014)............................................. *passim*

*Staton Holdings, Inc. v. MCI WorldCom Commc'ns, Inc.,*
  2001 WL 1041796 (N.D. Tex. Sept. 4, 2011)................................................21

*Sw. Bell Tel. Co. v. FCC,*
  153 F.3d 523 (8th Cir. 1998) .................................................................6

*Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n,*
  461 F. Supp. 2d 1055 (E.D. Mo. 2006).......................................................8

*Sw. Bell Tel., L.P. v. VarTec Telecom, Inc.,*
  2005 WL 2033416 (E.D. Mo. Aug. 23, 2005) .............................................5, 9

*Swarthout v. Mich. Bell Tel. Co.,*
  504 F.2d 748 (6th Cir. 1974) .............................................................45, 46

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,*
   975 F.2d 1134 (5th Cir. 1992) ..................................................................................32

*Tex. Commercial Energy v. TXU Energy, Inc.,*
   413 F.3d 503 (5th Cir. 2005) ...............................................................................20-21

*Tex. Office of Pub. Util. Counsel v. FCC,*
   265 F.3d 313 (5th Cir. 2001) ....................................................................................3

*Total Telecomms. Servs., Inc. v. AT&T Co.,*
   919 F. Supp. 472 (D.D.C. 1996), *aff'd,* 99 F.3d 448 (D.C. Cir. 1996)....................52

*TSR Wireless, LLC v. US West Commc'ns, Inc.,*
   15 FCC Rcd. 11166 (2000), *pet. for recon. dismissed,* 16 FCC Rcd. 11462,
   *aff'd sub. nom., Qwest v. FCC,* 252 F.3d 462 (D.C. Cir. 2001) .................................25, 33, 35

*United States v. AT&T Co.,*
   552 F. Supp. 131 (D.D.C. 1982) ...............................................................................3

*United States v. W. Pac. R.R. Co.,*
   352 U.S. 59 (1956)....................................................................................................49

*V.I. Tel. Corp. v. FCC,*
   444 F.3d 666 (D.C. Cir. 2006)..................................................................................21

*W. Radio Servs. Co. v. Qwest Corp.,*
   678 F.3d 970 (9th Cir. 2012) ..........................................................................24, 29, 30

*W. Union Int'l, Inc. v. Data Dev., Inc.,*
   41 F.3d 1494 (11th Cir. 1995) ...................................................................................7

*Wagner & Brown v. ANR Pipeline Co.,*
   837 F.2d 199 (5th Cir. 1988) ...................................................................................49

*Ward v. N. Ohio Tel. Co.,*
   251 F. Supp. 606 (N.D. Ohio 1966)..........................................................................46

*Wegoland Ltd. v. NYNEX Corp.,*
   27 F.3d 17 (2d Cir. 1994)..........................................................................................20

*Wilbert Family Ltd. P'ship v. Dall. Area Rapid Transit,*
   2012 WL 246091 (N.D. Tex. Jan. 26, 2012) ............................................................53

*In the Matter of Wireless Consumers Alliance, Inc.,*
   Mem. Op. & Order, 15 FCC Rcd. 17021 (2000) .................................................41, 42

*WWC License, L.L.C. v. Boyle,*
   459 F.3d 880 (8th Cir. 2006) .....................................................................................4

**State Cases**

*BMG Mktg., Inc. v. Peake,*
    178 S.W.3d 763 (Tex. 2005)...................................................................... 38-39

*Capital Warehouse Co. v. McGill-Warner-Farnham Co.,*
    149 N.W.2d 31 (Minn. 1967)..................................................................... 37

*In re Exch. of Transit Traffic,*
    2001 WL 36521831 (Iowa U.B. Nov. 26, 2001), *aff'd,* 2002 WL 535299
    (Iowa U.B. Mar. 18, 2002)..................................................................27, 28, 38

*F. Cary Fitch d/b/a Fitch Affordable Telecom Petition for Arb. Against SBC Tex.,*
    PUC Docket No. 29415, Order Approving Arb. Award with Modif.
    (P.U.C. of Tex. Dec. 19, 2005) ................................................................ 32-33

*Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.,*
    625 S.W.2d 295 (Tex. 1981).................................................................... 36

*Qwest Commc'ns Co. v. MCIMetro Access Transmission Servs., LLC,*
    Order Nos. C11-1216, 2011 WL 6010026 (Colo. P.U.C. Oct. 17, 2011) &
    C12-0276, 2012 WL 1571712 (Colo. P.U.C. Feb. 15, 2012) .................................21

**Federal Statutes**

47 U.S.C. § 201(b) ....................................................................16, 51, 52, 53

47 U.S.C. § 203...........................................................................16, 19

47 U.S.C. § 251(a) .......................................................................11

47 U.S.C. § 251(a)(1) ....................................................................8

47 U.S.C. § 251(b)(5) .................................................................8, 9, 11

47 U.S.C. § 251(c)(1)....................................................................11

47 U.S.C. § 251(c)(2)....................................................................8

47 U.S.C. § 252........................................................................9, 11

47 U.S.C. § 414.........................................................................46

47 U.S.C. § 415.......................................................................46, 47

47 U.S.C. § 415(b) ................................................................... *passim*

47 U.S.C. § 415(g) .....................................................................46

**<u>Rules</u>**

Fed. R. Civ. P. 12 ................................................................................................................32, 39

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... *passim*

**<u>Regulations</u>**

47 C.F.R. § 20.11(b) ...............................................................................................................11

47 C.F.R. § 51.209 ....................................................................................................................4

47 C.F.R. § 51.209(b) ...............................................................................................................5

47 C.F.R. § 51.701 ..................................................................................................................10

47 C.F.R. § 51.701(b)(2) .........................................................................................................25

47 C.F.R. § 51.703 ..................................................................................................................10

47 C.F.R. § 51.713 ....................................................................................................................9

47 C.F.R. § 64.4001(f) ..............................................................................................................5

47 C.F.R. § 69.2(b) .................................................................................................................34

47 C.F.R. § 69.5(b) ...........................................................................................................25, 34

**<u>Other Authorities</u>**

Restatement (First) of Contracts: Acts as Manifestation of Assent § 21 (1932) ...........................37

## INTRODUCTION

Defendants jointly move to dismiss the Complaints of Plaintiffs Sprint Communications Company L.P. ("Sprint") and MCI Communications Services, Inc. d/b/a Verizon Business and Verizon Select Services Inc. (together "Verizon").[1]

Plaintiffs are attempting to use these lawsuits to obtain hundreds of millions of dollars of services for free.  For over two decades, Plaintiffs have ordered, received, and used Defendants' tariffed "access services;" in exchange, Plaintiffs have routinely paid Defendants the lawful, tariffed charges for those services, without objection.  All this time, Plaintiffs never contended that the tariffed charges were illegal, violated FCC orders, or were inconsistent with federal law. Moreover, Sprint and Verizon have even sued each other, alleging that each continues to assess these charges on one another.

Last year, for the first time, Plaintiffs declared that these industry-standard, tariffed access charges were "illegal," and have been illegal since 1996.  As a result, Plaintiffs now seek (1) refunds for many years of payments, and (2) a declaration that they do not owe the charges going forward, even if they continue to receive and use the access services.

Plaintiffs' newly-minted attack on these industry-standard charges is based on their gross misreading of two FCC orders.  First, those orders are inapplicable because they did not address compensation Plaintiffs paid Defendants, but instead compensation paid to or by *wireless carriers* (who are *not* parties to this lawsuit).  Second, those orders did not alter the FCC's longstanding, preexisting rules for access services compensation.  If the law is "clear" that the

---

[1]     This Motion is not filed on behalf of: Verizon's LEC affiliates; Sprint; AT&T Corp.; and defendants for which no counsel has yet to file a notice of appearance, and is asserted by any Defendant only in the Actions in which they are named as a Defendant.  In addition, some Defendants may raise additional issues or may not join, in whole or in part, some sections of the Motion.  In accordance with Case Management and Scheduling Order No. 2, these Defendants will file supplemental briefs and/or notices of non-joinder.

charges are illegal, as Plaintiffs claim, they cannot justify paying these same "illegal" charges for over 18 years.

Plaintiffs also ignore or misconstrue Fifth Circuit and other appellate opinions. No court has read the underlying FCC orders to have the meaning Plaintiffs ascribe to them, and even the cases Plaintiffs rely upon recognize that these charges must be paid.

Even if the Court found that Plaintiffs did not owe the charges under applicable access tariffs, many Defendants contend that the charges are owed under state law. Plaintiffs' use of and payment for the access services created implied-in-fact contracts, and the voluntary payment doctrine bars the refunds they now seek.

Assuming Plaintiffs could clear each of these legal hurdles, the Court should dismiss or sharply limit Plaintiffs' state-law claims. Plaintiffs base their state claims entirely on the meaning of FCC orders, rather than on any state statute, regulation or tariff provision. Thus their state-law claims should be dismissed, or at a minimum limited by the federal two-year statute of limitations. This result eliminates or sharply reduces Plaintiffs' potential damages.

Finally, while Defendants believe the meaning of the relevant FCC orders is clear and requires dismissal, if the Court disagrees, then it should refer to the FCC those regulatory issues requiring FCC guidance, while continuing to address other issues (*e.g.*, statute of limitations) within the Court's province.

## **REGULATORY OVERVIEW**

To understand Plaintiffs' claims and the relevant law, it is first important to understand the general background of intercarrier compensation in the telecommunications industry. Carriers exchanging domestic call traffic historically have used two different types of charges: (1) "access charges" which local exchange carriers ("LECs") like Defendants assess on

interexchange carriers (also known as "IXCs" or "long-distance carriers") like Plaintiffs, and

(2) "reciprocal compensation," paid between two LECs, or between a wireless carrier and a LEC.

## I.    TARIFFED ACCESS CHARGES APPLY TO IXCS' USE OF LECS' ACCESS SERVICES

LECs typically provide local phone services to end-user customers via what are known as

landlines. *Global NAPS, Inc. v. Verizon New Eng., Inc.*, 454 F.3d 91, 93 n.1 (2d Cir. 2006).  The

LECs generally own or lease the physical "facilities" necessary to provide local phone

services—such as the wires connected to the end-user customers, and the switching equipment

used to route calls. *Iowa Network Servs., Inc. v. Qwest Corp.*, 385 F. Supp. 2d 850, 856 (S.D.

Iowa 2005) ("*INS*").

IXCs generally provide long-distance services. *Tex. Office of Pub. Util. Counsel v. FCC*,

265 F.3d 313, 317 (5th Cir. 2001) ("*TOPUC*").  In the 1980's, the breakup of the Bell system

(called "divestiture") allowed greater competition for long-distance services. *See generally*

*United States v. AT&T Co.*, 552 F. Supp. 131 (D.D.C. 1982).  Before divestiture the LECs

typically selected the long-distance carriers that would carry long-distance calls.  Post-

divestiture, end-user customers were allowed to choose their long-distance carriers. *Alma*

*Commc'ns Co. v. Mo. Pub. Serv. Comm'n*, 490 F.3d 619, 621 (8th Cir. 2007).

Because long-distance companies usually do not construct the facilities to connect

directly to end users' phones, they rely on LECs' local networks to complete these connections.

*TOPUC*, 265 F.3d at 318; *AT&T Corp. v. Excel Commc'ns, Inc.*, No. Civ. A. 96-434-SLR, 1999

WL 1050064, at *1 & n.1 (D. Del. Oct. 25, 1999).  Thus, the FCC requires LECs to provide

services that allow IXCs to connect to end users through the LECs' local phone networks. *See In*

*re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, First

Report & Order, 11 FCC Rcd. 15499, 15511, ¶ 17, 15546, ¶ 90 (1996) ("*Local Competition*

*Order*" or "*LCO*") (sub. history omitted); 47 C.F.R. § 51.209.  These services are called "access

services," and LECs provide them under filed tariffs, as described below.  Access services

facilitate competition among IXCs. *WWC License, L.L.C. v. Boyle*, 459 F.3d 880, 884, 887 n.5

(8th Cir. 2006); *Excel Commc'ns*, 1999 WL 1050064, at *1; *Cent. Scott Tel. Co. v. Teleconnect

*Long Distance*, 832 F. Supp. 1317, 1318 (S.D. Iowa 1993).

### A.    IXCs Use LECs' Existing Networks To Reach End Users' Phones

The process of completing a call through an IXC resembles a relay race, where the

"baton" is the end user's phone call, and the call starts with an "originating" LEC, is passed to an

IXC, and is then passed to a "terminating" LEC where the call ends.  The dialing end user

originates the call on the phone line he or she obtains from the LEC.  Most simplistically, this

originating LEC then takes the call and hands it off to the IXC's network.  The IXC then hands

the call off to a second LEC, which terminates the call to a second end user to whom the call was

dialed.  The following diagram illustrates the path of the call:[2]



Neither the originating LEC nor the terminating LEC has a choice when it comes to exchanging

this call with the IXC—instead, as explained next, they are legally required to do so.

---

[2]    Although not affecting any issues in this lawsuit, the call path is slightly more
complicated for small LECs that do not maintain direct connections with IXCs.  These small
LECs connect with nearby larger LECs (which maintain direct connections with IXCs) to
establish "jointly provided" access arrangements to IXCs.  In this situation, each LEC effectively
provides a portion of the total access service to the IXC, and each LEC collects access charges
from the IXC for its portion. *See, e.g., In the Matter of Access Billing Requirements for Joint
Serv. Provision*, Order, 1988 WL 488227, at *21, ¶ 88 (Com. Car. Bur. 1988).

*__Origination.__*  At the front end of the call, the IXC uses the originating LEC's phone line and local network to provide long-distance services to the end user.  An end user who purchases a local phone line from a LEC can choose an IXC to provide long-distance service on that phone line (called "presubscription").  47 C.F.R. §§ 51.209(b) & 64.4001(f).  Then, each time that end user dials "1" and then a 10-digit phone number (a "1+ call") on that phone line, the LEC servicing that line for the end user *__must__* deliver the call to that IXC.  *Excel Commc'ns*, 1999 WL 1050064, at *1 & n.2; *Cent. Scott Tel.*, 832 F. Supp. at 1318.  In this instance, the end user is deemed to be the IXC's customer (for long-distance services), and he or she typically pays the IXC compensation (usually per-call prices, or a flat-rate monthly package).[3]  *Qwest Corp. v. Wash. State Utils. & Transp. Comm'n*, 484 F. Supp. 2d 1160, 1163 & n.2 (W.D. Wash. 2007) (explaining compensation structure of long-distance calls); *S. New Eng. Tel. Co. v. MCI WorldCom Commc'ns, Inc.*, 353 F. Supp. 2d 287, 291 (D. Conn. 2005) (same).

*__Termination.__*  The IXC also relies on the terminating LEC's phone lines to connect to the called party.  The IXC's network sends the call to the network of the LEC that provides local service to the called end user.  This terminating LEC routes the call through its network to the end user.  *E.g.*, *Great Lakes Commc'n Corp. v. AT&T Corp.*, No. C13-4117-DEO, 2014 WL 2866474, at *2 (N.D. Iowa June 24, 2014), *report and recommendation adopted in part*, 2015 WL 897976 (N.D. Iowa Mar. 3, 2015); *Sw. Bell Tel., L.P. v. VarTec Telecom, Inc.*, No. 4:04-CV 1303 (CEJ), 2005 WL 2033416, at *1 (E.D. Mo. Aug. 23, 2005).  Absent unusual circumstances, this terminating LEC cannot "block" the call from the IXC but must terminate it to the called end user.  *In the Matter of Connect Am. Fund*, Report & Order and Further Notice of Proposed

---

[3]      In this instance, the IXC is the carrier serving the end user that originates a 1+ call, and that end user is acting as the customer of an IXC.  This is because the end user is using that IXC's services and paying for the call under a long distance plan with that IXC.  But the call physically originates on the LEC's phone line and network.

Rulemaking, 26 FCC Rcd. 17663, 17903, ¶ 734 (2011) ("*Transformation Order*" or "*TO*") final

rules pub., 76 Fed. Reg. 73830 (Nov. 29, 2011), *recon. in part*, 2011 WL 6778613 (Dec. 23,

2011), *aff'd sub nom*, *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014); *In the Matter of*

*Developing an Unified Intercarrier Comp. Regime*, Declaratory Ruling, 27 FCC Rcd. 1351,

1354, ¶ 9 (Wireline Comp. Bur. 2012); *In the Matter of Establishing Just & Reasonable Rates*

*for Local Exch. Carriers; Call-Blocking by Carriers*, Declaratory Ruling & Order, 22 FCC Rcd.

11629, 11629, ¶ 1, 11631, ¶ 6 (Wireline Comp. Bur. 2007).

### B.   To Enable The IXCs' Use Of Their Networks, LECs Provide Services Using Standardized Connections

"Switched access services" (or more generally, "*access services*") are industry-standard

services that LECs provide to IXCs to allow IXCs to connect to end users. *Sw. Bell Tel. Co. v.*

*FCC*, 153 F.3d 523, 542 & n.9 (8th Cir. 1998); *INS*, 385 F. Supp. 2d at 856.

*Feature Group D Facilities.*  IXCs typically obtain access services from LECs by

ordering certain industry-standard communication facilities, called "Feature Group D" facilities.[4]

An FGD facility includes both the physical equipment (*e.g.*, switches) and wiring that connects

an IXC's long-distance network to a LEC's local network, and is specifically designed to route

"1+" calls to each end-user's presubscribed IXC. *Cent. Tel. Co. of Va. v. Sprint Commc'ns Co.*

*of Va., Inc.*, 715 F.3d 501, 507 (4th Cir. 2013) ("*Embarq*") (explaining how access trunks link

with a LEC's network).  The IXC uses a LEC's FGD facility to receive originating calls from,

and/or to terminate calls to, that LEC. *Id.* at 507; *S. New Eng. Tel. Co. v. Global NAPS, Inc.*, No.

---

[4]      IXCs can "order" these facilities either by affirmatively asking for them in the form of a
written service order, or by using existing facilities to exchange calls (called "constructive
ordering"). *Connect Insured Tel., Inc. v. Qwest Long Distance, Inc.*, No 3:10-CV-1897-D, 2012
WL 2995063, at *4 (N.D. Tex. July 23, 2012) (Fitzwater, C.J.) (citing *Alliance Commc'ns Co-
op., Inc. v. Global Crossing Telecomms., Inc.*, 663 F. Supp. 2d 807, 820-21 (D.S.D. 2009) and
*Advamtel, LLC v. AT&T Corp.*, 118 F. Supp. 2d 680, 686 (E.D. Va. 2000)); *INS*, 385 F. Supp. 2d
at 910 n.92.

Civ.A. 304-CV-2075-JCH, 2005 WL 2789323, at *1 (D. Conn. Oct. 26, 2005); *Cent. Scott Tel.*,
832 F. Supp. at 1318.

    ***Access Charges.*** IXCs are required to pay charges known as "access charges" for using
LECs' access services through FGD facilities. *Iowa Network Servs., Inc. v. Qwest Corp.*, 363
F.3d 683, 686 (8th Cir. 2004) ("*INS (I)*"); *Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068,
1072 (8th Cir. 1997) ("*CompTel*"). Access charges, and other terms and conditions of LECs'
access services, are set forth in federal tariffs (for interstate calls) filed at the FCC, and in state
tariffs (for intrastate calls) filed at state public utility/service commissions ("state commissions").
*Id.* A tariff is "the equivalent of federal regulations or law." *Dreamscape Design, Inc. v. Affinity
Network, Inc.*, 414 F.3d 665, 669 (7th Cir. 2005); *accord Marcus v. AT&T Corp.*, 138 F.3d 46,
56 (2d Cir. 1998) ("'federal tariffs are the law, not mere contracts'" (quoting *MCI Telecomms.
Corp. v. Garden State Inv. Corp*, 981 F.2d 385, 387 (8th Cir. 1992)); *W. Union Int'l, Inc. v. Data
Dev., Inc.*, 41 F.3d 1494, 1496 (11th Cir. 1995) ("a tariff . . . constitutes the law and is not merely
a contract").

    IXCs recover the costs of the access charges they pay LECs through the rates they charge
their customers for long-distance services. *INS*, 385 F. Supp. 2d at 866 n.24; *see generally LCO*,
11 FCC Rcd. at 16013-18, ¶¶ 1034-1045.

## II.    CONTRACTUAL "RECIPROCAL COMPENSATION" APPLIES TO LECS' USE OF LOCAL FACILITIES TO CONNECT LOCAL CALLS

    An entirely different compensation regime, called "reciprocal compensation," exists to
provide compensation to LECs that exchange local calls. Reciprocal compensation also applies
to LECs and wireless carriers when they exchange local calls. Reciprocal compensation does not
involve IXCs.

### A.   Landline Calls Between Two LECs

In the Telecommunications Act of 1996 (the "1996 Act"), Congress sought to extend

competition to local telephone markets.  *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371

(1999).  Generally, the 1996 Act requires LECs to physically connect their networks to other

LECs operating in the same area, to enable the exchange of local phone calls.  47 U.S.C.

§§ 251(a)(1) & (c)(2); *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 677 (8th Cir. 2009); *INS (I)*,

363 F.3d at 685-86; *Embarq*, 715 F.3d at 506.  A local call is one that begins and ends within a

local calling area, established either by LECs in their state tariffs, or by state regulatory

commissions.  *CompTel*, 117 F.3d at 1072 n.3.[5]  A local call connected between two LECs is

illustrated by the following diagram:



Reciprocal compensation was mandated by the 1996 Act.  47 U.S.C. § 251(b)(5).

Reciprocal compensation applies when one LEC sends a local call to a second LEC.  *LCO*, 11

FCC Rcd. at 16013, ¶ 1034 ("two carriers collaborate to complete a local call").  To encourage

competition in local markets, rates for reciprocal compensation are much lower than access

charges IXCs pay to LECs to originate or terminate long-distance calls.  *Sw. Bell Tel., L.P. v.

Mo. Pub. Serv. Comm'n*, 461 F. Supp. 2d 1055, 1075 (E.D. Mo. 2006).  In fact, LECs often do

not even send payments to each other for reciprocal compensation; when the volume of calls

they exchange is roughly balanced in both directions, each LEC retains all payments from its

---

[5]     The nomenclature has changed over time; the FCC now refers to local calls as "non-
access" calls.  *TO*, 26 FCC Rcd. at 18030-31, ¶ 976.

-8-

own local customers (an arrangement called "bill and keep"). 47 C.F.R. § 51.713; *INS*, 385 F. Supp. 2d at 862 & n.21.

Reciprocal compensation arrangements are effectuated by contracts called interconnection agreements ("ICAs"). LECs negotiate ICAs with other LECs. 47 U.S.C. §§ 251(b)(5) & 252; *Embarq*, 715 F.3d at 506 (an ICA is the "product of the process" of local carriers negotiating or arbitrating a "schedule of itemized charges for interconnection"); *Global NAPS Cal., Inc. v. Pub. Utils. Comm'n of Cal.*, 624 F.3d 1225, 1228 (9th Cir. 2010) (the Act "requires LECs to negotiate interconnection agreements that 'establish reciprocal compensation arrangements'"); *TO*, 26 FCC Rcd. at 17945, ¶ 825 (§ 251(b)(5) reciprocal compensation terms "are agreed to pursuant to an interconnection agreement").

Thus, the compensation regime between two LECs is very different from the regime between an IXC and a LEC. Unlike access charges, reciprocal compensation may be provided *only* through ICAs, not tariffs. *See, e.g., Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 3-4 (D.C. Cir. 2000) (discussing how reciprocal compensation is different from access charges); *In the Matter of Developing a Unified Intercarrier Comp. Regime*, Declaratory Ruling and Report and Order, 20 FCC Rcd. 4855, 4860, ¶ 9 (Wireline Comp. Bur. 2005) ("*T-Mobile Order*") (barring LECs from imposing reciprocal compensation arrangements through tariffs).

In addition, it is not typical industry practice for LECs to use FGD facilities to exchange local calls—instead, they maintain other, different connecting facilities under terms provided for in ICAs for exchanging local calls, referred to as "local trunks." *Embarq*, 715 F.3d at 507; *Sw. Bell Tel.*, 2005 WL 2033416, at *1 ("The LECs maintain separate facilities for local calls, which are compensated at a lower rate. Local calls are routed through separate facilities that lack the capacity to detect and measure long-distance calls.").

The reciprocal compensation regime set out in ICAs does not apply to IXCs' use of LECs' access services. The FCC specifically rejected IXCs' requests that they be allowed to avoid access charges, and instead use the lower reciprocal compensation rates when IXCs terminate customers' calls to LECs' networks. *LCO*, 11 FCC Rcd. at 15598-99, ¶ 191.

### B.   Cell Phone Calls Between A Wireless Carrier And A LEC

The foregoing discussion of reciprocal compensation relates to "landline" local calls— local calls exchanged between two LECs. The FCC treats compensation between LECs and wireless carriers essentially the same way when they exchange wireless local calls.

The FCC defined the geographic areas within which a wireless call is considered to be "local" for reciprocal compensation purposes: large economic regions called Major Trading Areas ("MTAs"). 47 C.F.R. §§ 51.701 & 51.703; *INS*, 385 F. Supp. 2d at 857. An MTA is much larger than a typical LEC's local calling area; a single MTA might cover an entire state or more. A wireless call that both originates and terminates within a single MTA (at the start of the call) is deemed to be a "local" wireless call—known as an "intraMTA" call. *Id.* at 857 & n.10.

An intraMTA call can have two possible call paths: (1) a cell phone customer can call a LEC's landline end-user customer (cell phone-to-landline), or (2) in the reverse direction, a landline calls a cell phone.[6] The two possible call flows are illustrated by the following diagram:

---

[6]      A LEC generally does not know if a call exchanged with a wireless carrier is intraMTA. When a LEC's end user dials a call to a cell phone user, a LEC has no way of ascertaining *where* that cell phone is located at the time of the call. Similarly, when the LEC terminates a wireless call, it may know the number of the cell phone that dialed the call, but the LEC generally does not know where that cell phone is located at the time of the call. But the wireless carrier knows whether any wireless call is intraMTA—it can record the approximate location of the cell phone (based on the location of the closest cell phone tower), and it can determine from an industry-wide database the location of the landline phone. *LCO*, 11 FCC Rcd. at 16017-18, ¶ 1044.



To enable the physical exchange of intraMTA calls, wireless carriers have the legal right to obtain direct or indirect connections to LECs. 47 U.S.C. § 251(a). No law, however, requires wireless carriers to use indirect connections to IXCs to exchange intraMTA calls with LECs.

Under the 1996 Act, a wireless carrier has the right to demand reciprocal compensation from a LEC with which it exchanges local calls, and for certain LECs, the right to seek state-commission arbitration of the terms of such compensation. 47 U.S.C. §§ 251(b)(5), (c)(1) & 252. Just as with landline local calls, a wireless carrier's right to receive reciprocal compensation from a LEC for wireless local calls must be provided by the terms of an ICA with that LEC. *See T-Mobile Order*, 20 FCC Rcd. at 4863-64, ¶¶ 14-15; 47 C.F.R. § 20.11(b).

### PLAINTIFFS' ALLEGATIONS

Each Complaint alleges essentially the same facts and causes of action, varying only with respect to the identification of the parties and the states in which they provide services. Representative is Sprint's Amended Complaint in *Sprint Commc'ns Co. v. Butler-Bremer Mut. Tel. Co.*, No. 3:14-cv-3028-MWB (N.D. Iowa June 23, 2014), ECF No. 5 ("Sprint N.D. Iowa Compl.") and Verizon's Corrected First Amended Complaint in *MCI Commc'ns Servs., Inc. v. Austin's Bestline, Inc.*, No. 3:14-cv-03210-D (N.D. Tex. Mar. 27, 2015), ECF No. 93 ("Verizon Tex. Compl."). For purposes of this Motion only, Defendants assume the truth of reasonable factual allegations in the Complaints.

## I.     PLAINTIFFS ADMIT THAT THEY RECEIVED DEFENDANTS' ACCESS SERVICES AND PAID DEFENDANTS' ACCESS CHARGES

Plaintiffs allege that they are IXCs that provide telecommunications services involving the transport of some purportedly intraMTA calls between wireless carriers and Defendants.[7] Plaintiffs admit that they used Defendants' FGD facilities to exchange these purported intraMTA calls with Defendants, and that they paid Defendants' access charges under tariffs.  Sprint N.D. Iowa Compl. ¶¶ 27-29, 37-38; Verizon Tex. Compl. ¶¶ 1, 5, 48, 56.

The Complaints do not specify whether Defendants originated or terminated the purported intraMTA calls.  The Court should therefore consider both potential call paths.

***LEC-Originated Calls.***  A Defendant could originate an alleged intraMTA call if it was made by Defendant's local phone service customer who was also a "presubscribed" (or "1+") customer of Plaintiff's long-distance services.  If the customer dials a "1" followed by a ten-digit cell phone number, the Defendant has no choice in how to route the call.  Under equal access obligations, the Defendant ***must*** route that call to the presubscribed Plaintiff instead of directly to the wireless carrier.  Such a call would be "intraMTA" if the dialing landline and the receiving cell phone were located in the same MTA.  Such an intraMTA call would take this path:[8]



---

[7]     Both Plaintiffs have affiliates that are wireless carriers—Sprint Spectrum and Verizon Wireless.  These affiliates are not currently parties to this litigation.  Thus, the "wireless carriers" in this discussion are, for purposes of this Motion, third parties.

[8]     As explained in footnote 2 *supra*, the call flow is slightly more complicated for "jointly provided" access services that involve a small LEC and a larger LEC teaming together, but the analysis remains the same.

***LEC-Terminated Calls.***  A Defendant could terminate an alleged intraMTA call if it was dialed from a cell phone, routed through an IXC, and made to Defendant's end-user customer.  If an IXC delivers such a call to a Defendant's network, a Defendant must terminate it to the called end user.  Such a call would be intraMTA if, again, both the cell phone and the landline phone are in the same MTA when the call is placed.  For such a call, the wireless carrier that originated the call—for whatever reason—made a decision to route the call through one of the two Plaintiff IXCs.[9]  In such instances, that call path would be as follows:



***Plaintiffs Used And Paid For Access Services.***  Plaintiffs admit that when they exchanged these purported intraMTA calls with Defendants, they used the LECs' FGD facilities to do so.  *E.g.*, Sprint N.D. Iowa Compl. ¶ 29; Verizon Tex. Compl. ¶ 48.

Plaintiffs also admit that they paid access charges to the LECs for using the LECs' access services to exchange intraMTA calls.  Sprint N.D. Iowa Compl. ¶¶ 1, 8; Verizon Tex. Compl. ¶ 5 ("Verizon seeks to recover access charges on wireless intraMTA calls it has paid in the past").  The Complaints do not indicate when Plaintiffs started paying these access charges.  Plaintiffs further allege that the FCC prohibited Defendants from billing Plaintiffs for access charges on

---

[9]        Sprint recently advised the FCC that wireless carriers choose this routing option because it is "more efficient" and "most cost-effective"—which means that Sprint thinks it is cheaper for wireless carriers to rely on IXCs' use of LECs' FGD facilities, than it is for wireless carriers to pay for direct connections to the LECs.  *In the Matter of Petition for Declaratory Ruling Regarding Applicability of the IntraMTA Rule to LEC-IXC Traffic*, WC Docket No. 14-228, Comments of Sprint Corp. & Level 3 Commc'ns, LLC, at 14 (filed Feb. 9, 2015), *available at* http://apps.fcc.gov/ecfs/document/view?id=60001028026 ("Sprint FCC Comments").  Of course, these types of connections certainly would become cheaper if the IXC now asserts that it owes no access payment to the LEC for the use of those FGD facilities.

intraMTA calls as long ago as 1996 (when the FCC issued the *LCO*).  Sprint N.D. Iowa Compl.
¶ 30; Verizon Tex. Compl. ¶ 46.

Plaintiffs do not dispute that the LECs billed charges to them that were set forth in
Defendants' filed access tariffs.  Sprint wrote to the Judicial Panel for Multidistrict Litigation
that "Sprint . . . does not dispute that CenturyLink is applying the access charges from its
intrastate and interstate tariffs."  Resp. of Sprint Commc'ns Co. in Opp. to CenturyLink's Mot. to
Transfer at 2, *In re IntraMTA Switched Access Charges Litig.*, MDL No. 2587 (J.P.M.L. Oct. 16,
2014), ECF No. 212;[10] *accord* Verizon Tex. Compl. ¶¶ 5, 52, 53.  The Complaints do not allege
that any Defendant's charges were different from the charges set forth in its tariffs.

Plaintiffs nowhere allege that they were tricked, coerced, threatened, or forced into using
these access services or paying the applicable charges.  Similarly, in most of their Complaints,
Plaintiffs do not allege that they ever sought to challenge the imposition of the access charges by
invoking the "dispute" provisions that are contained in virtually every tariff.

Each Plaintiff also alleges that the other Plaintiff (or its affiliate) imposes these access
charges too.  Besides providing long-distance services nationally as an IXC, Sprint also provides
local phone services as a LEC in some locations.  Verizon has sued Sprint (in its capacity as a
LEC) for allegedly imposing access charges on Verizon for intraMTA calls exchanged through
Sprint's access services.  *See* Corrected First Am. Compl. ¶ 39, *MCI Commc'ns Servs., Inc. v.
ACN Commc'ns Servs., Inc.*, No. 3:14-cv-04561-D (N.D. Tex. Mar. 27, 2015), ECF No. 70.
Similarly, Verizon has about fifteen commonly-owned LEC affiliates that provide local phone
services in many parts of the country.  Sprint (in its capacity as an IXC) has sued these Verizon

---

[10]    Sprint told the FCC the same thing.  "There is no dispute here about the 'terms' of
[LECs'] tariffs.  Rather, the question is whether the charges set forth in those tariffs *apply* to the
intraMTA traffic at issue here."  Sprint FCC Comments at 24 (emphasis in original).

LEC affiliates for collecting access charges for intraMTA calls exchanged through the Verizon

LECs' access services.[11]  Thus, the Court need not look beyond the Complaints before it to

determine that, if Plaintiffs' newfound legal theory were correct, Sprint (as a LEC) and Verizon

LEC affiliates too are continuing to assess "illegal" charges.

## II.   PLAINTIFFS ARE SEEKING REFUNDS YEARS AFTER USING DEFENDANTS' ACCESS SERVICES

Having availed themselves of Defendants' access services to exchange purported

intraMTA calls, and having paid the tariffed charges for these services for years, Plaintiffs now

demand refunds based on a legal theory they assert existed since 1996.  They also want a

declaration that they do not have to pay for these access services going forward.

Plaintiffs contend that the FCC's *LCO* and *TO*, issued respectively in 1996 and 2011,

each make it "illegal" for Defendants to collect access charges for intraMTA calls.  Sprint N.D.

Iowa Compl. ¶¶ 1, 8, 33, 35; Verizon Tex. Compl. ¶¶ 46-50, 58-59, 62-63, 132.  Plaintiffs do not

explain why, if each order clearly prohibits such charges, they paid the allegedly "illegal" access

charges for purported intraMTA calls since 1996, without objection.  *See* Sprint N.D. Iowa

Compl. ¶¶ 1, 7; Verizon Tex. Compl. ¶¶ 5, 52-53.  Nor do they explain why, as described above,

Sprint (as a LEC) and Verizon (through its LEC affiliates) continue to assess and collect these

purportedly "illegal" charges from other IXCs, including each other.

Based on their characterization of the FCC's orders, Plaintiffs assert both federal and

state-law causes of action:

---

[11]   *Sprint Commc'ns Co. L.P. ("Sprint") v. Verizon New Eng. Inc.*, No. 3:15-cv-01069-D (N.D. Tex.); *Sprint v. Verizon Fla. LLC*, No. 3:15-cv-01070-D (N.D. Tex.); *Sprint v. Pac. Bell Tel. Co.*, No. 3:15-cv-01071-D (N.D. Tex.); *Sprint v. Verizon Md. LLC*, No. 3:15-cv-01102-D (N.D. Tex.); *Sprint v. KLM Tel. Co.*, No. 3:14-cv-04577-D (N.D. Tex.); *Sprint v. Sw. Bell Tel. Co.*, No. 3:15-cv-00114-D (N.D. Tex.).

First, Plaintiffs raise counts under *federal* law to recover access charges they paid for purported *interstate* intraMTA calls under Defendants' federal tariffs. Plaintiffs do not allege that any language in the tariffs prohibits the charges. Instead, Plaintiffs allege that Defendants' collection of access charges under their federal tariffs constitutes an "unjust and unreasonable practice" in violation of 47 U.S.C. § 201(b) of the Communications Act, and the tariffs (to the extent they authorize collection of these access charges) are *ultra vires* in violation of 47 U.S.C. § 203 of the Act. *E.g.*, Sprint N.D. Iowa Compl. ¶¶ 41-55; Verizon Tex. Compl. ¶¶ 55-69.

Second, Plaintiffs raise counts under *state* law concerning access charges they paid on purported *intrastate* intraMTA calls (under Defendants' state-filed tariffs). Plaintiffs allege that Defendants "breached" their state tariffs by collecting access charges for alleged intrastate, intraMTA calls. *E.g.*, Sprint N.D. Iowa Compl. ¶¶ 56-115; Verizon Tex. Compl. ¶¶ 70-130. Plaintiffs do not cite any state statutes or regulations that allegedly bar the charges, nor do they cite which specific provisions of the state tariffs Defendants allegedly breached. Rather, Plaintiffs' claims regarding state tariffs rely entirely on Plaintiffs' interpretation of federal law.

Plaintiffs also seek a declaration that they should not be required to pay access charges on any alleged intraMTA calls in the future, even if routed over FGD facilities, and that this Court should approve their methodologies for identifying and measuring the amount of such traffic. *E.g.*, Sprint N.D. Iowa Compl. ¶¶ 116-118; Verizon Tex. Compl. ¶¶ 133-135.

## PROCEDURAL DEVELOPMENTS

Defendants respectfully note two procedural developments relevant to this Motion.

Some Defendants filed Rule 12(b)(6) motions in their individual actions before consolidation, alleging many of the same grounds for dismissal as Defendants raise here. Only one court had issued a ruling on any of those motions before consolidation. The U.S. District Court for the Northern District of Iowa ("Iowa Court") concluded that the FCC's *LCO* and *TO*,

-16-

and federal precedent, did *not* support Sprint's position, but declined to reach Defendants'

arguments that Sprint's claims therefore warranted dismissal. Instead, the Iowa Court granted

the motion in part and referred the dispute to the FCC under the doctrine of primary jurisdiction.

*Sprint Commc'ns Co. v. Butler-Bremer Mut. Tel. Co.*, No. C 14-3028-MWB, 2014 WL 4980539

(N.D. Iowa Oct. 6, 2014) ("*Iowa Order*"). That Order remains the law of that action.[12]

After the Court issued the *Iowa Order*, numerous LECs and other providers of voice

services filed a petition with the FCC for declaratory relief. *Petition for Declaratory Ruling to

Clarify the Applicability of the IntraMTA Rule to LEC-IXC Traffic*, WC Docket No. 14-228

(filed Nov. 10, 2014) ("Petition for Declaratory Relief"). The Petition for Declaratory Relief

requests that the FCC confirm that Plaintiffs owe tariffed access charges, and not reciprocal

compensation, when they use access services to originate or terminate calls, even if the calls are

within the same MTA. The FCC received public comment on the Petition for Declaratory

Relief, with initial comments filed on February 9, 2015, and reply comments filed on March 11,

2015. LECs, associations of LECs, Plaintiffs, and a wireless carrier trade association filed

numerous comments and reply comments. The FCC now has the matter under review and can

issue a ruling at its discretion.

## STANDARD OF REVIEW

The Court should dismiss a complaint under Rule 12(b)(6) where it fails to state a valid

claim under applicable law, assuming all of the plaintiff's reasonable factual allegations to be

---

[12]     Recently the district court in North Dakota denied the motion to dismiss of several rural
LECs in one of Sprint's intraMTA cases. Order Denying Defs.' Mot. to Dismiss, *Sprint
Commc'ns Co. v. Dakota Cent. Telecomms. Coop., Inc.*, No. 4:14-cv-00065-DLH-CSM (D.N.D.
Mar. 30, 2015), ECF No. 40, *now docketed as* No. 3:15-cv-01177-D (N.D. Tex.) ("*Dakota
Central*"). As explained below, this opinion did not analyze the primary issues Defendants raise
here, and is therefore not useful guidance for this Court.

true. *Rosenblatt v. United Way of Greater Houston*, 607 F.3d 413, 417 (5th Cir. 2010).

Plaintiffs are not entitled to rely on "labels and conclusions" to avoid dismissal. *Id.* at 417-18.

## ARGUMENT

The Court should dismiss all Complaints for failure to state a claim for which relief can be granted:

(1)     The "filed tariff doctrine" requires Plaintiffs to pay the access charges set forth in Defendants' filed tariffs. (Part I.)  Plaintiffs misread FCC orders and federal precedent in wrongly claiming that the tariffs do not apply here. (Part II.)

(2)     Alternatively, even if the tariffs do not apply here, Plaintiffs' allegations that they used Defendants' services and paid for them for 18 years establish that implied contracts have been formed.  The voluntary payment doctrine bars Plaintiffs' demand for refunds under these implied contracts. (Part III.)[13]

(3)     Plaintiffs fail to state valid claims under state law—they nowhere allege Defendants violated any state statute or regulation, or that Defendants failed to abide by the terms of their state-filed tariffs. (Part IV.)  Even if Plaintiffs stated valid claims under state law, the federal two-year statute of limitations applies to those claims. (Part V.)

(4)     Finally, while Defendants believe the meaning of the relevant FCC orders is clear and require dismissal, if the Court disagrees, then it should refer to the FCC those regulatory issues requiring FCC guidance, as well as Plaintiffs' claims regarding "unjust and unreasonable practices," while continuing to address other issues (*e.g.*, statute of limitations) within the Court's province. (Part VI.)

---

[13]     Not all Defendants join in the arguments in Part III.

## I.    THE "FILED TARIFF DOCTRINE" BARS PLAINTIFFS' CLAIMS THAT WOULD VARY THE CHARGES UNDER DEFENDANTS' FILED TARIFFS

Plaintiffs' claims fail because (1) based on the facts pled, the filed tariff doctrine requires Plaintiffs to pay access charges as set forth in Defendants' tariffs, and (2) the filed tariff doctrine bars any claim or theory that would have the effect of causing Plaintiffs to pay less than the full tariffed amounts.

For services that are subject to tariffs, Section 203 of the Communications Act (and similar state laws) bars Defendants from charging a rate that deviates from their tariffs.[14] Consistent with this law, courts have developed the "filed tariff doctrine" (sometimes called the "filed rate doctrine"). The filed tariff doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Hill v BellSouth Telecomms., Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004) (internal quotation marks and citation omitted). "'[T]he rate of the carrier duly filed is the only lawful charge [and] [d]eviation from it is not permitted upon any pretext.'" *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990) (quoting *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915)). The rule is inflexible, reflecting Congress's intent that all those who utilize tariffed services (such as a LEC's access services) receive identical terms of service and pay identical charges:

> Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. . . . This rule is undeniably strict

---

[14]    The FCC has authorized competitive LECs to negotiate different rates with IXCs, as such a policy "continues [the FCC's] move to market-based solutions by encouraging CLECs to negotiate rates outside of the tariff safe harbor where they see fit." *In the Matter of Access Charge Reform; Reform of Access Charges Imposed by Competitive Local Exch. Carriers*, Seventh Report & Order and Further Notice of Proposed Rule Making, 16 FCC Rcd. 9923, 9925, ¶ 5 (2001). However, Plaintiffs here do not assert that any Defendants should have charged a negotiated rate different from the tariffed rate.

> and it obviously may work hardship in some cases, but it embodies
> the policy which has been adopted by Congress in the regulation of
> interstate commerce in order to prevent unjust discrimination.

*AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222-23 (1998) (quoting *Louisville & Nashville R.R.*, 237 U.S. at 97).[15]

The doctrine also applies to claims for relief in lawsuits, and bars courts from awarding any relief that would cause a deviation from tariffed charges. "[C]ourts may not award relief (whether in the form of damages or restitution) that would have the effect of imposing any rate other than that reflected in the filed tariff." *Dreamscape Design*, 414 F.3d at 668-69 (calling for "rigorous enforcement of filed tariffs"); *see also Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002) ("[N]o one may bring a judicial proceeding to enforce any rate other than the rate established by the filed tariff."); *Hill*, 364 F.3d at 1316 ("'[T]he [filed tariff] doctrine is applied strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities . . . .'" (quoting *Marcus*, 138 F.3d at 59)); *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000) ("[T]he filed rate doctrine bars all claims—state and federal—that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed.") (alteration in original) (citation omitted). The Fifth Circuit fully applies this doctrine: "The filed rate doctrine bars judicial recourse against a regulated entity based upon allegations that the

---

[15]    State law recognizes the doctrine as well. *See generally Firstcom*, 555 F.3d at 679-80 (filed rate doctrine also applies to tariffs filed with state agencies); *Pfeil v. Sprint Nextel Corp.*, 284 F. App'x 640, 642 (11th Cir. 2008) (barring claims conflicting with state tariffs); *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 20 (2d Cir. 1994) ("[C]ourts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies."); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) (affirming district court's holding that filed rate doctrine applies to state tariffs); *Miranda v. Mich.*, 141 F. Supp. 2d 747, 758 (E.D. Mich. 2001) ("The filed rate doctrine has been applied equally strong to regulation by state agencies.").

entity's 'filed rate' is too high, unfair or unlawful." *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 507 (5th Cir. 2005).[16]

Certainly there are instances where the filed tariff doctrine cannot be used to insulate LECs from improper conduct, but none are alleged or relevant here:

- Where a LEC engages in unreasonable "discrimination" such as charging similarly-situated customers different rates for essentially the same services, *e.g.*, *Qwest Commc'ns Co. v. MCIMetro Access Transmission Servs., LLC*, Docket No. 08F-259T, Order Nos. C11-1216, 2011 WL 6010026 (Colo. P.U.C. Oct. 17, 2011) & C12-0276, 2012 WL 1571712 (Colo. P.U.C. Feb. 15, 2012), *aff'd sub nom. Bullseye Telecom, Inc. v. Colo. P.U.C.*, Colo. 2d Judicial Dist., No. 2012CV7226 (Denver Cnty. Nov. 5, 2013) (filed tariff doctrine did not prevent reparations claim under Colo. law by IXC against CLECs, where CLECs had been unjustly discriminating against that IXC by collecting tariff rates from that IXC while collecting lower, off-tariff rates from another IXC pursuant to a contract);

- Where a service required to be tariffed is not set forth in the LEC's tariff, *e.g.*, *Qwest Commc'ns Co. v. Aventure Commc'ns Tech., LLC*, ---F. Supp. 3d---, 2015 WL 711154, at *9, *55 (S.D. Iowa Feb. 17, 2015) (filed rate doctrine did not apply where traffic at issue did not involve a "customer" of the carrier as defined in carrier's tariff); or

- Where a tariff filing fails to conform with regulatory procedures, where the tariff has been suspended or where it has not been approved by the regulatory agency, *e.g.*, *Ariz. Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 284 U.S. 370, 384 (1932) (if tariff still requires approval from the agency, its rates are subject to court challenge); *Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 669 (D.C. Cir. 2006) (applying rules to FCC tariffs).

While Plaintiffs do allege that another limitation on the doctrine applies here—a statute or FCC rule supersedes a tariff[17]—the Court should reject that assertion because Plaintiffs misread the *LCO* and *TO*, and misconstrue precedent supporting Defendants' collection of access charges.

---

[16]   This Court has applied the filed tariff doctrine several times in the past. *E.g.*, *Connect Insured Tel.*, 2012 WL 2995063, at *10-11 (Fitzwater, C.J.) (federal filed tariff doctrine preempts state-law claims that attempt to vary tariff); *Staton Holdings, Inc. v. MCI WorldCom Commc'ns, Inc.*, No. 3:99-CV-2876-D, 2001 WL 1041796, at *2-3 (N.D. Tex. Sept. 4, 2011) (Fitzwater, J.) (filed tariff doctrine barred any contract or tort claim that is derivative of the services governed by and provided under a tariff); *AT&T Corp. v. Swain*, No. 3:97-CV-2766-D, 1998 WL 907031, at *2 (N.D. Tex. Dec. 16, 1998) (Fitzwater, J.) (filed tariff doctrine barred any contract theory inconsistent with terms of tariff).

## II. THE FCC DID NOT EXEMPT PLAINTIFFS FROM DEFENDANTS' TARIFFS

Plaintiffs seek to avoid the impact of Defendants' tariffs by contending that the *LCO* and *TO* exempt Plaintiffs' intraMTA calls with Defendants from the scope of Defendants' tariffs. While Plaintiffs claim that these FCC orders are "clear" and favor them, the FCC has never exempted IXCs from paying those access charges. Accordingly, Defendants' tariffs have the force of law, are not "*ultra vires*," and require Plaintiffs to pay the tariffed access charges.

In the Iowa case, Plaintiffs made the same claim they make here—that the *LCO* and *TO* prohibit LECs from imposing access charges on IXCs for exchanging alleged intraMTA calls over FGD facilities. The Iowa Court squarely rejected Plaintiffs' argument:

> First, contrary to Sprint's repeated representations, neither the FCC's 1996 *Local Competition Order* nor its 2011 *Connect America Fund Order* expressly applies to compensation between a LEC and an IXC for intraMTA calls. As the LECs point out, the 1996 *Local Competition Order* . . . did *not* apply its conclusion that service arrangements involving intraMTA traffic between CMRS providers and LECs are subject to reciprocal compensation, not access charges, to service arrangements involving such traffic between LECs and IXCs. . . . Second, the federal appellate decisions on which Sprint relies also *do not* involve interpretation or policy analysis of FCC regulations regarding payment arrangements between LECs and IXCs.

*Iowa Order*, 2014 WL 4980539, at *4 (emphasis in original). Thus, the Iowa Court concluded that Plaintiffs' legal argument and authorities were readily distinguishable. Plaintiffs' arguments here are identical in substance to those presented in Iowa, and are distinguishable for the same reasons.

The *Iowa Order* recognized an obvious inconsistency in Plaintiffs' argument. If the law were "clear" (as Plaintiffs told this Court at the Initial Scheduling Conference), Plaintiffs must

---

[17]   *E.g.*, *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1084-85 (9th Cir. 2006) (LECs' tariffs for payphone lines were potentially suspended for "limited" period based on FCC's "waiver" order).

explain why both companies paid access charges without objection for nearly two decades, and

only recently contended that the charges are "illegal." The Iowa Court noted this illogic:

> Sprint did not seek application of the FCC ruling, as it now
> interprets it, to the current parties, for more than 18 years, which
> suggests that the interpretation of the FCC's ruling that Sprint
> presses is not as obvious as Sprint contends.

*Id.* at *5. Like Plaintiffs, Defendants believe that the FCC's orders are "clear"—they leave no

doubt that Plaintiffs properly paid, and continue to owe, access charges for the calls routed

through Defendants' access services.

### A.   The FCC's Orders Did Not Preclude LECs From Imposing Access Charges On IXCs For Use Of LECs' Access Services To Route "IntraMTA" Calls

Plaintiffs' claims rest entirely on the contention that, in the 1996 *LCO* and the 2011 *TO*,

the FCC prohibited LECs from imposing on IXCs access charges for intraMTA calls, because

such calls are deemed "local." Sprint N.D. Iowa Compl. ¶¶ 33, 35; Verizon Tex. Compl. ¶¶ 47,

50. Plaintiffs fail to acknowledge that those orders prohibited imposing access charges on

*wireless* carriers, but did nothing to change LECs' existing billing practices on *IXCs*. Because

Plaintiffs are not wireless carriers, the FCC orders are inapplicable.

First, the 1996 *LCO* only addresses billing between a LEC and wireless carrier. *LCO*, 11

FCC Rcd. at 16016, ¶ 1041 ("[R]eciprocal compensation obligations . . . apply to all local traffic

transmitted between LECs and [wireless] providers.") and *id.* at 16018, ¶ 1045 ("[Wireless]

providers . . . will receive reciprocal compensation"). The *LCO* did not address billing

arrangements with *IXCs*, and it surely did not exempt *IXCs* from paying tariffed access charges

for allegedly carrying intraMTA calls over FGD facilities that they ordered and used. To the

contrary, the *LCO* recognized that all calls subject to access charges would continue to be subject

to access charges:

-23-

> Under our existing practice, most traffic between LECs and
> [wireless] providers is not subject to interstate access charges
> ***unless it is carried by an IXC*** .... Based on our authority under
> section 251(g) to preserve the current interstate access charge
> regime, we conclude that the new transport and termination rules
> should be applied to LECs and [wireless] providers so that
> [wireless] providers continue not to pay interstate access charges
> for traffic that currently is not subject to such charges, ***and are
> assessed such charges for traffic that is currently subject to
> interstate access charges***.

*Id.* at 16016-17, ¶ 1043 (emphasis added).

Thus, in the *LCO*, the FCC maintained the existing practice at the time—IXCs remained

"currently subject to" paying LECs' access charges for wireless calls routed through an IXC to

or from a LEC—regardless of geographic location.  The LCO provides no support for the

contention that the FCC ***changed*** the *status quo* with respect to IXCs' compensation to LECs.

Second, in the 2011 *TO*, the FCC stated that a LEC may not avoid paying reciprocal

compensation to *a wireless carrier* for intraMTA calls, even if the intraMTA calls are routed

through an IXC.  But the FCC said ***nothing*** about the compensation an IXC owes to a LEC for

such calls.  *TO*, 26 FCC Rcd. at 18043, ¶ 1007 n.2132 (LECs have "extended reciprocal

compensation arrangements with [wireless] providers to intraMTA calls without regard to

whether a call is routed through interexchange carriers.").  In *W. Radio Servs. Co. v. Qwest

Corp.*, 678 F.3d 970 (9th Cir. 2012), the Ninth Circuit expressly recognized that the *TO* was

limited to compensation between wireless providers and LECs:

> Further, we note that the FCC has issued a new report and order,
> effective December 29, 2011, that cites this case law approvingly
> and clarifies that ***in the LEC-[wireless provider] context***, this is
> indeed how the reciprocal compensation rules are to operate.

*Id.* at 989 (emphasis added).  However, the FCC did not state in the *TO* that a LEC may not

impose access charges on ***the IXC*** for those calls.

A third FCC order (that Plaintiffs do not cite) also expressly recognizes the obligation of

IXCs to pay access charges when exchanging intraMTA calls with LECs using the LECs' access

services. In *TSR Wireless, LLC v. US West Commc'ns, Inc.*, Mem. Op. & Order, 15 FCC Rcd.

11166 (2000), *pet. for recon. dismissed*, 16 FCC Rcd. 11462, *aff'd sub. nom.*, *Qwest v. FCC*, 252

F.3d 462 (D.C. Cir. 2001), the FCC stated that while "a LEC may not charge [wireless] providers

for facilities used to deliver LEC-originated traffic that originates and terminates within the same

MTA, as this constitutes local traffic under our rules[,]" such traffic is still subject to "our access

charge rules *if carried by an interexchange carrier*." *Id.* at 11184, ¶ 31 (emphasis added).

The FCC's regulations mirror the plain language of these orders. Regulations governing

compensation that IXCs owe for use of access services are set forth in regulations that pre-date

the 1996 Act and the *LCO*, and also pre-date (and are separate from) regulations governing

reciprocal compensation arrangements between LECs, or between LECs and wireless carriers.

Those separate regulations require IXCs to pay access charges for using LECs' local phone lines.

47 C.F.R. § 69.5(b). In contrast, the regulations the FCC issued in the *LCO* addressing LEC-to-

LEC and LEC-to-wireless carrier compensation expressly state that wireless carriers do not pay

access charges when they terminate intraMTA calls to a LEC. 47 C.F.R. § 51.701(b)(2). The

FCC's regulations contain no such express statement with respect to IXCs.

Thus the FCC's orders and regulations directly rebut Plaintiffs' claim that LECs may not

impose access charges on IXCs who use Defendants' tariffed access services to exchange

intraMTA calls. Plaintiffs are not the beneficiaries of the FCC's decisions in the *LCO* and *TO*.

### B.    Plaintiffs Misread Federal Precedent

Federal court precedent addressing this issue overwhelmingly supports Defendants'

position. Plaintiffs rely on cases from other circuits and superficially apply isolated passages

from those cases in an effort to support their new-found theory. But the cases on which Plaintiffs

-25-

rely actually support Defendants. These cases recognize that IXCs pay access charges to LECs
when they use LECs' tariffed access services to exchange intraMTA calls. The Iowa Court
similarly recognized that no federal cases support Plaintiffs' flawed interpretation of the FCC's
Orders. *Iowa Order*, 2014 WL 4980539, at *4.

### 1. The INS Case Defeats Plaintiffs' Claims Because IXCs Are Not Exempt From The Access Charge Regime

Plaintiffs rely heavily, but mistakenly, on the Eighth Circuit's ruling in *Iowa Network
Servs., Inc. v. Qwest Corp.*, 466 F.3d 1091 (8th Cir. 2006) ("*INS (II)*"). Significantly, the Court
that issued the *Iowa Order* was bound by *INS (II),* but concluded that it did not support
Plaintiffs' position because it arose in an entirely different context. *Iowa Order*, 2014 WL
4980539, at *4. Indeed, as described below, the *INS* cases recognize that an IXC pays access
charges for LEC-originated "1+" intraMTA calls.

**_The Dispute Did Not Involve an IXC._** That the *INS* dispute did not involve an IXC was
a critical fact in the case. *INS*, 385 F. Supp. 2d at 871-76. The litigation involved intraMTA
calls that wireless carriers originated, and then were dialed to end-user customers of several rural
Iowa LECs. INS was a company the rural Iowa LECs established to aggregate the calls destined
for them. The wireless carriers did not have direct connections to these rural LECs, but instead
had a direct connection to Qwest, the largest LEC in Iowa. Qwest contracted with the wireless
carriers to carry these calls approximately six city blocks, from a Qwest facility to INS's facility.
After Qwest delivered the wireless carriers' calls to INS, INS in turn forwarded the calls to the
rural LECs for termination. *Id.* at 854-58. The calls thus followed this complicated path:



Before the litigation, Qwest had erroneously paid INS access charges for routing the calls to the rural LECs. *Id.* at 858. Qwest sought refunds, arguing that it was not liable for access charges when it delivered intraMTA calls to INS because it was not acting as an IXC.

The parties first litigated the issues before the Iowa Utilities Board ("IUB"), which agreed that Qwest was not liable for access charges on a going-forward basis. However, the IUB declined to order refunds for access charges that Qwest had paid previously without objection. The IUB directed all the parties—the wireless carriers, the LECs and INS, and Qwest—to negotiate an interconnection agreement to determine appropriate future compensation. *In re Exch. of Transit Traffic*, Docket No. SPU-00-7, Proposed Decision & Order, 2001 WL 36521831, at *1, *7, *16, *20 (Iowa U.B. Nov. 26, 2001) ("*IUB Proposed Order*"), aff'd, 2002 WL 535299 (Iowa U.B. Mar. 18, 2002) ("*IUB Final Order*").

Unhappy with the IUB's ruling, INS sued Qwest to collect the going-forward access charges. Relying heavily on the IUB's findings, the district court ruled that Qwest did not owe access charges. Critical to this determination was the IUB's finding that Qwest was not an IXC. *INS*, 385 F. Supp. 2d at 863, 871-876, 893.

The Eighth Circuit agreed, holding that the FCC's orders "do not directly address the intermediary carrier compensation to be paid" between Qwest and INS in this unique situation. *INS (II)*, 466 F.3d at 1095-96. Given that holding, the Eighth Circuit concluded that the IUB's previous order to negotiate an ICA was "not contrary" to the FCC's compensation rules between wireless carriers and LECs. *Id.* Consequently, the Eighth Circuit upheld the determinations of the district court and IUB that "reciprocal compensation agreements control and that the parties should negotiate or arbitrate—not unilaterally file tariffs." *Id.* at 1096.

-27-

***INS (II) Is Contrary To Plaintiffs' Claims.*** In relying on *INS (II)*, Plaintiffs ignore fundamental differences between their claims and the issues determined in *INS (II)*. Once the differences are considered, *INS (II)* actually ***supports*** Defendants' position here.

First, Plaintiffs fail to acknowledge the critical distinction that in *INS*, Qwest ***was not acting as an IXC***. *INS*, 385 F. Supp. 2d at 871-876, 893. The district court explained that IXCs are subject to access charges when LECs originate "1+" intraMTA calls to IXCs. *Id.* at 871 ("The regulatory classification of Qwest is, however, pertinent as there exists within the reciprocal compensation rules an exception for IXCs."); *accord id.* at 893. Thus, *INS* supports Defendants' position here, not Plaintiffs'.

Second, *INS (II)* does not purport to interpret federal law as it applies to LECs' provision of services to, and compensation arrangements with, IXCs in the case of intraMTA calls. The Eighth Circuit found that the IUB's Order was "not contrary" to federal law, but held that federal law did not address the compensation between two non-IXC carriers in the middle of the calls, situated between the originating and terminating carriers. *INS (II)*, 466 F.3d at 1096-97; *see also INS*, 385 F. Supp. 2d at 889 ("the issues now presented are unresolved in the law"). Furthermore, the Eighth Circuit repeatedly emphasized that it was deferring to the previous decision of the IUB, which had ordered Qwest and INS to negotiate an ICA. *INS (II)*, 466 F.3d at 1094-98.

Third, Plaintiffs ignore that the IUB ***expressly rejected*** the relief Plaintiffs seek here—refunds for previously-paid access charges. *IUB Final Order*, 2002 WL 535299, at *7. Instead, the IUB and federal courts ordered a forward-looking obligation on Qwest and INS—neither one acting as an IXC—to negotiate ICAs to address intraMTA calls in the future. *INS (II)*, 466 F.3d at 1096. None of these factors applies here.

-28-

For these reasons, the Iowa Court did not find *INS (II)* supportive of Plaintiffs' claims, and this Court should reach the same conclusion.[18]

### 2.    *Plaintiffs' Other Authorities Also Support Defendants' Position*

None of the other cases involving intraMTA calls on which Plaintiffs rely involved an IXC's obligation to pay access charges. Instead, *all* of those cases involved the contractual relationship between LECs and wireless carriers as determined in state commission arbitrations and set out in ICAs approved by state commissions. In fact, those authorities expressly recognize that *IXCs pay access charges to LECs* when they use the LECs' access services to exchange alleged intraMTA calls.

In prior briefs and before the FCC, Plaintiffs consistently have cited a handful of federal decisions that addressed intercarrier compensation for intraMTA calls:

- *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970 (9th Cir. 2012);

- *Alma Commc'ns Co. v. Mo. Pub. Serv. Comm'n*, 490 F.3d 619 (8th Cir. 2007); and

- *Atlas Tel. Co. v. Okla. Corp. Comm'n*, 400 F.3d 1256 (10th Cir. 2005).

None of these cases supports Plaintiffs' arguments because each involved the payments between *wireless carriers and LECs* for intraMTA calls—not *IXCs' payments to LECs* for use of the LECs' tariffed services. In addition:

- Each concerned review of state commission decisions in ICA arbitrations;

- None said that IXCs did not have to pay LECs' access charges; and

- None involved a claim for refunds of previously-paid access charges—all involved forward-looking arrangements.

---

[18]    Plaintiffs also rely on the Eighth Circuit's parallel opinion in *Rural Iowa Indep. Tel. Ass'n v. Iowa Utils. Bd.*, 476 F.3d 572, 576 (8th Cir. 2007), filed by the rural LECs and involving the same IUB proceeding and issues. But there too, the court was not examining a LEC's charges to an IXC and did not extend its analysis to the LEC-IXC billing relationship.

*W. Radio*, 678 F.3d at 973; *Alma*, 490 F.3d at 620; *Atlas*, 400 F.3d at 1260; *3 Rivers*, 2003 WL

24249671, at *17-18.  These cases lend no support to Plaintiffs' claims that a LEC may not bill

tariffed access charges to an IXC when the IXC uses the LEC's access services to exchange

intraMTA calls. *Iowa Order*, 2014 WL 4980539, at *4 (concluding that *Alma* and *Atlas* lend no

support to Sprint's claims).

   To the contrary, many of these cases actually *confirm* that IXCs have an obligation to

pay tariffed access charges when IXCs use the LECs' tariffed access services to exchange

intraMTA calls using tariffed access services.

   For example, in *Alma*, both the wireless carriers and LECs agreed that IXCs carrying

intraMTA calls paid access charges to the LECs.[19]  The dispute concerned the compensation

owed between wireless carriers and the LECs.  The Court *approved* of the IXCs' payments of the

LECs' "fees" (that is, access charges):

> When the cell-phone to land-line traffic goes through an
> interexchange carrier, T-Mobile pays the interexchange carrier
> both for the interexchange carrier's services and for ***the fee the
> terminating local exchange carrier charges to deliver the call***.

490 F.3d at 622 (emphasis added).

---

[19]    Pls.' Suggestions in Supp. of Mot. for Summ. J., *Alma Commc'ns Co. v. Mo. Pub. Serv.
Comm'n*, No. 05-4358-CV-C-NKL, 2006 WL 6406867, at *15 (W.D. Mo. Feb. 6, 2006) ("For
landline-to-mobile calls the IXC pays Plaintiffs originating access compensation . . . .  For
mobile-to-landline calls, the IXC is responsible to pay Plaintiffs terminating access
compensation."); T-Mobile Consol. Resp. to Pls.' Cross-Mot. for Summ. J., *Alma Commc'ns Co.
v. Mo. Pub. Serv. Comm'n*, No. 05-4358-CV-C-NKL, 2006 WL 6406869, at *2 n.3 (W.D. Mo.
Mar. 9, 2006) ("If . . . T-Mobile . . . delivers its intraMTA calls to an . . . IXC . . . T-Mobile will
compensate Plaintiffs indirectly through the fees it pays the 'IXC,' which then pays the
terminating RLEC."); Br. of Appellants, *Alma Commc'ns Co. v. Mo. Pub. Serv. Comm'n*, No.
06-2401, 2006 WL 2180081, at *20 (8th Cir. July 19, 2006) ("The IXC is the access customer of
Appellants, and pays Appellants tariffed originating access compensation for use of Plaintiffs'
exchange access facilities.").

*Atlas* also recognized that IXCs pay access charges when they use LECs' access services to exchange intraMTA calls with those LECs. As in *Alma,* both the wireless carriers and LECs in the *Atlas* proceeding agreed that IXCs properly paid access charges when using LECs' access services to exchange intraMTA calls with those LECs.[20] The dispute was limited to whether the LECs were required to pay the wireless carriers reciprocal compensation for intraMTA calls that might have been routed through an IXC. The appellate court took no issue with the IXCs' payment of access charges to the LECs. 400 F.3d at 1266-67. Sprint (through its corporate parent) was one of the parties in *Atlas* and did not object to IXCs paying the LECs' access charges.

Plaintiffs also have relied on *3 Rivers Tel. Coop., Inc. v. US West Commc'ns, Inc.,* No. CV 99-80-GF-CSO, 2003 WL 24249671 (D. Mont. Aug. 22, 2003). That case also is not relevant to Plaintiffs' claims. The *3 Rivers* opinion recognized, without any criticism, that the IXC (in that case, Qwest) paid access charges to exchange intraMTA calls with a LEC via tariffed access services. The dispute in the case arose when Qwest "ceased to act" as an IXC. *Id.* at *3.

Each of these cases supports Defendants' position here and negates Plaintiffs' claims.[21]

---

[20]   Joint Br. of Appellees Cingular Wireless, AT&T Wireless Servs., Inc. & Sprint Spectrum, L.P. d/b/a Sprint PCS ("Joint Br. of Appellees"), *Atlas Tel. Co. v. Okla. Corp. Comm'n,* Nos. 04-6096, 04-6101 ("*Atlas Appeal*"), 2004 WL 2445478, at *9 (10th Cir. Sept. 3, 2004); Pl.-Appellants Br. in Chief, *Atlas Appeal,* 2004 WL 2085048, at *41-42 (10th Cir. Aug. 6, 2004) (landline to wireless calls carried by an IXC remain subject to access charges).

[21]   Plaintiffs likely will rely on *Dakota Central, see supra* note 12, a recent case in which the court denied the defendants' Rule 12 motion. The Court should not rely on that opinion because it did not analyze the issues Defendants raise here. In that case, defendants accepted (for the purpose of their motion) that their tariffs did not apply to the services they provided for the intraMTA calls. Consequently, the court did not analyze Plaintiffs' argument that the FCC's *LCO* and *TO* negated an access tariff requiring compensation for such calls. Nor did that court discuss—or even cite—critical decisions such as *INS, Alma,* and *Atlas.* Thus, the result in *Dakota Central* is not helpful to this Court.

### 3.     *The Fifth Circuit Acknowledges That IXCs Pay Access Charges For Using LECs' Access Services To Exchange IntraMTA Calls*

The Fifth Circuit also has addressed intraMTA calls. It upheld a decision by the Public Utility Commission of Texas ("PUCT") that recognized that IXCs pay access charges when LECs originate "1+" intraMTA calls made by the IXC's customer.[22] *Fitch v. Pub. Util. Comm'n of Tex.*, 261 F. App'x 788, 794 (5th Cir. 2008).

This Texas litigation arose from an arbitration before the PUCT between a wireless provider (Affordable) and an incumbent LEC (AT&T Texas). One contested issue concerned intraMTA calls dialed as "1+" calls to mobile pager numbers serviced by Affordable. Because they were "1+" calls, AT&T Texas, the LEC, routed the calls to the presubscribed, third-party IXC. The IXC then transported the call to Affordable. These calls follow precisely the same flow as the alleged LEC-originated calls at issue in this litigation.

The PUCT recognized (as Defendants recognize here) that, if the LEC had sent the calls directly to the wireless provider (Affordable), it clearly would owe reciprocal compensation. *F. Cary Fitch d/b/a Fitch Affordable Telecom Petition for Arb. Against SBC Tex.*, PUC Docket No. 29415, Order Approving Arb. Award with Modif., at 3 (P.U.C. of Tex. Dec. 19, 2005). The parties disputed whether, on the "1+" dialed calls, the LEC owed reciprocal compensation to Affordable, due to "the introduction of the third-party IXC that switches and transports calls between the [AT&T Texas] and [Affordable]'s network facilities." *Id.* Affordable contended that AT&T Texas owed reciprocal compensation to Affordable. *Id.*

---

[22]     In a multidistrict proceeding, Fifth Circuit authority applies to all questions of federal law, even for actions that originated outside this Circuit. *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1138 (5th Cir. 1992) ("When a case is transferred from a district in another circuit, the precedent of the circuit court encompassing the transferee district court applies to the case on matters of federal law.").

When deciding that the LEC did not owe reciprocal compensation to Affordable for these intraMTA calls routed through an IXC, the PUCT recognized that the ***IXCs paid access charges to AT&T Texas*** for the calls:

> In order to complete 1+ calls between carriers, IXCs are subject to originating and terminating access charges (exchange access), instead of the FCC's reciprocal compensation regime.

*Id.* at 3-4. The PUCT cited the FCC's *TSR Wireless* order for this proposition. *Id.* at 4 n.12 (citing *TSR Wireless*, 15 FCC Rcd. at 11184, ¶ 31).

On appeal, the Fifth Circuit rejected Affordable's claim that the PUCT's conclusion on reciprocal compensation was "at odds with" the decisions in *INS* and *Atlas*. *Fitch*, 261 F. App'x at 794. Instead, as Defendants argue here, the Fifth Circuit found *INS* and *Atlas* were "inapplicable to this case." *Id.* Consequently, this Circuit has recognized that (1) the access charge regime applies to "1+" dialed IXC calls to wireless customers, and (2) that *INS* and *Atlas* did not address "1+" calls. *Id.*

### C.   Plaintiffs' Theory Is Contrary To Well-Settled Law

Plaintiffs' claims are based on two fundamental errors and the following illogic: Plaintiffs posit that, because an intraMTA call is treated as a "local" call for purposes of compensation between a wireless carrier and a LEC, then (1) access charges necessarily cannot apply to that call, and (2) different types of compensation cannot apply to the same call at different points along its route; that is, if a call between a wireless carrier and a LEC is subject to reciprocal compensation, then the same call cannot also be subject to access charges between an IXC and LEC. Both assertions are incorrect.

### 1. *IXCs Must Pay Access Charges For Using LECs' Access Services, Even When The Traffic They Exchange With The LECs Are IntraMTA Calls*

Plaintiffs' claims assume that an IXC does not owe access charges for a "local" wireless call exchanged with a LEC through the LEC's access services. That is not so. That a call is deemed "local" does not exempt an IXC from paying access charges for exchanging the same call with a LEC over access services.

The FCC defines "access service" as use of a LEC's facilities to exchange *any* kind of calls—not merely "long-distance" calls. *See* 47 C.F.R. § 69.2(b) ("Access service includes services and facilities provided for the origination or termination of any interstate or foreign telecommunication."); 47 C.F.R. § 69.5(b) (Access charges "shall be computed and assessed upon all interexchange carriers that use local exchange switching facilities for the provision of interstate or foreign telecommunications services."). FCC regulations do not exempt intraMTA calls from the definition of access services, nor do they limit the definition of these services to a particular type of call.

*In the Matter of Nw. Bell Tel. Co. Petition for Declaratory Ruling*, Mem. Op. & Order, 2 FCC Rcd. 5986 (1987), *vacated as moot*, 7 FCC Rcd. 5644 (1992), illustrates that IXCs owe access charges regardless of whether the calls exchanged over FGD facilities are local or long-distance. In that case, the FCC rejected a claim that certain "information" service traffic (which was not considered a long-distance toll call) was exempt from access charges when exchanged through a LEC's access services. The FCC explained that, because the traffic was exchanged with LECs over FGD facilities, access charges nevertheless applied to the use of those facilities:

> Dial Info argues that it should be exempt from access charges for the interstate services, such as 800 service, it uses in offering its enhanced services. . . . End users that purchase interstate services from interexchange carriers do not thereby create an access charge exemption for those carriers. Thus, to the extent that Dial Info is suggesting that some kind of access charge credit for 800 or 976

> service should be available, Dial Info has misinterpreted our rules;
> it cannot be credited for an exemption from access charges on that
> traffic.

*Id.* at 5988, ¶ 21.  This explanation applies here.  That a wireless carrier (not subject to access

charges) is on the other end of the call does not exempt the IXC from paying access charges to

the originating LEC on the same call.[23]

### 2. The Same Call Can Be Subject To Both Access Charges And Reciprocal Compensation As Between Different Carriers

Equally erroneous is Plaintiffs' assertion that different compensation regimes cannot

apply to different carriers on the same call.  In fact, different segments of a single call can be

subject to reciprocal compensation for some carriers (a wireless carrier and a LEC) *and* to access

charges for other carriers (an IXC and a LEC).

Numerous decisions demonstrate that different compensation regimes can apply to

different carriers on the same call.  For instance, the compensation rules upheld in *Alma* resulted

in the same intraMTA calls being subject to reciprocal compensation as between the wireless

carrier and LEC, but also subject to access charges as between the LEC to the IXC.  490 F.3d at

622.  In *TSR Wireless*, the FCC explained that intraMTA calls fall under the reciprocal

compensation regime if carried by a LEC, but "under our access charge regime if carried by an

interexchange carrier."  15 FCC Rcd. at 11184, ¶ 31.  *Atlas* recognized that the same call could

be treated as local between the LEC and wireless carriers, while also being treated as a "toll" call

---

[23]     Plaintiffs' allegation that they are "intermediate carriers," *e.g.*, Sprint N.D. Iowa Compl.
¶ 28; Verizon Tex. Compl. ¶¶ 48-50, does not exempt them from paying Defendants' tariffed
access charges.  The phrase "intermediate carrier" only means that Plaintiffs were in the middle
of the call path.  *E.g.*, *TO*, 26 FCC Rcd. at 17897, ¶ 720 (definition of "intermediate provider" is
"any entity that carriers or processes traffic that traverses or will traverse [interconnected phone
networks] at any point insofar as that entity neither originates nor terminates that traffic").  The
FCC provides no other significance to the term that is relevant here.  If Plaintiffs qualified as
some other type of carrier that (theoretically) is exempt from access charges, surely they would
have alleged that fact.

by the carrier serving the end-user customer.  400 F.3d at 1267 ("[T]he [FCC] unequivocally

stated that the LEC was required to deliver relevant calls free of charge to the [wireless]

provider, but was not precluded from charging its own customers for toll calls.").

Dispositive of this point, Sprint's corporate parent contended in the *Atlas* litigation that

"the access charge and reciprocal compensation schemes are not mutually exclusive" on the

same call.  Joint Brief of Appellees, *Atlas Appeal*, 2004 WL 2445478, at *25-26 (10th Cir. Sept.

3, 2004).  Yet Sprint now asserts exactly the opposite.

Plaintiffs lack any authority or precedent to support any of their claims, which are

contrary to well-settled law.

## III.   IF DEFENDANTS' TARIFFS DO NOT APPLY, THEN STATE CONTRACT LAW BARS PLAINTIFFS' CLAIMS

Even if this Court were to accept Plaintiffs' contention—that the exchange of intraMTA

calls through LECs' FGD facilities is not subject to Defendants' filed tariffs—Plaintiffs' claims

should be dismissed for another reason.  The particular facts Plaintiffs allege establish that

Plaintiffs and Defendants entered into enforceable implied-in-fact contracts where for 18 years

Plaintiffs received Defendants' services at prices equal to the rates set forth in Defendants' filed

tariffs.  Similarly, the "voluntary payment doctrine" bars Plaintiffs' demand for refunds of the

payments they made.[24]

### A.   Plaintiffs' Allegations Admit To Implied-In-Fact Contracts

State laws create implied-in-fact contracts where a party regularly receives services and

pays for them, even if the terms are never discussed or written.  *E.g., Preston Farm & Ranch

Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295, 298 (Tex. 1981).  The validity and

---

[24]   Some Defendants, including the AT&T LECs and CenturyLink's affiliates, do not join this Section III.  In accordance with Case Management and Scheduling Order No. 2, these Defendants will file notices of non-joinder by May 15.

enforceability of a contract is not affected by how the contract is expressed, whether in writing or by actions or by some combination. *E.g.*, *Capital Warehouse Co. v. McGill-Warner-Farnham Co.*, 149 N.W.2d 31, 35-36 (Minn. 1967). The applicable standards are summarized in Restatement, Contracts:

> Words are not the only medium of expression. ***Conduct may often convey as clearly as words*** a promise or an assent to a proposed promise, and where no particular requirement of form is made by the law a condition of the validity or enforceability of a contract, ***there is no distinction in the effect*** of a promise whether it is expressed, (1) in writing, (2) orally, ***(3) in acts, or (4) partly in one of these ways and partly in others***.

Restatement (First) of Contracts: Acts as Manifestation of Assent § 21 (1932) (emphasis added). The authority supporting application of implied-in-fact contracts for each state where Plaintiffs have asserted a claim is set forth in the Appendix in support at 1-8.

The Complaints establish the existence of implied-in-fact contracts between Plaintiffs and Defendants. Plaintiffs *admit* that: (1) they received Defendants' access services for years, by exchanging intraMTA calls over Defendants' FGD facilities; (2) they ordered access services from Defendants; and (3) they paid monthly, without dispute, for these services at prices equal to Defendants' access charges. *See, e.g.*, Sprint N.D. Iowa Compl. ¶¶ 3, 7, 8, 29, 37-40; Verizon Tex. Compl. ¶¶ 3, 5, 46, 48, 52-53. The Complaints also fail to allege facts sufficient to defeat the formation of an implied contract, such as that Plaintiffs did not understand the true nature of the calls for which the access charges are being imposed, or that Defendants engaged in any fraud or misconduct. Thus, Plaintiffs' factual allegations meet all the necessary components of an implied-in-fact contract and are the same in each of Plaintiffs' Complaints.

The FCC has previously held the door open to carriers entering compensation arrangements not based on tariffs or ICAs. The FCC specifically recognized that, in the absence

of an applicable tariff, a LEC "*may* be entitled to some compensation for providing a non-tariffed service, depending on the totality of the circumstances." *All Am. Tel. Co. v. AT&T Corp.*, Memo. Op. & Order, 26 FCC Rcd. 723, 731, ¶ 19 (2011) (citing authorities that carrier might be entitled to compensation if it provided services not governed by a tariff). Similarly, with respect to reciprocal compensation, the FCC gives carriers the flexibility of "accepting alternative compensation arrangements" different from the FCC's default rules. *T-Mobile Order*, 20 FCC Rcd. at 4862, ¶ 12. If Plaintiffs are correct that the LECs' access tariffs do not apply, there is no logical reason that the same implied-in-fact contract concepts cannot apply to the services that Plaintiffs have used.

As an example, in the *INS* matter, the IUB rejected claims for refunds because it found that Qwest's years of paying access charges established an implied-in-fact contract. *IUB Final Order*, 2002 WL 535299, at 16-18 (applying Iowa law). If the Court finds that Defendants' tariffs do not apply to the exchange of intraMTA calls, the Court should alternatively reach the same conclusion as the IUB and hold that implied contracts formed as a result of Plaintiffs' and Defendants' conduct.

**B.**     **The Voluntary Payment Doctrine Bars Plaintiffs' Demand For Refunds**

Furthermore, as a result of Plaintiffs making their payments on a monthly basis for 18 years without protest, the "voluntary payment doctrine" bars Plaintiffs from now demanding refunds.

**1.**     ***Plaintiffs' Admissions And Allegations Are Sufficient To Invoke The Doctrine Even On A Rule 12 Motion***

Under the voluntary payment doctrine, a commercial entity that voluntarily makes payments for goods or services—without fraud, duress, or some kind of legally-recognizable mistake—cannot later ask for its money back. *See, e.g., BMG Mktg., Inc. v. Peake*, 178 S.W.3d

763, 768-73 (Tex. 2005) (analyzing the voluntary payment doctrine under Texas law); *Best Buy Stores, L.P. v. Benderson-Wainberg Assocs.*, 668 F.3d 1019, 1031 (8th Cir. 2012) ("The voluntary payment doctrine is a long-standing doctrine of law, which clearly provides that one who makes a payment voluntarily cannot recover it on the ground that he was under no legal obligation to make the payment.") (citation omitted); *Johnson v. Sprint Solutions, Inc.*, No. 3:08-CV-00054, 2008 WL 2949253, at *1-3 (W.D.N.C. July 29, 2008), *aff'd on other grounds*, 357 F. App'x 561 (4th Cir. 2009) (dismissing claim by Sprint customer on behalf of class alleging misrepresentation of charges because plaintiff voluntarily paid the charges and had "the opportunity to review Sprint's information in order to fully comprehend the roaming charges she was contracting to pay[,]" applying North Carolina law).

The authority supporting the voluntary payment doctrine for each state where Plaintiffs have asserted a claim is set forth in the Appendix in support at 9-16. This authority establishes that the voluntary payment doctrine bars Plaintiffs' refund claims in each state, although there are some variations in the elements doctrine among some of the states.

The Court can apply the doctrine on a Rule 12 motion where, as here, the facts are undisputed:

> Dismissal "on the basis of an affirmative defense requires that (i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude."

*Ruiz-Sánchez v. Goodyear Tire & Rubber Co.*, 717 F.3d 249, 252 (1st Cir. 2013) (internal citations omitted). Here, Plaintiffs allege that they voluntarily paid for Defendants' services for years without complaint. Under similar circumstances, courts frequently grant dismissal. *See, e.g., Arnold v. AT&T, Inc.*, No. 4:10-CV-2429-SNLJ, 2012 WL 1441417, at *8-10 (E.D. Mo. Apr. 26, 2012) (granting a motion to dismiss claims by landline telephone customers regarding

allegedly unauthorized service charges that were voluntarily paid, applying Missouri law);

*Johnson*, 2008 WL 2949253, at \*1-3 ("While the use of the voluntary payment doctrine may be

regarded as an affirmative defense, a motion under Rule 12(b)(6) should be granted if an

affirmative defense or other bar to relief is apparent from the face of the complaint.").

### 2. *If The Services Are Not Governed By Tariffs, The Filed Tariff Doctrine Would Not Be Applicable*

Plaintiffs are likely to respond that Defendants cannot retain payments if their tariffs do

not authorize collection of those payments.[25]

But Plaintiffs cannot have it both ways. If Plaintiffs persuade the Court that the tariffs do

not apply to the exchange of intraMTA calls through FGD facilities, then those same, irrelevant

tariffs would neither authorize ***nor prohibit*** any charges for that exchange. In other words, if

Defendants' services are not subject to the access charge regime, then those services are just like

many other business lines of various Defendants that are provided through commercial contracts

under state law. The content of the tariffs would have no relevance to those services, and

Plaintiffs could not hide behind inapplicable tariffs (by invoking the filed tariff doctrine) to

defeat the application of state law. Both the FCC and federal courts agree that the filed rate

doctrine depends on the applicability of the tariffs.

---

[25]     Plaintiffs are likely to rely on the *Dakota Central* opinion, which held that the filed tariff
doctrine trumped the voluntary payment doctrine with respect to Sprint's intraMTA claims.
Defendants respectfully submit that the opinion is not persuasive on this point. The North
Dakota court concluded that the filed tariff doctrine superseded the voluntary payment doctrine,
but the court did not seem to consider that both Sprint and Defendants ***agreed*** that the tariffs did
not apply to the exchange of intraMTA calls. Despite this agreement, the court held that it could
not decide if the tariffs applied (or whether an implied contract formed) without reading the
tariffs first. *Dakota Central*, slip op. at 9. If this Court concludes the tariffs do not apply, then
the *Dakota Central* opinion is unhelpful in determining if the voluntary payment doctrine
applies.

***FCC Precedent.***  Several times, the FCC has recognized that if a service is not subject to a tariff regime, then state law and not the filed tariff doctrine apply to the terms of that service. For instance, in *In the Matter of Policy & Rules Concerning the Interstate, Interexchange Marketplace*, Second Report & Order, 11 FCC Rcd. 20730 (1996), the FCC eliminated tariff filing requirements for certain IXCs.  A significant reason for doing so was to eliminate application of the filed tariff doctrine, which often was used as a defense by carriers against consumers.  The FCC recognized that if the services were removed from the tariff regime, the filed tariff doctrine would not apply: "Complete detariffing would also further the public interest by eliminating the ability of carriers to invoke the 'filed-rate' doctrine." *Id.* at 20762, ¶ 55.

Similarly, in *In the Matter of Wireless Consumers Alliance, Inc.*, Mem. Op. & Order, 15 FCC Rcd. 17021, 17029, ¶ 15, 17030-31, ¶ 18 (2000), the FCC issued a declaratory ruling that damages may be awarded against wireless providers in part because tariffs and filed rates do not apply to wireless services: "In reaching this decision, we find that the filed rate doctrine is inapposite because there are no filed rates or tariffs for [wireless] services." *Id.* at 17026, ¶ 9. The FCC confirmed that the filed tariff doctrine does not apply to services that are not based on tariffs:

> The intrastate services of [wireless] providers . . . are also no longer subject to any comparable tariffing requirements or other rate regulation imposed by state agencies.  We therefore find that, since there are no filed rates for [wireless] services, the filed rate doctrine does not preclude a state court's ability to award monetary relief against wireless telephone companies.  We have similarly held that our subsequent forbearance action . . . not to require or allow nondominant interexchange carriers to file tariffs for their interstate wireline services also eliminated the ability of carriers to invoke the filed rate doctrine for those services.

*Id.* at 17031, ¶ 18.  The FCC rejected the argument of the wireless providers to preserve the filed rate doctrine: "In addition, the argument of [wireless] providers ignores the fact that the filed rate

cases arose under a totally different regulatory regime, one in which carriers file tariffs with a regulatory agency that are subject to scrutiny by the agency and the public, and under which carriers are bound to charge only the filed rate for the services they provide." *Id.* at 17032, ¶ 20.

The same logic applies with equal force in this case. There is a fundamental, irreconcilable inconsistency between (1) Plaintiffs' primary theory that Defendants' tariffs cannot be lawfully applied to the services Defendants have provided to Plaintiffs, and (2) Plaintiffs' contention that the filed tariff doctrine—enforcing a tariff—bars a state-law defense.

***Federal Precedent.*** The Courts have also recognized that the filed tariff doctrine does not bar state-law doctrines if the services are not required to be governed by tariffs. *E.g.*, *Cent. Office Tel.*, 524 U.S. at 230 (Rehnquist, C.J., conc.) ("The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the ***services covered by the tariff***.") (emphasis added); *cf. Manhattan Telecom. Corp. v. Global Naps, Inc.*, No. 08 Civ. 3829 (JSR), 2010 WL 1326095, at * 3 (S.D.N.Y. Mar. 31, 2010) (rejecting defendant's inherently conflicting claim "that it is not subject to [plaintiff's] filed tariff rates, while arguing that the statutory rate system precludes the unjust enrichment claims").

If Plaintiffs' theory is correct, the exchange of intraMTA calls between Plaintiffs and Defendants would simply not be subject to the statutory and regulatory regime of access services and filed tariffs. The particular language of the tariffs would be irrelevant. Defendants provide many other services to other carriers, commercial customers or the public that are not governed by tariffs either—but that does not mean those Defendants have to provide those services for free, merely because their tariffs impose no charges for those other services (because, by definition, the tariffs do not apply to them). Defendants anticipate that Plaintiffs will rely on

-42-

irrelevant cases where a party argued that the voluntary payment doctrine should apply to tariffed services. The Court should disregard those cases, because the premise of the application of the voluntary payment doctrine is that the tariffs do not apply.[26]

Therefore, if Plaintiffs use of Defendants' FGD facilities to exchange intraMTA calls is not subject to Defendants' access tariffs, then state law bars Plaintiffs' attempts to claw back payments after Plaintiffs voluntarily made them.

## IV.   PLAINTIFFS HAVE NOT ALLEGED A VIOLATION OF STATE LAW

Plaintiffs allege only state-laws causes of action for intrastate access charges governed by Defendants' state-filed tariffs. However, because Plaintiffs do not point to any state laws that Defendants could have violated, the Court should dismiss all state-law claims.

Plaintiffs' allegations make clear that Defendants have *complied* with state law. As described in Part I above, state law requires Defendants to abide by their tariffs and collect all charges set forth in their tariffs. Plaintiffs admit that the access charges they paid were described in Defendants' tariffs. They do not allege that the services they ordered and received were not as described in any tariffs. *See supra* p. 14 & n.10 (Sprint admits charges were described in tariffs). They also do not plead that Defendants failed to perform fully pursuant to their tariffs.

Plaintiffs do not (and cannot) cite any *state* law—independent of federal law—that prohibits Defendants from collecting access charges for Plaintiffs' use of access services to exchange intrastate, intraMTA calls. Instead, Plaintiffs rely solely on FCC rules and orders. *E.g., INS (I)*, 363 F.3d at 693 (state commission's decision about intraMTA calls "indisputably [was] interpreting federal law").

---

[26]   *E.g., PAETEC Commc'ns, Inc. v. MCI Commc'ns Servs., Inc.*, 712 F. Supp. 2d 405, 417-18 (E.D. Pa. 2010) (voluntary payment doctrine could not be invoked for *tariffed* services).

Plaintiffs' alleged state-law claim—for "breach" of the state-filed tariffs—does not detail how (if at all) Defendants breached any obligations to Plaintiffs described in Defendants' tariffs. Plaintiffs readily acknowledge that the access charges are described in tariffs, *e.g.*, Sprint N.D. Iowa Compl. ¶¶ 4, 37-38; Verizon Tex. Compl. ¶¶ 52-53, and nowhere allege that any Defendant acted contrary to their tariffs' plain language. Indeed, Plaintiffs' claims are based on allegations that Defendants imposed these charges, but that federal law exempts intraMTA calls from the charges under state tariffs. That is not a claim for breach of the state tariffs, but rather, a claim for violation of a putatively preemptive federal law. *Cf. Cnty. Motors, Inc. v. Gen. Motors Corp.*, No. 00-108T, 2001 WL 34136693, at *4 (D.R.I. Jan. 29, 2001) (where defendant performed a contract by its terms, but those terms allegedly were inconsistent with a governing statute, the proper cause of action was for violation of the statute and not breach of contract).

On the other hand, assuming that Plaintiffs were correct that the *LCO* and *TO* prohibit LECs from collecting access charges from IXCs when exchanging intraMTA calls, then federal law would preempt all state laws on the issue. *Cf. 3 Rivers*, 2003 WL 24249671, at *12-14 (in dispute between two LECs about compensation for intraMTA calls, state-law claims for breach of state-filed tariffs were preempted by FCC orders on intraMTA compensation); *Petition for Declaratory Ruling*, Comments of Verizon, WC Docket No. 14-228, at 14-15 (filed Feb. 9, 2015), *available at* http://apps.fcc.gov/ecfs/document/view?id=60001008765 (based on its contentions regarding the intercarrier compensation treatment of intraMTA calls handled by an IXC, FCC rules preempt state laws as to compensation for services used to exchange intraMTA calls).

In sum, Plaintiffs have not stated a claim upon which relief can be granted and cannot possibly prevail on any state-law theory.

V.     THE FEDERAL, TWO-YEAR STATUTE OF
       LIMITATIONS APPLIES TO ANY STATE-LAW CLAIMS

Even if Plaintiffs have properly stated state-law claims for which relief could be granted,

any potential damages would be sharply limited by the Communication Act's two-year

limitations period.[27]

The two-year limitations period is significant because Plaintiffs are seeking refunds of

intrastate access charges going back for many years, subject only to state statutes of limitation

for breach of contract, some of which are as long as 10 years.  For many Defendants, the vast

majority of Plaintiffs' claims accrued outside of the federal two-year limitations period.

A.     Section 415(b) Applies To Any State-Law Claim That Alleges
       Violation Of Duties Or Rights Provided By Federal Communications Law

The Communication Act's relevant statute of limitations, § 415(b), states in part:

> All complaints against carriers for the recovery of damages not
> based on overcharges shall be filed with the [FCC] within two
> years from the time the cause of action accrues, and not after . . . .

47 U.S.C. § 415(b).  While the statute speaks of filings at the FCC, courts uniformly interpret it

to apply to federal court lawsuits as well.  *Pavlak v. Church*, 727 F.2d 1425, 1426 (9th Cir.

1984); *Swarthout v. Mich. Bell Tel. Co.*, 504 F.2d 748, 749 (6th Cir. 1974); *Hoffman v. Rashid*,

No. Civ. A. 07-3159, 2009 WL 5084098, at *2 (E.D. Pa. Dec. 28, 2009), *aff'd*, 388 F. App'x 121

(3d Cir. 2010).

Section 415(b)'s reference to "all complaints" includes state-law causes of action filed

against carriers.  *Firstcom, Inc. v. Qwest Commc'ns*, 618 F. Supp. 2d 1001, 1005 (D. Minn.

---

[27]     It is well-settled under federal law that a cause of action regarding an access charge
accrues at the time the LEC first renders a bill for that charge. *MCI Telecomms. Corp. v.
Teleconcepts, Inc.*, 71 F.3d 1086, 1100-01 (3d Cir. 1995).  Consequently, each month's bill starts
its own two-year limitations clock under federal law. *E.g.*, *Davel Commc'ns*, 460 F.3d at 1092-
93 (claim that customer paid unreasonable tariffed rate was valid only for charges billed within
two-year statute of limitations period).

2007) ("[T]hese state claims fall within the [Act]'s broad definition of claims against

carriers . . . ."), *aff'd on other grounds*, 555 F.3d 669 (8th Cir. 2009); *MFS Int'l, Inc. v. Int'l*

*Telecom Ltd.*, 50 F. Supp. 2d 517, 520 (E.D. Va. 1999).[28]

The only state-law claims that are not subject to the two-year limitations period in

§ 415(b) are those that are ***independent of and distinguishable from rights and obligations***

***created by the Act***. *See* 47 U.S.C. § 414 ("savings clause"); *MCI Telecomms. Corp. v. Garden*

*State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir. 1992) (Section 414 only "preserves causes of action

for breaches of duties that are not created under the [Act]"); *Firstcom*, 555 F.3d at 679 (state-law

claims are not within scope of Act only if they can be resolved without reference to the Act,

"[a]ssuming that the Act did not exist"). As explained above, this case does not plausibly present

any state-law claims that are independent of the rights and obligations created by the federal

statute.

Congress's careful wording of § 415(b) reflects its intention that a uniform statute of

limitations should apply throughout the country to all obligations of federal telecommunications

laws. *Swarthout*, 504 F.2d at 749 (discussing the "national uniformity Congress intended in

enacting" § 415); *MFS Int'l*, 50 F. Supp. 2d at 520 (same); *Ward v. N. Ohio Tel. Co.*, 251 F.

Supp. 606, 611 (N.D. Ohio 1966) (surveying law). The Court should apply that uniform limit

here.

---

[28]     Section 415(g) defines "overcharges" to mean "charges for services in excess of those
applicable thereto under the schedules of charges lawfully on file with the ***Commission***"
(emphasis added). But Plaintiffs' claims about intrastate access charges relate to tariffs filed
with ***state commissions***, not the FCC, and thus the claims do not meet the definition of an
"overcharge." Furthermore, Plaintiffs have not alleged that any Defendant charged an access
rate different from that set forth in its tariff; rather, their theory is that no charge is "lawfully on
file" with respect to intraMTA calls. Therefore, their actions are not for "overcharges" within
the meaning of § 415.

**B.    Courts Dismiss Untimely State-Law Causes Of Action
That Allege Duties Under Federal Communications Laws**

Applying § 415(b), courts routinely dismiss state-law causes of action brought outside

this federal two-year statute of limitations if the state-law claim merely seeks to vindicate

obligations set out in federal communications law.  That is precisely what Plaintiffs are

attempting to do in these cases.

For instance, a Utah court dismissed a plaintiff's state-law breach of contract claim as

time barred under § 415(b), because the claims were merely asserting violation of rights and

obligations provided by federal law:

> [T]he legal and contractual duties alleged to have been breached
> are imposed by the . . . Act.  They are at the heart of AT&T's
> Complaint and their resolution depends on the application and
> interpretation of federal law.  For purposes of the present Motion,
> the Court agrees with Qwest that regardless of the labels used,
> AT&T's contract claims arise under, or are inextricably
> intertwined with, federal law.  As such they are subject to the two
> year statute of limitations set forth in 47 U.S.C. § 415.

*AT&T Commc'ns of the Mountain States, Inc. v. Qwest Corp.*, No. 2:06cv000783DS, 2007 WL

1342657, at *1 (D. Utah May 4, 2007) (internal quotation marks and citation omitted); *accord*

*AT&T Commc'ns of the Midwest v. Qwest Corp.*, No. 8:06cv625, 2007 WL 2743491, at *2 (D.

Neb. Feb. 27, 2007) ("AT&T may not avoid the two-year statute of limitations contained in

§ 415 simply by characterizing its claims as state law claims," because "[t]he claims in this case

necessarily require the Court to determine whether Qwest complied with the . . . Act."), *cited*

*with approval, Firstcom*, 555 F.3d at 674-75.

In a parallel case, a district court explained that state-law claims can survive the two-year

limitation only if they assert violations of independent state laws, without reference to federal

law.  In *AT&T Commc'ns of the Midwest, Inc. v. Qwest Corp.*, Civil No. 06-3786, 2007 WL

978091, at *2 (D. Minn. Mar. 28, 2007), some of plaintiff's claims under Minnesota statutes

-47-

imposed substantive requirements independent of federal law and thus were not governed by the limitations period in § 415(b).  That is not the case here; Plaintiffs' entire claim is based on their interpretation of the FCC's orders.  *Cf. Firstcom*, 618 F. Supp. 2d at 1005 (distinguishing *AT&T v. Qwest* because Firstcom's state-law claims were not separate or distinct from federal claim).

Other courts have applied § 415(b) to state-law claims that restated or depended on federal law.  *E.g., MFS Int'l,* 50 F. Supp. 2d at 520-21 (state-law breach of contract and conversion claims governed by § 415(b) because they merely replicated federal tariff-filing requirements); *Drive Train Specialists, L.L.C. v. Teleport Commc'ns Grp.*, No. 02-cv-72116-DT, 2003 WL 1120062, at *1-2 (E.D. Mich. Feb. 3, 2003) (applying § 415(b) to state-law breach of contract claim); *see generally Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946) ("If Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter.  The Congressional statute of limitation is definitive.").

Because Plaintiffs have not alleged any claims concerning intrastate access services that are not predicated on the meaning and effect of federal law, their causes of action are governed by § 415(b).  The Court should dismiss all claims outside of the two-year limitations period.

## VI.   IN THE ALTERNATIVE—AND ONLY IF IT FINDS THE ORDERS ARE UNCLEAR—THE COURT SHOULD "REFER" ISSUES TO THE FCC

The plain meaning of the FCC's orders (the *LCO* and the *TO*), as well as all existing precedent, point to one undisputable conclusion: Plaintiffs' claims are baseless and should be dismissed pursuant to Rule 12(b)(6).  However, if the Court disagrees, then it should refer to the FCC those regulatory issues requiring FCC guidance, while continuing to address other issues (*e.g.*, statute of limitations) within the Court's province.[29]

---

[29]     The district court has the authority to dismiss the case or stay the litigation while the parties seek a ruling on controlling questions of law from the appropriate agency.  *Reiter*, 507 U.S. at 268-69 ("Referral of the issue to the administrative agency does not deprive the court of

### A.     The Court Should Allow The FCC To Resolve Any Ambiguities In The Meaning Of Its 1996 And 2011 Orders

Under the doctrine of "primary jurisdiction," a federal court can stay or dismiss an action

to allow a federal agency to resolve a threshold issue in the litigation. *Reiter v. Cooper*, 507 U.S.

258, 268-69 (1993); *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 811 (5th Cir. 2011). The

doctrine "is concerned with promoting proper relationships between the courts and

administrative agencies charged with particular regulatory duties." *United States v. W. Pac. R.R.

Co.*, 352 U.S. 59, 63 (1956). A court should invoke the doctrine when "(a) it will promote even-

handed treatment and uniformity in a highly regulated area . . . or (b) the agency possesses

expertise in a specialized area with which the courts are relatively unfamiliar." *Elam*, 635 F.3d

at 811; *accord Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir. 1988).[30]

If the Court finds the FCC's two relevant orders to be unambiguous, then it should apply

their plain meaning. *See Iowa Order*, 2014 WL 4980539, at *4 (no need to refer case if it

"merely involved the interpretation and application of prior FCC rulings and case law"").

However, if the Court finds that the *LCO* and *TO* are ambiguous or unclear, several factors

should lead the Court to seek the FCC's guidance on certain issues.

First, determining the meaning of ambiguous FCC orders is a paradigmatic reason to

refer an issue to the FCC:

> Both this court and the Supreme Court have held that the
> interpretation of an agency order issued pursuant to the agency's

---

jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly
disadvantaged, to dismiss the case without prejudice.").

[30]     This Court has issued rulings based upon the doctrine of primary jurisdiction. *E.g., Drew
v. MCI WorldCom Mgmt. Co*, No. 3:99-CV-1355-D, 1999 WL 1087470, at *1 n.6 (N.D. Tex.
Dec. 1, 1999) (Fitzwater, J.) (suggesting claims as to whether MCI complied with its tariff might
need to be referred to FCC under doctrine of primary jurisdiction); *Borges v. Local 19 of the Int'l
Bhd. of Teamsters*, No. 3:95-CV-1951-D, 1996 WL 734951, at *3-4 (N.D. Tex. Dec. 10, 1996)
(Fitzwater, J.) (explaining doctrine).

> congressionally granted regulatory authority falls within the
> agency's primary jurisdiction where the order reflects policy
> concerns or issues requiring uniform resolution.

*Davel Commc'ns*, 460 F.3d at 1089 (referring to FCC the meaning of ambiguous language in an

FCC order, which had extended a "limited" waiver of a filing deadline and suspended the filed

tariff doctrine during that period).

 Second, the FCC has already received industry-wide comments on these issues as a result

of the pending declaratory ruling proceeding. A pending petition weighs strongly in favor of

referral because it may conflict with a court's ruling on the same question or render such a ruling

unnecessary. *See, e.g., Sandwich Isles Commc'ns, Inc. v. Nat'l Exch. Carrier Ass'n*, 799 F.

Supp. 2d 44, 55 (D.D.C. 2011) (referring to the FCC because "application to the agency has

already been made, and there would be a significant risk of inconsistent rulings if this Court were

to exercise jurisdiction over the case now").

 Third, challenges to the validity and interpretation of filed tariffs are "typically referred to

the FCC under the primary jurisdiction doctrine." *Advamtel, LLC v. Sprint Commc'ns Co.*, 105

F. Supp. 2d 476, 480 (E.D. Va. 2000); *accord Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th

Cir. 1998) (Posner, C.J.) ("[I]f an issue arose in the suit concerning the validity of a tariff the

court would have to interrupt the litigation and, pursuant to the doctrine of primary jurisdiction,

compel the parties to resort to the FCC for a determination . . . ."); *Himmelman v. MCI*

*Commc'ns Corp.*, 104 F. Supp. 2d 1, 5, 7 (D.D.C. 2000).

 Fourth, this is an industry-wide dispute that may raise policy questions the FCC is best

suited to resolve. The Court should be wary of Plaintiffs' contention that it should reverse more

than 18 years of unchallenged practice, and should rewrite tariffs governing intercarrier

compensation and the federal access charge regime on an industry-wide basis, without the FCC's

input. The FCC has decades of experience overseeing the industry, understands the nuances of

its orders and the policy positions that shaped them, and when acting consistent with its enabling statute has authority to make policy for the public and the telecommunications industry. *E.g., Iowa Order*, 2014 WL 4980539, at *5 (Referring Sprint's intraMTA claims to FCC, where the "determination is fraught with policy considerations involving the impact of certain regulatory decisions upon the telecommunications industry . . . . This may be all the more true where, as here, the FCC ruling on which Sprint relies was handed down in 1996."); *see also Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120-21 (D.C. Cir. 1992) (holding referral was appropriate where "judicial resolution of Allnet's claims here would preempt the Commission from implementing what amount to policy decisions about the Universal Service Fund programs and technical questions on the adequacy of filed tariffs").

**B.     The Court Should Also Refer Plaintiffs' Causes Of Action Under Section 201(b) Of The Communications Act**

The Court could also refer Plaintiffs' causes of action alleging that Defendants violated Communications Act § 201(b) by engaging in "unjust and unreasonable practices." *E.g.*, Sprint N.D. Iowa Complaint ¶¶ 42-46; Verizon Tex. Compl. ¶¶ 56-59.

The statutory standard of "unjust or reasonable" is purposefully vague; it affords the FCC broad discretion to regulate the industry. *See Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 204 (D.C. Cir. 1994) ("Because 'just,' 'unjust,' 'reasonable,' and 'unreasonable' are ambiguous statutory terms, this court owes substantial deference to the interpretation the Commission accords them.").

Consequently, when a plaintiff claims that a defendant acted unjustly and unreasonably, courts routinely invoke the doctrine of primary jurisdiction and refer that question to the FCC. For instance, one appellate court concluded:

> The district court was clearly correct in concluding that the claims based on section 201(b) of the Communications Act are within the

> primary jurisdiction of the FCC. Section 201(b) speaks in terms of
> reasonableness, and the very charge of Count I is that the
> defendants engaged in unreasonable practices. This is a
> determination that "Congress has placed squarely in the hands of
> the [FCC]."

*In re Long Distance Telecomms. Litig.*, 831 F.2d 627, 631 (6th Cir. 1987) (quoting *Consol. Rail Corp. v. Nat'l Ass'n of Recycling Indus., Inc.*, 449 U.S. 609, 612 (1981)); *accord Access Telecomms. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 609 (8th Cir. 1998) (question of whether defendant's "reasonable classification" under § 201(b) "clearly falls within the FCC's statutory authority to determine the reasonableness").[31]

Obviously, if the FCC's orders mean what Defendants say, there can be no serious claim that Defendants have acted unreasonably. But, even if Plaintiffs prevail on their interpretation of the FCC's orders, the FCC could still conclude that it was not an "unjust and unreasonable practice" in violation of § 201(b) for Defendants to collect access charges. No IXC, including Plaintiffs, complained about any LECs' access charges related to intraMTA calls for 18 years. Moreover, each Plaintiff alleges that the other Plaintiff continues to collect these supposedly "illegal" charges.

If the Court were to conclude that it cannot immediately dismiss Plaintiffs' Complaints, the Court should allow the FCC, in the first instance, to decide whether Plaintiffs or Defendants violated proscriptions in § 201(b). *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1158 (9th Cir. 2010) ("[G]iven the broad language of the [§ 201(b)], a more reasonable

---

[31]   Federal district court decisions are legion where claims of allegedly "unjust or unreasonable practices" by carriers are referred to regulatory agencies. *See, e.g., Advamtel, LLC v. AT&T Corp.*, 105 F. Supp. 2d 507, 511-12 (E.D. Va. 2000); *Digital Commc'ns Network, Inc. v. AT&T Wireless Serv.*, 63 F. Supp. 2d 1194, 1199-1200 (C.D. Cal. 1999); *MCI Telecomms. Corp. v. Dominican Commc'n Corp.*, 984 F. Supp. 185, 189-90 (S.D.N.Y. 1997); *Total Telecomms. Servs., Inc. v. AT&T Co.*, 919 F. Supp. 472, 480 (D.D.C. 1996), *aff'd*, 99 F.3d 448 (D.C. Cir. 1996); *AT&T Co. v. IMR Capital Corp.*, 888 F. Supp. 221, 244-45 (D. Mass. 1995); *Kaplan v. ITT-U.S. Transmission Sys., Inc.*, 589 F. Supp. 729, 731-33 (E.D.N.Y. 1984).

interpretation is that it is within the Commission's purview to determine whether a particular practice constitutes a violation for which there is a private right to compensation.").

### C.   Even If It Refers Issues To The FCC, The Court Should Dismiss Plaintiffs' State-Law Claims Or Apply A Two-Year Statute of Limitations

Even if the Court refers issues to the FCC, however, it should still resolve issues that are well within the Court's expertise and not within the FCC's discretionary authority or specialized expertise. Specifically, the Court can and should rule that Plaintiffs have no independent state-law claims (Part IV) and that the two-year statute of limitations in 47 U.S.C. § 415(b) applies to any claims that remain (Part V). These issues are within the core competency of federal courts and do not depend on agency expertise, and so are not subject to referral. *E.g.*, *Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995); *Wilbert Family Ltd. P'ship v. Dall. Area Rapid Transit*, No. 3:10-CV-2052-D, 2012 WL 246091, at *4 (N.D. Tex. Jan. 26, 2012) (Fitzwater, C.J.) (claims were within court's abilities to decide and thus did not necessitate referral to agency). For example, the Court is "as well equipped" as the FCC to determine if the applicable federal law preempts state laws in the manner claimed by Plaintiffs. *AT&T Commc'ns of the Sw., Inc. v. City of Dall.*, 8 F. Supp. 2d 582, 590 (N.D. Tex. 1998).

Similarly, the Court should not refer to the FCC the issue of whether Plaintiffs fail to allege a claim under state law, or the appropriate statute of limitations for any state-law claims. The FCC's resolution of the Petition for Declaratory Relief will not address these issues; there is no reason why the Court should postpone its decision on them, which would drastically narrow the size and scope of the claims before the Court.

### CONCLUSION

For these reasons, Defendants respectfully request that the Court dismiss Plaintiffs' claims with prejudice, or in the alternative, dismiss all state-law claims (and/or dismiss all state-

law claims that accrued more than two years prior to the filing of each action) and stay or dismiss

all other matters in this proceeding until the FCC resolves the Petition for Declaratory Relief.

Dated:  May 1, 2015                              Respectfully submitted,

                                                 */s/ Douglas P. Lobel*
                                                 Douglas P. Lobel
                                                    District of Columbia Bar No. 395508
                                                 David A. Vogel
                                                    Virginia Bar No. 48971
                                                 COOLEY LLP
                                                 One Freedom Square | Reston Town Center
                                                 11951 Freedom Dr.
                                                 Reston, Virginia  20190
                                                 (703) 456-8000  Telephone
                                                 (703) 456-8100  Facsimile
                                                 dlobel@cooley.com
                                                 dvogel@cooley.com

                                                 Michael P. Lynn, P.C.
                                                    Texas Bar No. 12738500
                                                 Christopher J. Akin
                                                    Texas Bar No. 00793237
                                                 LYNN TILLOTSON PINKER & COX, L.L.P.
                                                 2100 Ross Avenue, Suite 2700
                                                 Dallas, Texas  75201
                                                 (214) 981-3800  Telephone
                                                 (214) 981-3839  Facsimile
                                                 mlynn@lynnllp.com
                                                 cakin@lynnllp.com

                                                 *Counsel for* CenturyLink Affiliates

                                                 *Lead and Liaison Counsel for* Defendant LECs

                                                 On Behalf Of All Defendant LECs
                                                 (*Except As Otherwise Indicated*)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on counsel of record via *ECF* on May 1, 2015.

*/s/ Douglas P. Lobel*
Douglas P. Lobel

114483976